UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

                *Plaintiff,*             Case No.: 1:25-cv- 1338 (MAD/PJE)

    v.

BOARD OF ELECTIONS OF THE STATE OF
NEW YORK, KRISTEN ZEBROWSKY STAVISKY,
in her official capacity as Co-Executive Director of the
Board of Elections of the State of New York,
RAYMOND RILEY, III, in his official capacity as
Co-Executive Director of the Board of Elections of the
State of New York, PETER KOSINSKI, in his official
Capacity as Commissioner of the Board of Elections
of the State of New York, HENRY BERGER, in his
official capacity as Commissioner of the Board of
Elections of the State of New York, ANTHONY
CASALE, in his official capacity as Commissioner of the
Board of Elections of the State of New York, ESSMA
BAGNUOLA, in her official capacity as Commissioner
of the Board of Elections of the State of New York, and
the STATE OF NEW YORK,

                *Defendants.*

---

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

HARRIS BEACH MURTHA CULLINA PLLC
677 Broadway, Suite 1101
Albany, NY 12207

*Attorneys for Defendants Kristen Zebrowski
Stavisky, Henry Berger, and Essma Bagnuola*

i

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD........................................................................................................... 3

ARGUMENT ....................................................................................................................... 3

THE COMPLAINT FAILS TO STATE A COGNIZABLE CLAIM AS NO
PROVISION OF FEDERAL LAW REQUIRES A STATE TO PROVIDE ITS
COMPLETE, UNREDACTED COMPUTERIZED VOTER REGISTRATION
LIST TO DOJ OR ANY OTHER FEDERAL AGENCY. ............................................... 3

I.   DOJ HAS FAILED TO STATE A CLAIM FOR ENFORCEMENT OF
     ITS DEMAND, WHICH LACKS A VIABLE STATUTORY BASIS............................. 5

     A.  *Title III of the 1960 CRA does not support a demand for federal
         acquisition of New York's electronic statewide voter registration list.* ........................ 6

     B.  *DOJ's demand is unenforceable because it failed to articulate a proper
         basis or purpose under Title III of the 1960 CRA* ......................................................... 9

     C.  *The NVRA's "public inspection" provision does not provide a statutory basis
         for acquisition of New York's electronic, statewide voter registration list.* ............... 12

     D.  *Even if Title III or the NVRA provided statutory support for the demand,
         DOJ would not be entitled to "all fields" of the electronic statewide voter registration
         list* ................................................................................................................................ 15

     E.  *The "inspection" and "photocopying" provisions in Title III and the NVRA
         do not authorize a demand for electronic production or delivery of records* ........... 17

     F.  *HAVA contains no inspection or disclosure procedure and thus provides no statutory
         basis for DOJ's demand* .............................................................................................. 17

II.  THE DISCLOSURE OF SENSITIVE PERSONAL INFORMATION OF 13 MILLION
     NEW YORK VOTERS WOULD VIOLATE NEW YORK PRIVACY LAWS, WHICH
     ARE COMPATIBLE WITH, AND THEREFORE NOT PREEMPTED BY, FEDERAL
     LAW ...................................................................................................................... 19

III. DISMISSAL IS WARRANTED DUE TO DOJ'S FAILURE TO PLAUSIBLY ALLEGE
     COMPLIANCE WITH FEDERAL PRIVACY LAWS ................................................. 21

     A.  *DOJ's demand violates the Privacy Act* ..................................................................... 21

     B.  *DOJ's demand violates the E-Government Act* ............................................................ 24

C.  *DOJ's demand violates the Driver's Privacy Protection Act* .................................... 25

CONCLUSION ......................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp 848 (M.D. Ala. 1960), *aff'd on opn below sub nom. Dinkens v. Att'y Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961), *cert. denied sub nom. Dinkens v. Rogers*, 366 U.S. 913 (1961)....................................................................8

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013)................................................................................4, 12, 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................3

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................3

*Britt v. Naval Investigative Serv.*,
886 F.2d 544 (3d Cir. 1989)..........................................................................21

*Buckley v. Am. Const. L. Found., Inc.*,
525 U.S. 182 (1999)......................................................................................22

*Confederated Tribes & Bands of the Yakama Nation v. Yakima Cnty.*,
963 F.3d 982 (9th Cir. 2020) ........................................................................10

*Consumer Fin. Prot. Bureau v. Accrediting Council*,
854 F.3d 683 (D.C. Cir. 2017)........................................................................5

*Cotarelo v. Vill. of Sleepy Hollow Police Dep't*,
460 F.3d 247 (2d Cir. 2006)..........................................................................22

*Crooks v. Harrelson*,
282 U.S. 55 (1930)........................................................................................10

*Doe v. Off. of Pers. Mgmt.*,
No. CV 25-234 (RDM), 2025 WL 513268 (D.D.C. Feb. 17, 2025)...............24

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
266 F. Supp. 3d 297 (D.D.C. 2017), *aff'd on other grounds*, 878 F.3d 371 (D.C. Cir. 2017) ...........................................................................................24

*Elrod v. Burns*,
427 U.S. 347 (1976)......................................................................................22

*Foster v. Love*,
    522 U.S. 67 (1997)..................................................................................4, 20

*Greater Birmingham Ministries v. Sec'y of State for Alabama*,
    105 F.4th 1324 (11th Cir. 2024) ............................................................14, 17

*Greidinger v. Davis*,
    988 F.2d 1344 (4th Cir 1993) ......................................................................16

*Husted v. A. Philip Randolph Inst.*,
    584 U.S. 756 (2018)......................................................................................12

*In re Coleman*,
    208 F. Supp. 199 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313
    F.2d 867 (5th Cir. 1963), *cert. denied*, 373 U.S. 950 (1963)....................10

*In re Gordon*,
    218 F. Supp. 826 (S.D. Miss. 1963)...............................................................9

*In re McVane*,
    44 F.3d 1127 (2d Cir. 1995)............................................................................6

*In re Wallace*,
    170 F. Supp 63 (M.D. Ala. 1959) ...................................................................7

*Kennedy v. Bruce*,
    298 F.2d 860 (5th Cir. 1962) ........................................................................10

*Kennedy v. Lynd*,
    306 F.2d 222 (5th Cir. 1962) ...............................................................9, 10, 11

*Project Vote v. Kemp*,
    208 F. Supp. 3d 1320 (N.D. Ga. 2016) .........................................................21

*Project Vote/Voting for Am., Inc. v. Long*,
    682 F.3d 331 (4th Cir. 2012) ..................................................................14, 16

*Pub. Int. Legal Found., Inc. v. Bellows*,
    92 F.4th 36 (1st Cir. 2024).................................................................15, 16, 21

*Pub. Int. Legal Found., Inc. v. North Carolina State Bd. of Elections*,
    996 F.3d 257 (4th Cir. 2021) ........................................................................20

*Reno v. Condon*,
    528 U.S. 141 (2000)......................................................................................25

*Ritter v. United States*,
    177 Fed. Cl. 84 (Fed. Cl. 2025) ....................................................................21

iv

*Shelby Cnty. v. Holder,*
  570 U.S. 529 (2013) ................................................................................................12

*South Carolina v. Katzenbach,*
  383 U.S. 301 (1966) ........................................................................................7, 8, 12

*United States v. Lynd,*
  301 F.2d 818 (5th Cir. 1962), *cert. denied,* 371 U.S. 893 (1962) ......................8, 10

*United States v. Markwood,*
  48 F.3d 969 (6th Cir. 1995) .......................................................................................6

*Vezzetti v. Pellegrini,*
  22 F.3d 483 (2d Cir. 1994) ......................................................................................22

**Statutes**

Fed. R. Civ. P. 12(b)(6) ......................................................................................1, 26

New York Election Law ("N.Y. Elec. Law"):

  N.Y. Elec. Law § 3-103(2) ....................................................................................25

  N.Y. Elec. Law § 3-103(5) ....................................................................................19

  N.Y. Elec. Law § 3-220(1) ....................................................................................19

  N.Y. Elec. Law § 5-212(6) ....................................................................................25

  N.Y. Elec. Law § 5-212(8) ....................................................................................19

  N.Y. Elec. Law § 5-508 .........................................................................................19

  N.Y. Elec. Law § 5-614 .........................................................................................18

New York Penal Law § 190.77(1) ...........................................................................19

N.Y. Pub. Off. Law § 89(2) .....................................................................................20

N.Y. Pub. Off. Law § 96-a(1)(a) .............................................................................19

N.Y. Pub. Off. Law § 96-a(2) ..................................................................................19

Pub. L. No. 93-579, § 2(A)(5)(B), 88 Stat. 1896 (1974) ........................................24

Pub. L. No. 85-315, § 104(a)(1), 71 Stat. 634 (1957) ..............................................6

Pub. L. No. 86-449, § 303, 74 Stat. 86 (1960) .......................................................4, 7

Pub. L. No. 89-487, 80 Stat. 250 (1966) ...............................................................17

Pub. L. No. 104-231, § 4, 110 Stat. 3048, 3049 (1996) .........................................17

Pub. L. No. 107-347, § 208(b)(1)(A)(ii), 116 Stat. 2899 (2002) ...........................24

Pub. L. No. 107-347, § 208(b)(1)(A)(ii)(II), 116 Stat. 2899 (2002) ......................25

United States Code ("U.S.C."):

    5 U.S.C. § 552(a)(2) ..........................................................................................17

    5 U.S.C. § 552a(a)(3) ........................................................................................21

    5 U.S.C. § 552a(a)(5) ..................................................................................21, 23

    5 U.S.C. § 552a(e)(4) ..................................................................................21, 23

    5 U.S.C. § 552a(e)(7) ..........................................................................18, 21, 22

    5 U.S.C. § 552a(e)(11) ......................................................................................23

    5 U.S.C. § 552a(f) ..............................................................................................21

    18 U.S.C. § 2721(a) ...........................................................................................25

    18 U.S.C. § 2721(b)(1) .......................................................................................25

    18 U.S.C. § 2725(1) ...........................................................................................25

    18 U.S.C. § 2725(3) ...........................................................................................25

    18 U.S.C. § 2725(4) ...........................................................................................25

    52 U.S.C. § 20504 ..............................................................................................25

    52 U.S.C § 20507(a)(4) .......................................................................................4

    52 U.S.C. § 20507(b)(1) ...............................................................................12, 13

    52 U.S.C. § 20507(d) .........................................................................................13

    52 U.S.C § 20507(i)(1) ...................................................................................5, 13

    52 U.S.C. § 20507(i)(2) ......................................................................................14

    52 U.S.C. § 20701 .......................................................................................2, 7, 9

    52 U.S.C. § 20703 .........................................................................................4, 7

52 U.S.C § 21083(a)(1)(A) ................................................................................5, 18

52 U.S.C § 21083(a)(5)(A)(i) ...........................................................................5, 18

**Other Authorities**

Steven W. Becker, *Maintaining Secret Government Dossiers on the First Amendment Activities of American Citizens: The Law Enforcement Activity Exception to the Privacy Act*, 50 DePaul L. Rev. 675, 686 (2000)..................................22, 23

68 Fed. Reg. 47610-01 .........................................................................................23

70 Fed. Reg. 43904-01 .........................................................................................23

82 Fed. Reg. 24147-01 .........................................................................................23

Office of Mgmt. & Budget, Office of the President, OMB Memorandum M-03-33, Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002, Att. A. §II(B) (2003)..............................................................24

S. Rep. No. 93-1183 (1974) .................................................................................21

U.S. Const. art. I, § 4, cl. 1....................................................................................3

Defendants Zebrowski Stavisky, Berger, and Bagnuola (hereinafter Commissioners), by their counsel Harris Beach Murtha Cullina, PLLC, move to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) and submit the following Memorandum of Law in support of that motion. The correspondence comprising the document demand and the response thereto, referenced but not attached to the Complaint, are attached to the accompanying Declaration of Elliot A. Hallak.[1]

## INTRODUCTION

The United States Department of Justice (Plaintiff or DOJ) seeks to enforce its extraordinary and unprecedented demand that the State Board of Election (BOE) provide an electronic copy of "all fields" of New York's statewide electronic voter registration list, includ[ing] the registrant's full name, date of birth, residential address, . . . state driver's license number or the last four digits of the . . . social security number." Hallak Dec., Exh 3, at 1.  In the demand, DOJ contended that it was "entitled to conduct an independent review of each state's list," relying on the Help America Vote Act (HAVA), and inspection provisions in the Civil Rights Act of 1960 (1960 CRA) and the National Voter Registration Act (NVRA). Hallak Dec. Exh 3. DOJ challenges the BOE's effective denial of the demand; the BOE could not reach a consensus on the issue and, as a bipartisan agency, it could not act without consensus. Hallak Dec., Exh 4, at 4.  The Commissioners declined to accede to the demand, contending none of the statutes DOJ cited granted "a right to unredacted voter file information and other federal laws . . . prohibit its disclosure." Hallak, Exh 4 (Democratic Commissioners' Response).

Because the statutes on which DOJ relies do not authorize its investigative demand for the unredacted, personally sensitive information – including social security and driver's license numbers – of more than 13 million New York voters, the Complaint should be dismissed.  First,

---

[1] The Hallak Declaration is referred to as the "Hallak Dec."

DOJ cites Title III of the 1960 CRA, a statute that has lay dormant since the 1960s, authorizing "inspection, reproduction and copying" of "records and papers . . . relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701.  Title III's plain language and its use by the Attorney General soon after enactment show that the "records" intended to be covered were registration applications completed by prospective voters and related materials, the inspection of which was aimed at combating the invidious use of racially-discriminatory voter tests.  And although Title III requires both a statement of "basis and purpose," DOJ did not allege a "basis" and the identified purpose – "to ascertain New York's compliance with the list maintenance requirements of" the NVRA and HAVA – is not reasonably related to the 1960 CRA's mandate to combat racial discrimination.  When it enacted Title III in 1960, Congress did not grant DOJ the authority to "inspect" statewide voter registration lists, which did not even exist at that time.

Likewise, DOJ's reliance on the NVRA's "public inspection" provision is misplaced.  That provision permits inspection of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," a clear reference to records generated as part of the list maintenance program states were required to undertake by the NVRA. The NVRA does not authorize disclosure of a statewide electronic voter registration list, which presents only a snapshot fixed in time, providing no insight into "the [state's] implementation of programs and activities" relating to list maintenance.  Although DOJ relies on HAVA, HAVA contains no provision authorizing "inspection" or disclosure of any kind.  Enacted in 2002, HAVA required, for the first time, that states create a single, statewide electronic voter registration list but nothing in HAVA suggests Congress intended to provide any federal agency access to that list, which includes sensitive

personally-identifying information of New York voters, including relating to their exercise of First Amendment rights – information federal agencies are generally prohibited from possessing.

Even if DOJ had asserted a viable statutory basis for its document demand, New York privacy laws prevent disclosure of sensitive information, including social security and driver's license numbers, and therefore preclude disclosure of "all fields" of the statewide voter registration list; these state statutes do not conflict with – and therefore are not preempted by – the federal laws purportedly underlying DOJ's demand. Finally, DOJ's failure to plausibly allege compliance with critical federal privacy laws, including the Federal Privacy Act, the E-Government Act and the Driver's Privacy Protection Act, necessary to permit lawful acquisition of the data in question affords an independent barrier to enforcement of DOJ's demand.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court must accept as true all factual allegations in the complaint, that "tenet . . . is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

**THE COMPLAINT FAILS TO STATE A COGNIZABLE CLAIM AS NO PROVISION OF FEDERAL LAW REQUIRES A STATE TO PROVIDE ITS COMPLETE, UNREDACTED COMPUTERIZED VOTER REGISTRATION LIST TO DOJ OR ANY OTHER FEDERAL AGENCY.**

The Elections Clause, U.S. CONST. art. I, § 4, cl. 1, provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such

Regulations, except as to the Places of chusing Senators." The phrase "Times, Places and Manner" is "comprehensive" and "broad," recognizing states' "authority to provide a complete code for congressional elections," including regulations relating to "registration." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8-9 (2013). The Elections Clause is a "default provision [that] invests the States with responsibility for the mechanics of . . . elections" for federal offices, limited only to the extent Congress has enacted conflicting legislation that "preempt[s] state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997). Under the constitutional design, states are responsible for voter registration as well as the creation and maintenance of voter registration lists.

In seeking disclosure of New York's complete, unredacted voter registration list, DOJ relies on three federal statutory schemes.  First, DOJ cites the "inspection, reproduction and copying" provision in Title III of the 1960 CRA, anti-discrimination legislation intended to strengthen enforcement of the Civil Rights Act of 1957 (1957 CRA).  Title III requires that every "officer of election" retain certain records relating to voter registration for 22 months following an election involving federal offices and, upon written demand of the Attorney General, those records "be made available for inspection, reproduction and copying at the principal office of such custodian by the Attorney General." 52 U.S.C. § 20703.

DOJ also cites the NVRA, adopted in 1993, requiring that states "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" death or change in residence, in accordance with certain parameters. 52 U.S.C § 20507(a)(4).  That legislation contains a "retention" requirement under which states must maintain for at least two years and "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C § 20507(i)(1).

4

Finally, the centerpiece of DOJ's demand is HAVA, passed in the wake of the tumultuous 2000 election. HAVA imposed certain election administration requirements on states relating to voting technology and voter registration.  Relevant to this dispute, under HAVA, "each state" was directed to develop and maintain "a single, uniform, official, . . . computerized statewide voter registration list . . . that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter . . ." 52 U.S.C § 21083(a)(1)(A).  HAVA requires that *states* collect certain unique, personally-identifying information from voters when they register to vote for a federal election, including their driver's license number or the last four digits of their social security number.  *See* 52 U.S.C § 21083(a)(5)(A)(i).  But HAVA contains no public inspection or disclosure requirement, nor any provision requiring states to share the statewide electronic voter registration lists, or sensitive voter identification information, with the federal government or anyone else.  DOJ's demand for the unredacted, statewide voter registration list containing personally-identifying information of more than 13 million New York voters is unsupported by the statutes on which it relies and inconsistent with state and federal privacy laws.

## I.    DOJ HAS FAILED TO STATE A CLAIM FOR ENFORCEMENT OF ITS DEMAND, WHICH LACKS A VIABLE STATUTORY BASIS.

The authority of a federal agency "to issue subpoenas [or civil investigative demands] is created solely by statute." *Consumer Fin. Prot. Bureau v. Accrediting Council*, 854 F.3d 683, 690 (D.C. Cir. 2017).  To be enforceable, a civil investigative demand (CID) must comply with the requirements of its governing statute. *Id.*  In proceedings to enforce an administrative subpoena or CID, courts ensure that the information request is not "unduly burdensome or unreasonably broad" and may "inquire into allegations that an agency is using an administrative subpoena for an improper purpose." *Id.* at 689.  When information implicating the privacy interests of individuals

who are not themselves targets of the investigation is sought, the document request is subject to "more exacting scrutiny," and the agency must substantiate its need for the information sought. *In re McVane*, 44 F.3d 1127, 1138-39 (2d Cir. 1995). While its role may be narrow, "a district court is not a 'rubber stamp' for agency demands for the production of information." *United States v. Markwood*, 48 F.3d 969, 979 (6th Cir. 1995). Courts may consider whether the information demand was issued in "bad faith" – "a conscious decision by an agency to pursue a groundless allegation without hope of proving that allegation," or whether enforcement constitutes an "abuse of the court's process," which may occur even when investigators act in good faith if the inquiry is driven by the improper influence or motivation of others. *Id.* at 978-79.

**A. *Title III of the 1960 CRA does not support a demand for federal acquisition of New York's statewide electronic voter registration list.***

DOJ purports to justify its demand under the "inspection, reproduction and copying" provision of Title III of the 1960 CRA. But its reliance on the CRA is inconsistent with the plain language of Title III and incompatible with the history and purpose of that statute.

The 1960 CRA was enacted to augment enforcement of the 1957 CRA, which, among other things, created a Commission on Civil Rights to investigate whether citizens were being deprived of their right to vote "by reason of color, race, religion or national origin." Pub. L. No. 85-315, § 104(a)(1), 71 Stat. 634 (1957). The 1957 CRA prohibited interference with the right to vote, empowered the Attorney General to bring a civil action against offenders and to pursue contempt remedies for failure to comply with Commission subpoenas. However, the Commission's subpoena power was easily evaded by the refusal of state officials to appear with documents. Instead of compelling an appearance, an order the court likely knew would be ignored, in 1959 the District Court for the Middle District of Alabama ordered local registrars "to make said records available at their present location . . . for copying, inspection, and photographing by the

Commission or its duly authorized agents." *In re Wallace*, 170 F. Supp 63, 70 (M.D. Ala. 1959).

The next year, Congress effectively codified this inspection procedure in Title III of the 1960 CRA, on which DOJ relies here, imposing a requirement that every local "officer of election" retain certain records relating to voter registration for 22 months following an election and that, upon "a demand in writing" that "contain[s] a statement of the basis and purpose therefore," those records "be made available for inspection, reproduction and copying at the principal office of such custodian by the Attorney General." 52 U.S.C. § 20703. The records subject to inspection are specified in the statute: "records and papers which come into [an election officer's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C § 20701.

It is evident from the history of the provision and its use by the Attorney General soon after its enactment that the "records" that "come into" an election officer's possession referenced in the statute were voter registration applications and associated materials submitted and completed by prospective voters during the registration process – not a statewide electronic list of the current registered voter pool created by a State Board of Elections, as is clear both from the plain language and the history of the provision. During the period preceding the 1960 CRA, the principal method used to bar African American citizens from voting was "[d]iscriminatory administration of voting qualifications" including the discriminatory application of voting "tests." *South Carolina v. Katzenbach*, 383 U.S. 301, 312 (1966).[2] The 1960 CRA included "[p]erfecting amendments" to

---

[2] Discussing that era, the Supreme Court observed that "white applicants for registration have often been excused altogether from the literacy and understanding tests or have been given easy versions, have received extensive help from voting officials, and have been registered despite serious errors in their answers. [African Americans], on the other hand, have typically been required to pass difficult versions of all the tests, without any outside assistance and without the slightest error." *Id*.

strengthen the 1957 CRA by, among other things, "[giving] the Attorney General access to local voting records" through the inspection provision in Title III. *Id*. at 313. As the evidence in one enforcement proceeding showed, access to these records could reveal the discriminatory use of these tests and other invidious registration practices, such as a registrar's refusal to permit any African American person to apply for registration while, concomitantly, failing to deny any white person's application to vote during the same period, or requiring African Americans to write and interpret longer and more complex provisions of the state constitution than were given to white applicants (who were sometimes entirely excused from such requirements). *See United States v. Lynd,* 301 F.2d 818, 821-23 (5th Cir. 1962), *cert. denied,* 371 U.S. 893 (1962).

Thus, Title III was enacted under the same authority as the 1957 CRA to facilitate "preliminary investigations of registration *practices* . . . in order to determine whether or not such *practices* conform to constitutional principles[,] as an essential step in the process of enforcing and protecting the right to vote regardless of color, race, religion, or national origin." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp 848, 853-54 (M.D. Ala. 1960), *aff'd on opn below sub nom. Dinkens v. Att'y Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961), *cert. denied sub nom. Dinkens v. Rogers*, 366 U.S. 913 (1961) (emphasis added). The records to be "retained and preserved for a period of twenty-two months . . . relate[d] to acts requisite to voting in such election," i.e., registration practices in a particular locality. *Id.* at 855.

As understood at the time of enactment, "[t]he investigation is . . . limited to an examination and copying of the records designated in the Act which relate to Federal elections for the time during which the Clerk and Registrar is required by the Act to maintain such records and papers relating thereto [and is not] an unlimited discovery device which may be employed and used without restraint [to obtain] a complete discovery of any relevant irregularities and improprieties

in the administration of the registration and voting laws of the state" *In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963). An electronic, statewide voter registration list is not the type of "record" that can be maintained for a 22-month period (the electronic list is constantly being edited and updated), nor would review of a list – a snapshot of a dynamic process – reveal the type of discriminatory voter registration practices that underlay enactment of Title III's inspection, reproduction and copying requirement. Indeed, the requirement that states create a single, statewide voter registration list did not exist in 1960 – that requirement was not imposed until forty-two years later when HAVA was enacted in 2002 – and production of such a list could not have been intended at that time. A court assessing the validity of a document demand may deny relief if the records sought fall outside the purview of the authorizing statute, and this principle applies to inspection requests under Title III of the 1960 CRA, as is the case here. *See Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (courts may ascertain whether a particular document that is requested falls within the scope of the Title III inspection provision).

**B.** ***DOJ's demand is unenforceable because it failed to articulate a proper basis or purpose under Title III of the 1960 CRA.***

Even if a statewide voter registration list constituted a "record [that could] come into [an election officer's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting," 52 U.S.C. § 20701, within the meaning of Title III (and it does not), the demand here was insufficient because DOJ failed to articulate any "basis" for the record request and its statement of "purpose" bears no reasonable relationship to the objective of the 1960 CRA or the 1957 CRA it was enacted to enforce. Congress' use of the conjunctive "and" to join two distinct concepts (here "basis" and "purpose") typically means "not one or the other but both," *Confederated Tribes & Bands of the Yakama Nation v. Yakima Cnty.*, 963 F.3d 982, 990 (9th Cir. 2020) (*citing Crooks v. Harrelson*, 282 U.S. 55, 58 (1930)), and there is nothing in the surrounding

language or context here suggesting that the word "and" was used in an atypical fashion in this statute. Thus, under the plain language of the statute, a Title III inspection demand must be supported by a statement of "basis" and a statement of "purpose."

Based on cases applying Title III soon after it was enacted, a statement of "basis" is a factual allegation, deemed sufficient if the Attorney General alleged that "the demand is based on information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting" within the pertinent jurisdiction. *See Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962);[3] *Lynd*, 301 F.2d at 822-23 (demand sufficient upon allegations that "there are reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights in a given county"); *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963), *cert. denied*, 373 U.S. 950 (1963) ("demand is based upon information in the possession of the Attorney General tending to show that discriminations on the basis of race and color have been made with respect to registration and voting within your jurisdiction"); *Lynd*, 306 F.2d at 229 n.6 (same). This makes perfect sense because "one of the clearest purposes of the Title III proceeding is to enable the Attorney General to assemble all the voter record information within the time-reach of the statute *relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights." Id.* at 228 (emphasis added).

Under Title III, a proper demand must include a statement of "basis" and that element is entirely lacking here where neither of DOJ's letter demands alleged possession of information

---

[3] Where 112.4% of the white citizens of voting age in an Alabama County were registered to vote but not a single African American citizen (despite a population more than double that of white citizens), the statement of basis was clearly sufficient, and the court would not countenance the defense that inspection was unjustified. *Bruce*, 298 F.2d at 863.

suggesting that racial distinctions have been made with respect to registration and voting in New York. In fact, there were no allegations that DOJ has any basis to suppose that New York is in violation of the NVRA, HAVA or any other law relating to voter registration or maintenance of the statewide voter registration list. Nor does any such basis exist because New York has fully complied with all applicable laws relating to voter registration and list maintenance, which DOJ has not disputed. Because one of the key statutory requirements of a Title III demand is entirely absent, the demand is fatally flawed and unenforceable.

The demand here is also deficient under Title III because the DOJ failed to identify a purpose relevant to the antidiscrimination objectives of that legislation. It was not until DOJ's second letter on August 14, 2025, that it articulated a purpose, stating: "The purpose of the request is to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA." Hallak Dec., Exh 3, at 2. Not only did DOJ fail to offer any factual basis to question New York's compliance with either of the referenced statutory schemes but such a purpose falls outside the scope of the 1960 CRA. As demonstrated, Title III's purpose was to facilitate acquisition of voter registration records relating to individuals whose registration attempts were thwarted due to the use of invidious voter "tests" or similar discriminatory practices. *See Lynd,* 306 F.2d at 228. Records were typically sought to show that qualified citizens were being denied the franchise – information that could not be gleaned from examination of the voter roll as the very harm sought to be addressed was the failure of local election officials to include African Americans citizens on the voter roll. Title III, which was adopted to combat racial discrimination, has nothing to do with the directive to create statewide voter registration lists or associated list-maintenance requirements that did not come into existence until decades after its enactment.

In fact, Title III has largely been dormant since the early 1960s, likely due to the enactment

of the Civil Rights Act of 1965 which moved away from the onerous case-by-case Attorney General investigation/litigation strategy reflected in the earlier Civil Right Acts, which had been ineffective, favoring broader-based interventions, such as suspension of literacy tests and similar qualifications, as well as imposition of a "preclearance" provision requiring federal preapproval of new voting regulations in certain geographical areas where voting discrimination had been most flagrant. *Katzenbach*, 383 U.S. at 316; *see also Shelby Cnty. v. Holder,* 570 U.S. 529, 537-38 (2013).  DOJ's attempt to resurrect a moribund statute for an unprecedented use at odds with its plain language that was not (and could not have been) intended by Congress should be rejected.

C.  *The NVRA's "public inspection" provision does not provide a statutory basis for acquisition of New York's electronic, statewide voter registration list.*

The DOJ's reliance on the NVRA fares no better.  Enacted in 1993, the NVRA had "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.,* 584 U.S. 756, 761 (2018).  Toward that end, the NVRA establishes a detailed federal framework for voter registration in federal elections by, among other things, requiring states to provide simplified systems for voter registration, including a federal voter registration form, *Inter Tribal Council of Arizona, Inc.*, 570 U.S. at 4-5, and to maintain a "general program" to remove voters from voter registration lists when they are ineligible to vote due to death or change in residence. *Husted*, 584 U.S. at 761.  As to the latter, the NVRA contains detailed provisions relating to removal of voters' names from state voter registration lists based on a change in residence. *Id.* at 762.  But the NVRA also leaves many policies regarding list maintenance to the states, provided they are "uniform, nondiscriminatory and in compliance with the Voting Rights Act of 1965," 52 U.S.C. § 20507(b)(1), including how states identify candidates for possible ineligibility based on "change-of-residence" and also when and under what circumstances a state will send written notice (i.e., a

"return card") seeking confirmation of the voter's status. *See* 52 U.S.C. § 20507(d).

Here, DOJ relies on the NVRA's record retention and "public inspection" provision, which directs that "each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, *all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters*," with certain exceptions. 52 U.S.C. § 20507(i)(1) (emphasis added).  As was true with Title III, by its plain language this provision does not require a state to provide DOJ with an electronic copy of its unredacted, statewide voter registration list. The provision requires that states make available for "public inspection" the records they are required to maintain during the two-year retention period – which are records "relating to implementation of programs and activities conducted" to carry out the states' program for keeping eligible voters on its lists while purging voters that are ineligible due to a change of address, death or some other disqualifying factor the state might impose, such as felony conviction.

A statewide voter registration list is not a static document that can be "retained" for a two-year period but is constantly changing as registered voters leave the jurisdiction or die, new voters reach voting age or move into the jurisdiction, voters change party affiliation or the state learns of facts impacting voter eligibility, such as a disqualifying criminal conviction. Likewise, the statute very specifically requires that states allow for "public inspection" of records *"relating to implementation of programs and activities"* concerning list maintenance, which would include records describing a state's uniform program or relating to treatment of specific voters (i.e., records showing the number of voters purged from the list and the reasons for doing so, and paperwork related to the purging process, such as records tracking the sending/receipt of "return cards").

In fact, the NVRA includes an example of the type of record covered by the provision,

specifically requiring that "[t]he records maintained . . . shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) [referring to the return cards] are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made." 52 U.S.C. § 20507(i)(2). Records covered by the provision have reasonably been interpreted to encompass lists of individuals either removed from voter rolls because of a disqualifying felony or whose registration applications were denied due to a disqualifying felony, *Greater Birmingham Ministries v. Sec'y of State for Alabama*, 105 F.4th 1324, 1331-32 (11th Cir. 2024), as well as registration applications completed by prospective voters denied registration. *See Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012) ("[C]ompleted voter registration applications are clearly 'records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters'").

Conspicuously absent is any NVRA requirement that a state permit "public inspection" of the statewide voter registration list. This makes sense because the evident purpose of imposing a "public inspection" requirement was to gauge compliance with NVRA requirements and ensure transparency in the way states remove voters from registration lists. The statewide voter registration list, even if viewed as a static document, is a snapshot of the voter roll that is accurate only for a moment in time; it says nothing about the design or execution of a state's list maintenance program and cannot reasonably be characterized as a record relating to *implementation* of the NVRA's list maintenance requirements aimed at promoting accuracy and currency. When the NVRA was enacted in 1993, there was no federal requirement that states maintain a central statewide voter registration list, as opposed to registration rolls at the local district level, and it is therefore not surprising that the NVRA failed to require "public inspection"

14

of a statewide list which did not then exist in many if not most states.

While the scope of records covered under this inspection provision largely presents an open question, the First Circuit has addressed the issue, concluding – wrongly in the Commissioners' view – that Maine's statewide electronic voter registration list created in response to the HAVA, was a "record" that fell within the "public inspection" requirement of the NVRA. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 54-55 (1st Cir. 2024).  After a flawed statutory interpretation analysis that did not give significant effect to critical language defining the covered records ("records concerning implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists"), the First Circuit suggested in hyperbolic fashion that "evaluation of voter registration rolls would be impossible if the results of Maine's voter list registration and maintenance activities [i.e., the official lists] were not subject to public disclosure." *Id.* at 49.  But the NVRA requires that states implement a "reasonable program" for list maintenance, not that they maintain "perfect" lists, and there is no provision authorizing the federal government to "evaluate" a state's complete voter registration roll.  Whether a state has an appropriate program and is reasonably complying with the list maintenance requirements of the NVRA can and has been ascertained without examination of the state's complete voter registration list.  Because a statewide voter registration list is not a record covered by the NVRA's public inspection requirement, that statute does not afford a viable basis for DOJ's demand.

    **D.** ***Even if Title III or the NVRA provided statutory support for the demand, DOJ would not be entitled to "all fields" of the electronic statewide voter registration list.***

To the extent a voter registration list could be subject to public inspection under Title III, the NVRA, or any other statute, this would not permit access to sensitive, personally-identifying information such as social security and driver's license numbers.  Despite its mistaken conclusion

that Maine's statewide voter registration database constituted a "record" within the purview of the NVRA's "public inspection" provision, the First Circuit nonetheless appropriately declined to authorize disclosure of a state's unredacted voter registration list, holding that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter file." *Bellows*, 92 F.4th at 56 (citing cases holding that the NVRA does not preclude redaction of sensitive voter information, including social security numbers, including *Long*, 682 F.3d at 339 (registration applications completed by voters were "records" subject to inspection but nothing in the NVRA precluded redaction of social security numbers)). This aligns with the Fourth Circuit's holding that a statutory scheme that conditions voter registration on provision of a social security number and then permits public disclosure of social security numbers places an unduly burdensome condition on the right to vote, rendering the law compelling disclosure unconstitutional. *Long*, 682 F.3d at 339 (citing *Greidinger v. Davis*, 988 F.2d 1344 (4th Cir 1993)). Neither Title III nor the NVRA should be interpreted to violate this maxim as neither precludes appropriate redaction of the personally-identifying information at issue here.

The NVRA has a "public inspection" provision, meaning any information recoverable by DOJ would also be available to any member of the public that requested access. This court should not hold that DOJ has stated a viable claim for access to the complete New York voter registration list under the NVRA unless it is prepared to say the same material is recoverable by any member of the public. In this regard, DOJ's claim that it needs access to the unredacted list so that it can enforce the NVRA and HAVA is a red herring because the NVRA "public inspection" provision provides access to any member of the public, regardless of any special enforcement role.

### E. *The "inspection" and "photocopying" provisions in Title III and the NVRA do not authorize a demand for electronic production or delivery of records.*

Title III of the 1960 CRA and the NVRA provide a similar "inspection" and "copying"

procedure, using similar language that, by its plain terms, authorizes only inspection and photocopying at the office of the record custodian. Congressional authorization of "inspection" and "copying" (or "reproduction" under Title III, which as used in 1960 is analogous to copying) of records does not encompass delivery of documents, much less electronic delivery as demanded here. "[E]lectronic production . . . is an entirely different method of disclosure." *Greater Birmingham Ministries*, 105 F.4th at 1332. Some statutes that initially authorized only public inspection and copying, such as the Freedom of Information Act (FOIA), *see* Pub. L. No. 89-487, 80 Stat. 250 (1966), have since been amended to require delivery of records, including by "electronic means," *see* Pub. L. No. 104-231, § 4, 110 Stat. 3048, 3049 (1996) (codified as amended at 5 U.S.C. § 552(a)(2)). But neither Title III (which is dormant) nor the NVRA has ever been amended to require the record custodian to deliver or provide records by electronic means – not even when HAVA imposed the requirement that states create a single, statewide electronic voter registration database (and even though HAVA amended the NVRA in other ways). This is further indication that Congress never saw the electronic voter registration list as a "record" subject to disclosure under Title III or the NVRA (and, thus, saw no need to amend the inspection procedure). Even if the list constituted a record under Title III or the NVRA (and it does not), DOJ's relief would be limited to inspection and copying of the list at the BOE.

### F. *HAVA contains no inspection or disclosure procedure and thus provides no statutory basis for DOJ's demand.*

HAVA was enacted in 2002 with the aim of requiring states to modernize voting systems for federal elections through, among other things, a directive that "each state" develop and maintain "a single, uniform, official, . . . computerized statewide voter registration list . . . that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter . . ." 52 U.S.C. § 21083(a)(1)(A). HAVA

also requires that *states* collect certain unique, personally-identifying information from voters when they register to vote, including driver's license numbers and the last four digits of social security numbers. *See* 52 U.S.C. § 21083(a)(5)(A)(i). New York maintains an "interactive, statewide, computerized, voter registration list," N.Y. Elec. Law § 5-614, and collects the required information; DOJ acknowledges as much since it is seeking access to this information. New York is fully compliant with HAVA and DOJ has offered no factual allegation to the contrary.

HAVA contains no "inspection" or disclosure provision. Although HAVA requires that states create a centralized, statewide electronic voter registration list, nowhere in the legislation does Congress indicate that states are required to share or disclose any portion – much less "all fields" – with the federal government. If Congress had any such intent, it could easily have provided a mechanism to give DOJ (or another federal agency) a right to request access either by including a disclosure provision in HAVA or amending the Title III or NVRA inspection provisions. It did neither. No federal statute authorizes DOJ to issue an administrative subpoena or CID to obtain the personal information of millions of New York voters.

This is not surprising because, as detailed below, the federal Privacy Act generally prohibits federal agencies from collecting records relating to a citizen's exercise of First Amendment rights. *See* 5 U.S.C. § 552a(e)(7). None of the statutes upon which DOJ relies support the notion that Congress intended that any federal agency be given access to the entire statewide voter registration list of a single state, let alone multiple states, aggregating the sensitive, personal identifying information of millions of Americans. And the circumstances surrounding the request here – the absence of factual allegations attempting to justify the unprecedented inquiry and the near-simultaneous demands for the same data from at least forty other states – implicate bad faith or abuse of process concerns. These circumstances suggest the request is not in furtherance of any

legitimate investigation of *New York's* compliance with federal list maintenance requirements and is divorced from the anti-discrimination and other legitimate purposes underlying the statutes on which DOJ purports to rely.  Because the demand lacks the requisite statutory foundation, DOJ has failed to state a valid claim for enforcement, warranting dismissal of the complaint.

## II.    THE DISCLOSURE OF SENSITIVE PERSONAL INFORMATION OF 13 MILLION NEW YORK VOTERS WOULD VIOLATE NEW YORK PRIVACY LAWS, WHICH ARE COMPATIBLE WITH, AND THEREFORE NOT PREEMPTED BY, FEDERAL LAW.

New York Election Law § 3-220(1) provides that:

> [a]ll registration records, certificates, lists, and inventories . . . public records and open to public inspection under the immediate supervision of the board of elections or its employees and subject to such reasonable regulations as such board may impose, provided, however, that a voter's driver's license number, department of motor vehicle non-driver photo ID number, social security number and facsimile number shall not be released for public inspection.

Social security numbers, defined as "the nine digit account number . . . and any number derived therefrom," are also protected from disclosure under the New York Personal Privacy Protection Law. N.Y. Pub. Off. Law § 96-a(1)(a), (2).  Social security and driver's license numbers also fall within the definition of "personal identifying information" protected under identity theft statutes. N.Y. Penal Law § 190.77(1).  Other provisions protect the confidentiality of all registration records relating to victims of domestic violence or certain sex offenses. *See* N.Y. Elec. Law § 5-508. New York Election Law § 3-103(5) provides that "information contained in the statewide voter registration list shall not be used for non-election purposes."  *See also* N.Y. Elec. Law § 5-212(8) ("Disclosure of voter registration information . . . by the department of motor vehicles . . . for other than voter registration purposes, shall be deemed an unwarranted invasion of personal privacy [under New York Public Officer's Law § 89(2)] and shall constitute a violation of this chapter").

These protections are not preempted by federal law.  Under the Elections Clause, states

19

have "comprehensive" power "to provide a complete code for [federal] elections, including . . . regulations relating to registration." *Inter Tribal Council of Arizona, Inc.*, 570 U.S. at 8-9. The Elections Clause also permits Congress to "make or alter such Regulations" with certain limitations, in essence embedding a unique preemption provision in the Constitution. *Id.* at 14 n 6. Under that provision, "the regulations effected [by Congress] supersede those of the State which are inconsistent therewith." *Id.* at 9. "[T]he scope of Congress's pre-emptive intent" is communicated through its "statutory text." *Id*. at 14. In other words, Congress displaces state regulation when there is a direct, textual conflict between the federal legislation and the state regulation; when such a conflict occurs, the state regulation ceases to be operative but only "so far as the conflict extends." *Foster*, 522 U.S. at 69.

There is no text in the 1960 CRA, NVRA or HAVA that conflicts with New York's privacy laws. Those federal statutes do not contain language requiring disclosure of any part of a statewide voter registration list, much less sensitive voter information. Moreover, the "all records" language in the NVRA has not been read to "encompass any relevant record from any source whatsoever, but must be read in conjunction with the various statutes enacted by Congress to protect the privacy of individuals and confidential information held by certain governmental agencies." *Pub. Int. Legal Found., Inc. v. North Carolina State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021). Even when the NVRA "records" provision has been deemed to include a statewide voter registration list, the scope of disclosure has been limited on account of "federal statutory frameworks already in place that aim[] to protect voters from potential invasions of privacy, intimidation, discrimination, and harassment," including the Privacy Act, discussed below. *Bellows*, 92 F.4th at 55. Because "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information," *id.* at 56, nondisclosure of

20

"sensitive information that implicates privacy concerns" could not conflict with the NVRA, *id.* (quoting *Project Vote v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016)).  While the issue has not arisen under Title III of the 1960 CRA (which has been dormant for 60 years), the same analysis would foreclose relief.  Thus, New York privacy provisions are not preempted and DOJ has failed to state a claim to the sensitive voter information the Commissioners declined to provide.

### III.    DISMISSAL IS WARRANTED DUE TO DOJ'S FAILURE TO PLAUSIBLY ALLEGE COMPLIANCE WITH FEDERAL PRIVACY LAWS.

#### A.  *DOJ's demand violates the Privacy Act*

"The Privacy Act exists to protect individuals from disclosure of government-collected information." *Ritter v. United States*, 177 Fed. Cl. 84, 87 (Fed. Cl. 2025). When enacting the legislation, Congress recognized that "'the creation of formal or de facto national data banks, or of centralized Federal information systems without certain statutory guarantees would threaten the observance of the values of privacy and confidentiality in the administrative process.'" *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 550 (3d Cir. 1989) (quoting S. Rep. No. 93-1183, at 6930 (1974)) (alteration omitted). The Privacy Act prohibits federal agencies from collecting or maintaining records related to an individual's First Amendment activities (absent applicability of a narrow exception), 5 U.S.C. § 552a(e)(7), and establishes a strict process that must be followed before an agency may "maintain, collect, use, or disseminate" any records searchable by individual, 5 U.S.C. §§ 552a(a)(3), (5), (e)(4), (f). DOJ's demand for voter data violates the Privacy Act's substantive prohibition on gathering records related to First Amendment activity as well as its procedural conditions-precedent that must be met before record gathering may commence.

First, the voter registration data DOJ seeks fall within the Privacy Act's prohibition on collecting or maintaining records related to First Amendment activity. The statute provides that an agency shall "maintain no record describing how any individual exercises rights guaranteed by the

First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). It is well-established that voter registration data relates to first amendment activity. *See Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999) (the choice of whether to register to vote "implicates political thought and expression"). Indeed, "'political belief and association constitute the core of those activities protected by the First Amendment.'" *Vezzetti v. Pellegrini*, 22 F.3d 483, 487 (2d Cir. 1994) (quoting *Elrod v. Burns*, 427 U.S. 347, 356 (1976) (plurality opinion)); *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 253 (2d Cir. 2006) ("Political party affiliation is protected by the First Amendment.").

Here, the DOJ has demanded "all fields" of New York's statewide voter registration list, which includes, among other things, a voter's full name, date of birth, address, driver's license number, partial social security number, political party affiliation, and voting history.[4] This information implicates core First Amendment activity. *See Buckley*, 525 U.S. at 195; *Cotarelo*, 460 F.3d at 253. To allow the federal government to aggregate such data on a statewide (or national) basis would be entirely at odds with a foundational concern underlying the Privacy Act —*i.e.*, that the federal government should be prevented from creating First Amendment dossiers on citizens.[5]

Second, DOJ did not satisfy the Privacy Act's strict requirements for the maintenance by

---

[4] Data File Layout for voter list exports from NYSVOTER Statewide voter database, New York Board of Elections, available at
https://elections.ny.gov/system/files/documents/2024/02/foil_voter_list_layout-5.pdf

[5] *See* Steven W. Becker, *Maintaining Secret Government Dossiers on the First Amendment Activities of American Citizens: The Law Enforcement Activity Exception to the Privacy Act*, 50 DEPAUL L. REV. 675, 686 (2000) (Passage of the Act was "influenced [by] a profound fear concerning the collection and maintenance of information regarding the private activities of American citizens, conduct that unavoidably results in the creation of dossiers and the concomitant potential for governmental abuse through harassment and blacklisting.").

an agency of a "system of records," defined as a "group of records under the control of any agency from which information is retrieved by the name of the individual" or other individual identifier. 5 U.S.C. § 552a(a)(5), (e). In particular, DOJ was required to publish a System of Records Notice (SORN) in the Federal Register "upon establishment or revision" of the system of records. 5 U.S.C. § 552a(e)(4). A compliant SORN must provide at least 30-days prior "notice of any new use or intended use of the information in the system and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." 5 U.S.C. § 552a(e)(11).

Apparently cognizant of this requirement, DOJ cites the SORN titled "JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017) ("CRT 001 SORN"). Compl. ¶ 52. But that SORN applies to "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division," and implicates only the records of certain categories of listed individuals, which cannot be construed to cover more than 13 million New York voters. *See* 68 Fed. Reg. 47610-01, 47611. The other cited Federal Register entries do not expand the SORN in any relevant way.

DOJ's attempted circumvention of the SORN process and utilization of the CRT 001 SORN applicable to the Civil Rights Division's day-to-day investigatory work to house a massive database of unredacted voter information for all New York voters (as well as those from other states) is an affront to the Privacy Act. Indeed, the Privacy Act was enacted to "provide certain safeguards for an individual against an invasion of personal privacy by requiring federal agencies . . . to . . . permit an individual to determine what records pertaining to him are collected, maintained, used, or disseminated." Pub. L. No. 93-579, § 2(A)(5)(B), 88 Stat. 1896 (1974). If

JUSTICE/CRT – 001 can be used to collect and maintain a statewide database of sensitive, personally-identifying voter data, individuals have no way to know what personal information will be collected and maintained by the federal government.

### B. *DOJ's demand violates the E-Government Act.*

The E-Government Act requires that federal agencies perform a "privacy impact assessment" (PIA), ensure the review of the PIA by the appropriate official, and publish the PIA, if practicable, before "initiating a new collection of information that . . . includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons . . ." Pub. L. No. 107-347, § 208(b)(1)(A)(ii), 116 Stat. 2899 (2002). "The statute . . . requires all three of these events, to occur before the agency initiates a new collection of information." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 311 (D.D.C. 2017), *aff'd on other grounds*, 878 F.3d 371 (D.C. Cir. 2017); *Doe v. Off. of Pers. Mgmt.*, No. CV 25-234 (RDM), 2025 WL 513268, at *2 (D.D.C. Feb. 17, 2025) (describing the PIA process). According to agency guidance, the law is triggered even when "a system change creates new privacy risks," such as when previously held databases are merged or when new interagency functions involve new uses of identifiable information. Office of Mgmt. & Budget, Office of the President, OMB Memorandum M-03-33, Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002, Att. A. §II(B) (2003).

Here, the unredacted voter information implicates the E-Government Act because DOJ seeks identifying information in the form of, among other things, social security and driver's license numbers for every registered voter in New York. *See* Compl. ¶ 49 (describing DOJ's demand); Pub. L. No. 107-347, § 208(b)(1)(A)(ii)(II), 116 Stat. 2899 (2002).  DOJ has not alleged

compliance with the E-Government Act and seems to have completely ignored this statutory requirement. The failure to comply with the E-Government Act's conditions precedent for information gathering provides an independent bar to DOJ's enforcement claims.

### C. *DOJ's demand violates the Driver's Privacy Protection Act.*

DOJ's demand also runs afoul of the Driver's Privacy Protection Act (DPPA), which prohibits disclosing "personal information" obtained by the DMV in connection with a "motor vehicle record" "without the express consent of the person to whom such information applies." 18 U.S.C. §§ 2721(a), 2725(1), (3)-(4); *see Reno v. Condon*, 528 U.S. 141, 143-44 (2000). "[P]ersonal information" includes a "driver identification number." 18 U.S.C. § 2725(3). The DPPA's restriction extends to the NY Board of Elections (BOE), which is an authorized recipient of "personal information" by virtue of its role in connection with voter registration. 18 U.S.C. § 2721(b)(1). In New York, the Department of Motor Vehicles (DMV) provides the BOE with "information to assist local boards of elections to verify a voter's identity," N.Y. Elec. Law § 3-103(2), as well as certain information associated with each person who applies for a driver's license, including whether they registered to vote. 52 U.S.C. § 20504; N.Y. Elec. Law § 5-212(6).

DOJ alleges that its records demand is exempt from the DPPA because the requested disclosure here "is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority." Compl. ¶ 47 (citing 18 U.S.C. § 2721(b)(1)). However, DOJ's allegation does not plausibly allege the applicability of the DPPA's government-use exception. The Complaint is devoid of any explanation of why having a database containing driver's license numbers of every New York voter is necessary for DOJ to evaluate the State's compliance with NVRA and HAVA. The Complaint is also devoid of any detail as to what use would be made of New Yorkers' driver's license numbers and, without detailed assurances regarding such use, BOE's release of such information would violate the DPPA.

**CONCLUSION**

For these reasons, the Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

DATED: December 30, 2025.

Respectfully Submitted,

HARRIS BEACH MURTHA CULLINA PLLC

By:  */s/ Elliot A. Hallak*
     Elliot A. Hallak
     Brian D. Ginsberg
     Lisa A. LeCours
     Daniel R. LeCours
     677 Broadway, Suite 1101
     Albany, New York 12207
     Telephone (518) 427-9700
     ehallak@harrisbeachmurtha.com
     bginsberg@harrisbeachmurtha.com
     llecours@harrisbeachmurtha.com
     dlecours@harrisbeachmurtha.com

*Attorneys for Defendants Kristen Zebrowski Stavisky, Henry Berger, and Essma Bagnuola*