Exhibit 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)


UNITED STATES OF AMERICA,    ) CASE NO: 2:25-cv-09149-DOC-ADSx
                             )
              Plaintiff,     )            CIVIL
                             )
     vs.                     )   Los Angeles, California
                             )
SHIRLEY WEBER, ET AL,        )   Thursday, December 4, 2025
                             )   ( 7:38 a.m. to  9:09 a.m.)
              Defendants.    )   (12:01 p.m. to 12:58 p.m.)
                                 ( 2:00 p.m. to  2:31 p.m.)
                                 ( 2:31 p.m. to  2:33 p.m.)


HEARING RE:

MOTION TO DISMISS [DKT.NO.67];

PLAINTIFF'S REQUEST FOR ORDER TO PRODUCE RECORDS
(52 USC 20701)
[DKT.NOS.87,88,89]


BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE


APPEARANCES:           SEE PAGE 2


Court Reporter:        Recorded; CourtSmart


Courtroom Deputy:      Karlen Dubon


Transcribed by:        Exceptional Reporting Services, Inc.
                       P.O. Box 8365
                       Corpus Christi, TX 78468
                       361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES**:

| | |
|---|---|
| For Plaintiff: | ERIC V. NEFF, ESQ.<br>U.S. Department of Justice<br>150 M St. NE, Suite 8-139<br>Washington, DC 20002<br>202-532-3628 |
| For Intervenors: | GRAYCE S.P. ZELPHIN, ESQ.<br>American Civil Liberties<br>Union of Northern California<br>39 Drumm Street<br>San Francisco, CA 94111<br>530-515-8978 |
| | CHRISTOPHER D. DODGE, ESQ.<br>Elias Law Group<br>250 Massachusetts Ave. NW<br>Suite 400<br>Washington, DC 20001<br>202-987-4928 |
| For Robert Page: | SUZANNE E. SHOAI, ESQ.<br>Orange County Counsel<br>P.O. Box 1379<br>Santa Ana, CA 92702<br>714-834-3300 |
| For Defendants: | MALCOLM A. BRUDIGAM, ESQ.<br>Office of the Attorney General<br>1300 I Street<br>Suite 125<br>Sacramento, CA 95814<br>916-210-7873 |
| | ROBERT W. SETRAKIAN, ESQ.<br>California Department of Justice<br>300 S. Spring Street<br>Suite 1702<br>Los Angeles, CA 90013<br>213-269-6668 |

 1    **Los Angeles, California; Thursday, December 4, 2025; 7:38 a.m.**

 2                        **(Call to Order)**

 3            **THE COURT:**  -- Shirley Weber.

 4        **(Pause)**

 5            **THE COURT:**  And, counsel, as you're seated, let me

 6    take one more matter.  Just remain seated for a moment.

 7        **(Pause)**

 8            **THE COURT:**  All right.  Thank you then.  I think that

 9    resolves the rest of the morning calendar.  So first of all,

10    good morning.

11            **MR. NEFF:**  Good morning, Your Honor.

12            **THE COURT:**  This is the matter of United States v.

13    Shirley Weber.  It's case number 25-09149.  And, counsel, you

14    can just remain seated.  You can pretend it's state court if

15    you want to, but make your appearances.

16            **MR. NEFF:**  Eric Neff on behalf of the United States.

17    Good morning, Your Honor.

18            **THE COURT:**  Thank you.

19            **MR. BRUDIGAM:**  Deputy Attorney General Malcolm

20    Brudigam on behalf of defendants Secretary of State Shirley

21    Weber and the State of California.

22            **THE COURT:**  Okay, thank you very much.

23            **MR. SETRAKIAN:**  Deputy Attorney General Will

24    Setrakian on behalf of defendants State of California and

25    California Secretary of State Shirley Weber.

1          **THE COURT:**  Thank you very much.  I appreciate it.

2          **MR. DODGE:**  Chris Dodge on behalf of Intervenors

3     NAACP and Siren.

4          **MS. ZELPHIN:**  Grace Zelphin on behalf of Intervenors

5     League of Women Voters of California.

6          **THE COURT:**  Is anybody here representing what I call

7     the County case?

8          **MS. SHOAI:**  Good morning, Your Honor.

9          **THE COURT:**  Come on up.  What we're doing here may be

10     of interest to you.  So we want your appearance.

11          **MS. SHOAI:**  Thank you, Your Honor.  Deputy County

12     Counsel --

13          **THE COURT:**  No, no, wait, wait till we get a good

14     recording of you.

15          **MS. SHOAI:**  Good morning, Your Honor.  Deputy County

16     Counsel Suzanne Schoai on behalf of --

17          **THE COURT:**  I see.  Why don't you have a seat?  Do

18     you have any other colleague with you today?

19          **MS. SHOAI:**  No, Your Honor.

20          **THE COURT:**  All right.  So first, I'd like to address

21     plaintiff's motion for order to produce records pursuant to 52

22     U.S.C. 20701 that was filed on Monday, set for hearing

23     today.  I appreciate the speed, but not at the expense of due

24     process.  And although I've encouraged us to move forward as

25     quickly as possible concerning the substantive issues, this is

1  not the due process because there needs to be at least 28 days'

2  notice before a date for hearing under CD California Rule 6-1.

3          The plaintiff is seeking to reach the ultimate

4  question in this case regarding the production of records and

5  thousands of voters' lives will be impacted by this case.  And

6  the Court will not be setting the matter on any legal -- I

7  don't want to say gamesmanship, but therefore, the motion for

8  order to produce records pursuant to 52 U.S.C. 20701 is

9  denied.

10          Now, you can once again follow the process and

11  procedure in terms of due process.  We'll have time

12  potentially, but this doesn't supply the due process needed.

13          Second, I'd like to hear arguments if there are any

14  on two motions regarding amicus briefs.  First, there was a

15  motion for leave to file an amicus brief brought by 16 states.

16  Those states are Arizona, Colorado, Delaware, Hawaii, Illinois,

17  Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico,

18  New York, Oregon, Rhode Island, Vermont, and Washington.

19          The second request was to file an amicus brief and it

20  was filed by the former secretaries of state and the proposed

21  amicus briefs are allegedly from a bipartisan group of state

22  secretaries for the states of Colorado, Connecticut, Minnesota,

23  Nebraska, Oregon, Pennsylvania, and Washington.

24          Does any party have a statement to make regarding

25  these amici briefs and any wisdom on your part that if I allow

1   these amici briefs, whether I should then extend for some

2   period of time the opportunity for additional briefs from

3   interested parties, because these are the parties that have

4   directly contacted the Court, but there may be other parties

5   that piecemeal choose to come in, and then I'm deciding that on

6   an almost ex-parte basis, case by case as they come to me,

7   unless you're flying out here for every single hearing for

8   every requested amici brief.

9          So I was thinking if I was going to allow these, that

10  I should throw this open for 7 days or 14 days for the amici

11  briefs to come in during the period of argument and try to sort

12  through whatever the Court's opinion would be and give you that

13  courtesy and simply extend it.  But I'm looking for your wisdom

14  on that because you can anticipate if I'm getting these amici

15  requests now, I promise you, as soon as you leave the

16  courtroom, there's going to be another request.  And I don't

17  want to do that ex parte without your wisdom on both parties'

18  parts.

19         So let's start with the first group.  This motion for

20  leave to file an amici brief by 16 states, and one of my

21  concerns was whether this would become a bipartisan effort, for

22  instance, of Democrats and Republicans using the Court in a

23  sense, in a political sense, not necessarily a substantive

24  sense.  But I noticed there are what I consider some swing

25  states, New Mexico certainly was during the last election,

1    Minnesota was, Michigan certainly was, Arizona was and has been

2    what is popularly referred to as a swing state in a number of

3    elections, and I don't know the voting history, for instance,

4    of Illinois or Maryland, for instance.  I don't know how

5    they've swung in different elections between the parties, and I

6    don't know if that's even a consideration, but I was inclined

7    to accept this amici brief, but only after discussing this with

8    you folks.

9           So why don't you talk amongst each other or to

10   yourself, and then state what your respective positions might

11   be on this.

12       **(Pause)**

13       **(Recessed at 7:46 a.m.; reconvened at 7:48 a.m.)**

14       **THE COURT:**  Well, let me start with plaintiffs in

15   this matter.  What are your thoughts?

16       **MR. NEFF:**  The United States' biggest concern is that

17   this is resolved.  The United States' foremost and only concern

18   is that this is resolved in a manner that, as the Court shares

19   the concern, that it needs to be handled expeditiously.  As

20   long as --

21       **THE COURT:**  Yeah, because it's got to get to the

22   Ninth Circuit and probably the Supreme Court.

23       **MR. NEFF:**  And then there's, yes, and as long as

24   amici don't get in the way of that, we have no objection.

25       **THE COURT:**  Okay.  And then I'll ask, if we do this,

1  about mail-in ballots and voter registration and drive-in, et

2  cetera, but when we're finally done with this, we want

3  qualified voters to vote.  And if there's a chilling effect, or

4  this privacy right that we've somewhat skipped over, I want to

5  hear how you define that.

6          MR. BRUDIGAM:  Sure.  Your Honor, I think this action

7  should make the stomach of every American turn, knowing that

8  this executive branch is going in, state by state, collecting

9  and vacuuming up everybody's voter registration information.

10  It is on a scale that we have never seen before.  Okay.

11          And what this is going to do --

12          THE COURT:  It is their disparity argument.  In other

13  words, remember when I started this conversation early on, and

14  I discussed the amicus briefs, I was particularly interested if

15  I was getting just red and blue states.  That's why I was

16  looking to see if there were these swing states.

17          MR. BRUDIGAM:  I mean I point Your Honor to --

18          THE COURT:  Or is this a argument also that a

19  particular group of states are being examined versus other

20  states?  Because here, the government has represented while

21  California from their perception might be an outlier, they've

22  also made inquiries of the let's say more, from their

23  standpoint, compliant states like Kansas and -- I forget which

24  one -- just a moment -- Indiana, and that Texas was coming

25  onboard.

1          **MR. BRUDIGAM:**  Yeah.  Well, what I would say is I

2     mean those aren't states that are complying, they're

3     voluntarily giving that information to the federal government.

4          **THE COURT:**  But regardless, the government has made

5     an inquiry so if there's an argument that the government is

6     reaching out and being selective, if the state is voluntarily

7     complying that doesn't seem to me to be singling out

8     progressive states.  And if you think that, then I need to hear

9     that and hear your reasoning behind that.

10          **MR. BRUDIGAM:**  I'm not saying they're singling out

11     states.

12          **THE COURT:**  Okay.  Then we can pass that.

13          **MR. BRUDIGAM:**  They're going after every state and

14     California is by no means --

15          **THE COURT:**  So I'm not going to have a disparity

16     argument.

17          **MR. BRUDIGAM:**  Right, right.  I just mean in terms of

18     the position the secretary has taken, I mean the reason they

19     had to sue 14 different states is because nobody wants to turn

20     this data over.  The representations that Counsel just gave

21     today, that's the first that I've heard of any state turning

22     over that information.  So we are by no means an outlier in

23     taking this position.

24          **THE COURT:**  Wait just a moment.  For the government

25     or DOJ, how do we validate Kansas and Indiana?  What validation

89

1    do I have about that?

2        MR. NEFF:  I was actually looking that up right now,

3    Your Honor, because --

4        THE COURT:  Well go ahead and look it up.  You've got

5    lots of time.

6        MR. NEFF:  And I --

7        THE COURT:  By the way, I'm not holding you to it.  I

8    know it's in good faith but I'd like to hear what states that

9    we have validation for turning this document over.  And there

10   may be numerous states.

11       MR. NEFF:  It's a good-faith representation here.  I

12   am kind of a point --

13       THE COURT:  Okay.  Well now take away the good faith.

14   I accept that.  Okay, I'm asking for proof now.

15       MR. NEFF:  Okay.  Wyoming, Kansas, Indiana and

16   Arkansas all complied voluntarily.

17       THE COURT:  Okay.  Just a moment.

18       MR. NEFF:  Texas --

19       THE COURT:  Kansas, Indiana, Wyoming and Arkansas ...

20       MR. NEFF:  ... have already complied ...

21       THE COURT:  ... voluntarily.

22       MR. NEFF:  ... voluntarily.

23       THE COURT:  Okay.  Texas?

24       MR. NEFF:  Texas, Virginia, Utah, Tennessee, South

25   Dakota --

1          **THE COURT:**  Just a moment.

2          **MR. NEFF:**  Oh it's gonna go long, yeah.  South

3    Carolina, Nebraska, Montana, Mississippi, Missouri and Alabama,

4    all fall into the list of they have expressed with us a

5    willingness to comply based on the represented MOU that we have

6    sent them.  And so we expect full --

7          **THE COURT:**  Now apparently Nebraska can't make up its

8    mind because of the proposed amici briefed to the Court, they

9    have the former state secretaries of state for Colorado,

10   Connecticut, Minnesota and guess what?  Nebraska.

11         **MR. NEFF:**  Well those are former.  And furthermore,

12   just because some states are representing certain things in

13   court, there are still discussions going on now that this MOU

14   we have is fully blessed.  There are the -- I don't think it's

15   safe at this point to go beyond those states but --

16         **THE COURT:**  Then that's fine.

17         **MR. NEFF:**  -- that's a fair representation of the

18   state of discussions as of today.

19         **THE COURT:**  And Counsel, back to you.

20         **MR. BRUDIGAM:**  Sure.  And yeah, so all I heard there

21   was we've heard a willingness.  It doesn't sound like those

22   states have actually turned over any data, just to be clear.

23         So I want to talk a little bit about --

24         **THE COURT:**  No, I think he said that four states have

25   actually.  Kansas --

1          **THE COURT:**  Let me turn to the Department of Justice.

2          **MR. NEFF:**  Thank you, Your Honor.

3          **THE COURT:**  I want you to just state your name.

4          **MR. NEFF:**  Eric Neff for the Department of Justice --

5          **THE COURT:**  Thank you.

6          **MR. NEFF:**  -- Your Honor, the United States.  The

7 Civil Rights Act is so clear on its terms that we are ending up

8 with absurd arguments here and dealing with opposing counsel's

9 reference to language of come into possession.  We have not

10 been trying to hide from that language.  It's simply for

11 economy of briefing to not include that descriptive phrase,

12 which is referring to just the any record that is coming into a

13 state election official's possession, they then need to turn

14 that over to us if they want.  It doesn't provide any qualifier

15 that applies to this case.

16         Is counsel arguing that if a state was discriminating

17 against a whole class of voters based off of race that then the

18 federal government would not be able to request their voter

19 registration list because it was compiled by the state?  It

20 runs afoul of the very purpose of the statute.

21         It's simply saying that that is just a descriptive

22 phrase that says any record that comes into the state election

23 official's possession, if we deem it as something we need for

24 our purposes we can request it.

25         HAVA.  The language of HAVA does support subsidiarity

 1   when one understands the purpose under which it was passed and

 2   the legislative context in which it was passed.  Up to that

 3   point there had been no law passed that provided any minimum

 4   standards for the state that the federal government could

 5   enforce.  Therefore, HAVA is clearly stating, while we are not

 6   undermining subsidiarity, while we still have respect for

 7   subsidiarity, we here are stating in very specific

 8   circumstances these minimum standards for the first time are

 9   ones that the federal government has statutory authority to

10   enforce.

11           Big picture in this argument, I think you can put

12   kind of the three arguments that have been made by opposing

13   counsel kind of into three buckets.  First, jurisdiction,

14   whether it's proper here in Sacramento.  We stated in our

15   papers that we believe in an electronic era any office where

16   the records are available is a principal office under the

17   statute.  The request for these rolls are made on a regular

18   basis at Secretary of States and registrars all around the

19   state.

20           Going in reverse order, I think, of depth of

21   discussion and importance.

22           The privacy issue seemingly getting lost here is that

23   we're dealing with the United States, the federal government,

24   the agency that issues this number, that has more protections

25   than any other agency to preserve private information, is

1    dealing with national security matters on a day-to-day basis.

2    And within that context, this can't be clearer.  Election

3    integrity and privacy laws do not conflict.  I repeat they do

4    not conflict.  Privacy laws are about protecting the public as

5    the government goes about its lawful business.

6           With all respect, I would push back on Your Honor

7    that this is a unique issue posed before the Court.  I would

8    say it's not.  It's a non-issue.  No one thinks that privacy

9    laws preempt the government from going about its lawful

10   business.  No one thinks the government is restricted in its

11   ability to enforce federal laws, either civilly or criminally,

12   because of privacy laws, much less getting the last four digits

13   of a Social Security number where there's a specific federal

14   statute saying that we get it.  We are pursuing clean voter

15   rolls and free and fair elections and we will protect all

16   citizens' privacy, as it is our obligation to do and as we have

17   laid out in our papers how we will do it.

18          Furthermore, the request is not something

19   extraordinary.  For example, the SAVE database has been in

20   operation in the Department of Homeland Security for at least

21   two decades that I'm aware of.  And just in the past six, I

22   believe it was instituted in May, they began running voter

23   rolls for voluntary states with this data, with driver's

24   license and last four of Social.  Twenty-one states gave it to

25   them.  Twenty-one at last count.  The states are interested in

1    having their own clean voter rolls.  The federal government is

2    interested if states are not maintaining clean voter rolls.

3         Now the final bucket I would say is falling under or

4    at least getting to the statute here of the Civil Rights Act,

5    the purpose, the requirement that we state a purpose.  Opposing

6    counsel is trying to make just a mountain out of a molehill on

7    this.  As I've said to Your Honor, I would analogize it to a

8    requirement that putting a reason on the minutes.  Because that

9    precludes their various claims and defenses here they want to

10   say things like, and I'm quoting, we need to unpack that, this

11   is -- they are giving ephemeral reasons, also that we need to

12   allege some sort of facts.  Those are all quotes.  And none of

13   those are in the statute.  The Civil Rights Act does not allow

14   for that.  The Civil Rights Act is about getting election

15   records in short order and whether the purpose is combatting

16   discrimination, voter roll list maintenance, it does not

17   matter.

18        The *Coleman v. Kennedy* (phonetic) case made it clear.

19   Quote, no prima facie case is required.  Quote, we do not need

20   to identify in a general way the reasons.  Quote, it's

21   comparable to an order to show cause.  Your Honor should

22   just -- given the proper complaint, quote, it entitles AG to a

23   prompt order requiring compliance.  A prompt order is important

24   here because we do have concerns about this -- all states

25   are -- it's an interest in the federal government in ensuring

1    free and fair elections and clean voter rolls.

2              In California we have particular concerns.  It's the

3    largest, as we've alleged in our papers, it's the largest state

4    in the Union.  Just on their own publicly available data there

5    were 2.1 million duplicate registrations.  That is 15.6 percent

6    of the voter rolls were duplicates.  That doesn't even -- that

7    number doesn't even include the largest county in the state

8    because the data was not provided to them.  There are other

9    counties that weren't provided as well.  They provided no data

10   on duplicate registration removals.  Their removal -- their

11   death removal rate, removing someone from the voter rolls

12   because they have died, was half, about half the national

13   average.  These are all concerning data points.

14             There could be many more.  We're not required to

15   allege any of them.  I myself could get up here under oath.  I

16   used to be the election -- prosecutor of election crimes here

17   in Los Angeles.  I could describe my cases, go down the list.

18   It's not required.  All we have to do is allege a purpose.  And

19   the records need to be turned over to us in short order.

20             This isn't about the Privacy Act or California

21   privacy laws and their conflict with HAVA going to the Supreme

22   Court, this is just about the most populous state in the nation

23   failing in their list obligations and then, frankly,

24   obstructing federal oversight efforts.

25             Thank you.

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **December 8, 2025**

Signed                                                              Dated

*TONI HUDSON, TRANSCRIBER*