**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| *Plaintiff*, | * | |
| v. | * | No. 1:25-CV-01338-MAD |
| BOARD OF ELECTIONS OF THE STATE OF NEW YORK, *et al.*, | * | |
| *Defendants*. | * | |

* * * * * * * * * * * *

**BRIEF OF AMICI CURIAE MARYLAND, MINNESOTA, ARIZONA, CALIFORNIA, COLORADO, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MICHIGAN, NEVADA, NEW JERSEY, NEW MEXICO, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF MOTION TO DISMISS**

ANTHONY G. BROWN
Attorney General of Maryland

Daniel Kobrin*
Assistant Attorney General
dkobrin@oag.maryland.gov
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 210202
(410) 576-6472
(410) 576-6955 (facsimile)
*Admitted pro hac vice

January 6, 2026,

Attorneys for Amici States

# TABLE OF CONTENTS


STATEMENT OF INTEREST ........................................................................................ 1

ARGUMENT ............................................................................................................ 1

I. THE GOVERNMENT'S DEMAND FOR UNREDACTED VOTER REGISTRATION DATABASES IS PART OF A BROADER EFFORT TO COLLECT UNPRECEDENTED AMOUNTS OF PERSONAL INFORMATION. ........................................................................................ 2

A. The Federal Government Has Unlawfully Demanded SNAP Data. ........................ 3

B. Federal Health Agencies Have Unlawfully Shared State-Compiled Medicaid Data for Immigration Enforcement Purposes. ........................................................ 4

C. The Federal Government Demands Voter Registration Databases. ........................ 5

II. FEDERAL LAW DOES NOT PROVIDE THE FEDERAL GOVERNMENT THE AUTHORITY TO DEMAND UNREDACTED VOTER REGISTRATION DATABASES ........................................ 7

A. States Have Primary Authority Over Elections, and the Department of Justice's Demands Are Unconstitutional Because They Exceed the Scope of Authorizing Statutes. ........................................ **Error! Bookmark not defined.**

B. The Privacy Act Restricts the Federal Government's Attempted Aggregation of Voter Database Information. ........................................ **Error! Bookmark not defined.**

C. Neither the Help America Vote Act nor the National Voter Registration Act Mandates Disclosure. ........................................................................ 9

D. The Civil Rights Act of 1960 Does Not Authorize the Department of Justice's Demands for Voter Registration Data Unrelated to Civil Rights Violations.................... 10

CONCLUSION ........................................................................................................ 12

# TABLE OF AUTHORITIES

Page

**Cases**

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ..... 8

*California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025) ..... 9

*Husted v. A. Philip Randolph Inst.*, 584 U.S. 756 (2018) ..... 8

*League of United Am. Citizens v. Executive Off. of the President*, 780 F. Supp. 3d 135 (D.D.C. 2025) ..... 9

*Moore v. Kobach*, 359 F. Supp. 3d 1029 (D. Kan. 2019) ..... 8

*Peters v. United States*, 853 F.2d 692 (9th Cir. 1988) ..... 10

*Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016) ..... 8, 10

*Public Int. Legal Found. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) ..... 7, 10

*Public Int. Legal Found. v. North Carolina State Bd. of Elections*, 996 F.3d 257 (4th Cir. 2021) 7

*True the Vote v. Hosemann*, 43 F. Supp. 3d 693 (S.D. Miss. 2013) ..... 8, 10

**Statutes**

15 U.S.C. § 1312 ..... 10

2 U.S.C. § 1396b ..... 4

31 U.S.C. § 3733 ..... 10

42 U.S.C. § 1306 ..... 4

42 U.S.C. § 1997a-1 ..... 10

52 U.S.C. § 20503 ..... 9

52 U.S.C. § 20507 ..... 7, 9

52 U.S.C. § 20703 ..... 11

52 U.S.C. § 21083 ..... 5, 9

7 U.S.C. § 2020 ..... 3

Cal. Welf. & Inst. Code § 10850 ..... 3

Md. Code Ann., Hum. Servs. § 1-201 ..... 3

Paperwork Reduction Act of 1995, Pub. L. No. 104-13, 109 Stat. 163 (1995) .......... 2

Privacy Act of 1974, Pub L. No. 93-579, 88 Stat. 1896 (1974) .......... 2

**Regulations**

7 C.F.R. § 271.4 .......... 3

7 C.F.R. § 273.2 .......... 3

42 C.F.R. § 438.818 .......... 4

**Executive Orders**

Executive Order No. 14243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, 90 Fed. Reg. 13681 (Mar. 20, 2025) .......... 2

Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025) .......... 2

**Other Authorities**

Ballotpedia, *Partisan Affiliations of Registered Voters* (Aug. 31, 2025) .......... 7

Brennan Center for Justice, *Tracker of Justice Department Requests for Voter Information* .......... 6

CMS Information Security & Privacy Program, *Privacy: Overview*, https://tinyurl.com/mrh8vjsj (last visited Nov. 21, 2025) .......... 4

Kimberly Kindy & Amanda Seitz, *Trump Administration Gives Personal Data of Immigrant Medicaid Enrollees to Deportation Officials*, Associated Press (June 14, 2025) .......... 5

Kimberly Kindy & Amanda Seitz, *Trump Administration Hands Over Medicaid Recipients' Personal Data, Including Addresses, to ICE*, Associated Press (July 17, 2025) .......... 5

Press Release, *Secretary Rollins Requires States to Provide Records on SNAP Benefits, Ensure Lawful Use of Federal Funds* (May 6, 2025) .......... 3

*Report of the United States Commission on Civil Rights* (Sept. 9, 1959) .......... 11, 12

*Report of United States Commission on Civil Rights* (Sept. 30, 1963) .......... 12

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey: 2024 Comprehensive Report* 132 (June 2025) .......... 7

U.S. Election Assistance Comm'n, *Voter Roll Privacy* (Mar. 15, 2024) .......... 6

## STATEMENT OF INTEREST

Amici curiae the States of Maryland, Minnesota, Arizona, California, Colorado, Delaware, Hawai‘i, Illinois, Maine, Michigan, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Vermont and Washington ("the Amici States") submit this brief in support of the pending motions to dismiss. The Amici States have a strong interest in this case because the federal government's demands for States' voter data are not limited to New York. Each of the Amici States has received similar sweeping demands; the United States has already sued 22 States, and the District of Columbia, in addition to New York. As set forth more fully below, the Constitution guarantees the Amici States primary authority over election procedures. In addition to this constitutional interest, the Amici States have strong statutory and policy interests in safeguarding the privacy of their residents' most sensitive data and ensuring their residents' confidence, trust, and participation in the electoral process.

## ARGUMENT

For the past eleven months, the federal government has engaged in an unprecedented campaign to sweep up significant volumes of sensitive personal data on those living within its borders, including, and especially targeting data collected and possessed by States. The United States has now come for States' voter registration databases, under the guise of checking for compliance with federal list-maintenance laws. But the federal government is not charged with maintaining voter registration lists, and the information sought does not aid the federal government's limited compliance-enforcement role. Because the Constitution and legislation enacted by Congress preclude the United States' demands, the complaint should be dismissed.

## I. THE GOVERNMENT'S DEMAND FOR UNREDACTED VOTER REGISTRATION DATABASES IS PART OF A BROADER EFFORT TO COLLECT UNPRECEDENTED AMOUNTS OF PERSONAL INFORMATION.

Multiple layers of federal law limit how the Executive Branch can gather, aggregate, and share personal information. *See, e.g.*, Privacy Act of 1974, Pub L. No. 93-579, 88 Stat. 1896 (1974); E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002). Still, in March 2025, the President issued two executive orders directing federal officials to undertake novel efforts to aggregate federal and state records containing millions of individuals' personal information. Governmental efforts undertaken pursuant to those orders have been challenged and, for the most part, enjoined as unconstitutional or unlawful.

The first executive order, issued on March 20, 2025, commanded federal officials across agencies to synthesize "agency records, data, software systems, and information technology systems" to pursue "Administration priorities" related to "waste, fraud, and abuse." Executive Order No. 14243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, § 3(a), 90 Fed. Reg. 13681 (Mar. 20, 2025). The order further directed federal officials to establish "unfettered access to comprehensive data *from all State programs* that receive federal funding." *Id.* § 3(b) (emphasis added).

A second executive order, issued on March 25, 2025, sought to impose new requirements on the conduct of federal elections. Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025). The President directed the Department of Homeland Security and Administrator of the Department of Government Efficiency to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities," and to compare the publicly available data to "Federal immigration databases and State records requested" to ensure "consistency with Federal requirements." *Id.* § 2(b)(iii).

Subsequent to these orders, the federal government began taking unprecedented steps to collect and pool Americans' personal data and to pressure States into assisting with this effort. Fore example, federal agencies have pressed States to turn over sensitive, personal data collected in administering vital programs like the Supplemental Nutrition Assistance Program ("SNAP"). Seeking to preserve their residents' privacy and the integrity of these programs, the Amici States have repeatedly challenged these unlawful demands.

### A. The Federal Government Has Unlawfully Demanded SNAP Data.

Federal law delegates to the States the roles of creating and processing SNAP applications, determining eligibility, issuing benefits, and ensuring program integrity. 7 U.S.C. § 2020(a)(1); *see also* 7 C.F.R. § 271.4. To administer SNAP, each State collects extensive personal information, including applicants' and recipients' names, home addresses, and Social Security numbers. *See id.* § 273.2(b), (f)(1)(v). Federal law requires that States develop "safeguards which prohibit the use or disclosure of information obtained from applicant households," subject only to narrow exceptions. 7 U.S.C. § 2020(e)(8). And state laws throughout the country likewise protect the confidentiality of SNAP data. *See, e.g.*, Cal. Welf. & Inst. Code § 10850(a); Md. Code Ann., Hum. Servs. § 1-201.

Despite these restrictions, in mid-2025, the U.S. Department of Agriculture ("USDA")—which, through a subagency, oversees the States' administration of SNAP—attempted to obtain the States' SNAP participant data from January 1, 2020 to the present.[1] In June, it published formal notice of its intent to demand that data to compile a national database. National Supplemental Nutrition Association Program (SNAP) Information Database, 90 Fed. Reg. 26, 521 (June 23, 2025).

[1] Press Release, *Secretary Rollins Requires States to Provide Records on SNAP Benefits, Ensure Lawful Use of Federal Funds* (May 6, 2025), https://tinyurl.com/5yvbdwxt.

Twenty-two States and the District of Columbia sued, asserting, among other things, that USDA's demands violate the Administrative Procedure Act because they contravene federal law, are arbitrary and capricious, and flout notice-and-comment requirements. *California v. U.S. Dep't of Agric.*, No. 3:25-cv-06310 (N.D. Cal.), Dkt. 1 (Jul. 28, 2025). The district court entered a preliminary injunction, holding that the plaintiff States were generally likely to succeed on the merits of their contrary-to-law claim. *Id.*, Dkt. 106 (Oct. 15, 2025).

### B. Federal Health Agencies Have Unlawfully Shared State-Compiled Medicaid Data for Immigration Enforcement Purposes.

State agencies administer Medicaid, a joint federal-state insurance program that provides healthcare coverage to individuals with low income or disabilities. States collect sensitive personal information from all Medicaid applicants and participants, and routinely share portions of it with HHS's Centers for Medicare & Medicaid Services ("CMS"), as required by law. *See* 42 U.S.C. § 1396b(r)(1)(F); 42 C.F.R. § 438.818. Some States' Medicaid data sets include information about enrollees' immigration status.

Historically, States have furnished their Medicaid applicant information to CMS with the expectation that the agency will observe all legal constraints, including the Social Security Act's prohibition against disclosure (including to other federal agencies) unless permitted by regulation or other federal law. 42 U.S.C. § 1306(a)(1). States have also borne in mind CMS's longstanding policy of not sharing patients' personal data for non-healthcare-related reasons.[2]

Nonetheless, in June 2025, CMS transferred a trove of protected health data to DHS. The transferred data included Medicaid data compiled by California, Washington, Illinois, and the

[2] *See* CMS Information Security & Privacy Program, *Privacy: Overview*, https://tinyurl.com/mrh8vjsj (last visited Nov. 21, 2025).

District of Columbia, even though those jurisdictions had not consented.[3] Thereafter, CMS executed a data-sharing agreement that provided Immigration and Customs Enforcement ("ICE") with access to the personal data of 79 million Medicaid enrollees, including home address and ethnicities, for immigration enforcement efforts.[4]

Twenty states filed a lawsuit challenging CMS's disclosure. *California v. U.S. Dep't of Health & Hum. Servs.*, No. 3:25-cv-05536-VC (N.D. Cal.). In August 2025, a district court preliminarily enjoined HHS from sharing the plaintiff States' Medicaid data with DHS for immigration enforcement purposes. *Id.*, Dkt. No. 98, at 4-5 (Aug. 12, 2025).[5] Yet CMS has persisted in its intention to move forward with that data sharing.[6]

**C. The Federal Government Demands Voter Registration Databases.**

Apparently undeterred by federal court orders enjoining the improper collection and sharing of sensitive data, the federal government initiated this lawsuit seeking a full, electronic copy of New York's computerized voter-registration database, including "all fields" within the database. (ECF 76-4, at 1, 3-4.) It also has filed 22 parallel lawsuits against other States and the District of Columbia. For every State, the requested data encompasses personally identifying information used to verify voters' identities, including the last four digits of voters' Social Security and driver's license numbers. *See* 52 U.S.C. § 21083(a)(5)(A)(i). It also includes

---

[3] *See* Kimberly Kindy & Amanda Seitz, *Trump Administration Gives Personal Data of Immigrant Medicaid Enrollees to Deportation Officials*, Associated Press (June 14, 2025), https://tinyurl.com/bdt338e9.

[4] *See* Kimberly Kindy & Amanda Seitz, *Trump Administration Hands Over Medicaid Recipients' Personal Data, Including Addresses, to ICE*, Associated Press (July 17, 2025), https://tinyurl.com/32xwt9ws.

[5] The district court later extended its injunction to two States that joined the litigation following the initial order. *California*, No. 3:25-cv-05536-VC, Dkt. 127 (Sept. 22, 2025).

[6] U.S. Dep't of Health & Hum. Servs., *Notice of Information Sharing Between Centers for Medicare and Medicaid Services and the Department of Homeland Security* (Nov. 21, 2025), https://perma.cc/9ABZ-KB4D.

information whose disclosure federal law expressly restricts—specifically, the voter registration agencies (such as agencies that provide public assistance) through which voters registered to vote. *Id.* § 20507(i)(1). The requested data could also specifically unmask voters enrolled in address confidentiality programs that protect the home address of victims of domestic and sexual violence, law enforcement officers, and judicial officials. *See* U.S. Election Assistance Comm'n, *Voter Roll Privacy* (Mar. 15, 2024), https://tinyurl.com/48r7skn3.

In the same demands, the federal government also has sought information *about* States' voter registration databases. In many of the demands, the Department of Justice directed States to disclose "materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy" of the list. *See United States v. Weber*, No. 2:25-CV-09149, Dkt. No. 37-2 at 148 (Filed Nov. 7, 2025) (collecting demand letters sent by DOJ to 30 States). It included examples of such materials, including a "database user manual" or "coding list." *See id.* at 175-76. The federal government did not clarify *why* it needed those materials. But it seemingly sought to obtain more than read-only access to the computerized database files, potentially because additional information about the database coding would assist in transferring data from State voter registries into other federal databases. To the Amici States' knowledge, the federal government has demanded voter database information from 42 States; only seven have voluntarily provided complete, unredacted information in response. Brennan Center for Justice, *Tracker of Justice Department Requests for Voter Information*, https://tinyurl.com/532npb34 (last visited Dec. 31, 2025).

By its very nature, a voter registration database is a unique repository of information. As of the 2024 general election, 86.6% of the estimated national citizen voting-age population was registered to vote. U.S. Election Assistance Comm'n, *Election Administration and Voting*

*Survey: 2024 Comprehensive Report* 132, 156-60 (June 2025). Most States reported rates greater than 80%, with sixteen reporting more than 90%. *See id.* at 156-60. And in addition to the personal information that election officials must collect to verify voter identity and eligibility, voter registration databases may contain information about a voter's electoral participation necessary to administering the State's elections. In all States, this includes information on whether a person voted in an election, because federal law requires States to remove inactive voters who move out of a jurisdiction. *See* 52 U.S.C. § 20507(d)(1)(ii). And in 30 States and the District of Columbia, this also includes information about party affiliation. Ballotpedia, *Partisan Affiliations of Registered Voters* (Aug. 31, 2025), https://tinyurl.com/yx2aec8b. Additionally, voter registration databases may contain information on a variety of sensitive topics (used to assist with voting or verify residency), such as disability, religious beliefs, occupation, parents' names, and criminal history, along with documents that include sensitive information, such as paychecks and bank statements.[7] Obliging a demand for unredacted voter registration database information could divulge a large swath of information that voters never intended to share with law enforcement or other federal agencies, and thus could chill voters' willingness to continue participating in the electoral process.

## II. FEDERAL LAW DOES NOT PROVIDE THE FEDERAL GOVERNMENT THE AUTHORITY TO DEMAND UNREDACTED VOTER REGISTRATION DATABASES.

Collecting voter information implicates significant privacy interests. *See, e.g.*, *Public Int. Legal Found. v. Bellows*, 92 F.4th 36, 55 (1st Cir. 2024); *Public Int. Legal Found. v. North Carolina State Bd. of Elections*, 996 F.3d 257, 266-67 (4th Cir. 2021); *Moore v. Kobach*, 359 F.

[7] *See, e.g.*, Ariz. Rev. Stat. Ann. § 16-152(A)(9), (11); Del. Code Ann. tit. 15, § 2033; Ga. Code Ann. §§ 21-2-220(c), -417(c); 10 Ill. Rev. Stat. 5/4-8; La. Stat. Ann. § 18:104(B)(5), (8); Mass. Gen. Laws ch. 51, § 47C; Mo. Rev. Stat. § 115.157(1); Mont. Code Ann. § 13-2-110(5)(b)(ii); N.H. Rev. Stat. Ann. § 659:13-b; N.J. Stat. Ann. § 19:31-6.4; N.Y. Elec. Law § 8-303(3)(a)(2); Tenn. Code Ann. § 2-2-116; Wis. Stat. § 6.34(3)(a)(8)-(9).

Supp. 3d 1029, 1049-50 (D. Kan. 2019); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1345 (N.D. Ga. 2016); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 735 (S.D. Miss. 2013). And State legislatures, possessing the primary authority to decide the time, place, and manner of federal elections, U.S. Const. art. I, § 4, are empowered to set procedures for voter registration, maintaining voter rolls, and protecting voter data. *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 774 (2018); *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013); *Smiley*, 285 U.S. at 366. Accordingly, States have enacted regulatory limits on what voter registration data is made public, who can access that data, or how data may be used.[8]

The United States' demand for voter data tramples States' prerogative to set these limits. The United States cites an executive order as authority for that demand. (ECF 1, at 2-3.) But the President has no authority to displace States' election laws; only Congress may do so. U.S. Const. art. I, § 4. Thus, anything the President purports to do by executive order cannot override States' protections on voter data. *See also California v. Trump*, 786 F. Supp. 3d 359, 373 (D.

---

[8] Ala. Code § 17-3-53; Alaska Stat. § 15.07.195; Ariz. Rev. Stat. Ann. §§ 16-153, -168(E); Cal. Election Code §§ 2166(b)(2), 2194(a)(2)-(3), (b)(1); Colo. Rev. Stat. § 1-2-302(8); Conn. Gen. Stat. § 9-23h; Del. Code Ann. tit. 15, § 1305; D.C. Mun. Regs. tit. 3, § 510.5; Fla. Stat. § 97.0585; Ga. Code Ann. § 21-2-225(c); Haw. Rev. Stat. §§ 11-14, -97(a); Idaho Code §§ 34-437(1), -437A(3); 10 Ill. Rev. Stat. 5A/1A-25; Ind. Code §§ 3-7-26.4-8, -6, -10; Iowa Code §§ 48A.38(1)(f), .39; Kan. Stat. Ann. §§ 25-2320(b), 2320a; Ky. Rev. Stat. Ann. § 116.095, 117.025(3)(i); La. Stat. Ann. § 18:154(C); Mass. Gen. Laws ch. 51, § 47C; Me. Stat. tit. 21-A, § 196A(1)(K)(2), (6); Md. Code Ann., Elec. Law § 3-506(a)(1); Md. Code Regs. 33.05.02.02(B)(4); Mich. Comp. Laws § 169.168.509gg; Minn. Stat. § 201.091, subds. 4(c), 5, 9; 1 Miss. Code R. pt. 10, R. 7.2; Mo. Rev. Stat. § 115.157(3); Mont. Code Ann. § 13-2-122(1); Mont. Admin. R. 44.3.1102(3); Neb. Rev. Stat. § 32-330(3)(b), (4); Nev. Rev. Stat. §§ 293.440(6), .558(2); N.H. Rev. Stat. Ann. §§ 654:31(VI), :31-a; N.J. Stat. Ann. § 19:31-18.1(c); N.M. Stat. Ann. § 1-4-5.4(C), -5.5(B); N.Y. Elec. Law § 3-103(5); N.C. Gen. Stat. § 163-82.10(a1); N.D. Cent. Code § 16.1-02-15; Ohio Rev. Code Ann. § 3503.13(A)(2); Okla. Stat. tit. 26, §§ 4-112(H), 7-103.2(B)(1), (3); Or. Rev. Stat. § 247.948(2), .955; 25 Pa. Cons. Stat. § 1404(b)(3); 17 R.I. Gen. Laws § 17-9.1-21; S.C. Code Ann. § 7-5-170(1); S.D. Codified Laws § 12-4-9; Tenn. Code Ann. § 2-2-127, -138; Tex. Elec. Code Ann. § 18.009; Utah Code Ann. § 20A-2-104(4)(c), (d); Vt. Stat. Ann. tit. 17, § 2154(b)(1), (c)(1); Va. Code Ann. § 24.2-407, -407.1; Wash. Rev. Code § 29A.08.710(2)(a), .720(3)(a); W. Va. Code 3-2-30(a), (f); Wis. Stat. § 6.36(1)(b)(1)(a); Wyo. Stat. Ann. 22-2-113(a), (d).

Mass. 2025); *League of United Am. Citizens v. Executive Off. of the President*, 780 F. Supp. 3d 135, 159 (D.D.C. 2025) (observing that "Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds"). Because Congress has not authorized the federal government to make the sweeping demands at issue here, they are unconstitutional.

### A. Neither the Help America Vote Act nor the National Voter Registration Act Mandates Disclosure.

The United States contends that the States must provide all voter registration data to comply with the Help America Vote Act (HAVA) and with the list-maintenance requirements of the National Voter Registration Act (NVRA). These laws, however, require only that States make reasonable efforts to maintain accurate voter registration lists. 52 U.S.C. § 21083(a)(4)(A) (HAVA), 52 U.S.C. § 20507(a)(4) (NVRA). Enacted in 2002, HAVA requires each State to create and maintain an electronic statewide voter registration list. *Id.* § 21083(a)(1)(A). When registering a voter, a State must verify the applicant's information using either a driver's license number, the last four digits of a Social Security number, or—if the applicant has neither—a unique voter identification number assigned by the state. *Id.* § 21083(a)(5). HAVA also creates minimum standards for maintaining statewide voter registration records. *Id.* § 21083(a)(4). Each State must have a "system of file maintenance that makes reasonable effort to remove ineligible registrants" while implementing safeguards to prevent erroneous removals. *Id.* And States must prevent unauthorized access to statewide voter registration lists. *Id.* § 21083(a)(3). Likewise, the NVRA requires States to "conduct a general program that makes a reasonable effort to remove" people who have died or moved from voter registration lists. 52 U.S.C. § 20507(a)(4)(A).

These list-maintenance requirements underlie the United States' demands for data and lawsuits across the country. But neither supports its sweeping demands. HAVA does not have

any data-disclosure requirements. And while the NVRA does direct subject States to make some data public, that limited directive does not encompass the sensitive data, such as drivers' license numbers and Social Security Numbers, that the United States seeks. *See Public Int. Legal Found.*, 996 F.3d at 264; *see also Bellows*, 92 F.4th at 56; *Project Vote*, 208 F. Supp. 3d at 1344-45; *True the Vote*, 43 F. Supp. 3d at 736-39.

Alternatively, the United States appears to contend that its HAVA and NVRA enforcement authority entitles it to unfettered access to all voter registration data. (ECF 1 ¶¶ 22-40, 60-61, 67-69.) Enforcement authority, however, does not amount to broad investigative authority, such as would authorize the federal government to demand data. Rather, any such authority must derive expressly from statute. *Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988); *see also, e.g.*, *Cudahy Packing Co. of La. v. Holland*, 315 U.S. 357, 360-67 (1942) (concluding that even statute giving agency subpoena authority did not authorize agency to delegate subpoena-signing authority to other staff). And Congress has granted broad investigative or subpoena authority in more than 300 provisions of federal law. *See, e.g.*, 15 U.S.C. § 1312(a) (Antitrust Civil Process Act's grant of authority to Department of Justice); 42 U.S.C. § 1997a-1(a) (Civil Rights of Institutionalized Persons Act's grant of authority to Department of Justice); 31 U.S.C. § 3733(a) (False Claims Act's grant of authority to Attorney General). Congress, in short, knows how to give federal agencies authority to demand data. And it chose not to do so in HAVA or the NVRA—a policy choice that courts must honor.

### B. The Civil Rights Act of 1960 Does Not Authorize the Department of Justice's Demands for Voter Registration Data Unrelated to Civil Rights Violations.

The record-inspection authority conferred by the Civil Rights Act of 1960, 52 U.S.C. § 20703, likewise does not support the Department of Justice's present demands. Congress

created this inspection authority to enable the federal government to investigate and remediate racially discriminatory voting practices. The Department of Justice's present demands for records do not even purport to serve that objective.

The history of the record-inspection provision confirms its limited purpose. The Civil Rights Act of 1957 did not yet require States to maintain voter registration records or make them available for inspection, but it created the bipartisan Commission on Civil Rights. Civil Rights Act of 1957, Pub. L. No. 85-315, § 101(a), 71 Stat. 634 (Sept. 9, 1957). The Commission's first report, issued in 1959, included over 120 pages of findings and recommendations on voting discrimination. *Report of the United States Commission on Civil Rights* (Sept. 9, 1959), https://tinyurl.com/y253324x. Yet the Commission repeatedly bemoaned that its core purposes had often been thwarted by States' failure to retain or produce rejected voting applications and other registration records. *See, e.g.*, *id.* at 93 ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible."); *id.* at 137 (explaining that midway through the Commission's review of Alabama counties' records, the state legislature authorized counties to destroy denied registrants' application forms). Even where responsive records had not been destroyed, the Commission described occasions on which States had denied the Commission access. *See id.* at 70 (recounting that "when the Commission's agents arrived at the courthouse . . . the Board of Registrars told them that, by order of [Alabama] Attorney General Patterson, the records would not be made available to the Commission on Civil Rights"); *see also id.* at 98 (describing Louisiana's refusal to permit inspection of voter records).

In light of these hurdles and other findings, the Commission recommended that Congress require States to preserve and retain all registration and voting records. *Id.* at 138. And the

Commission was not the only advocate for such a requirement. President Eisenhower urged Congress to adopt these provisions to strengthen the federal response to racially discriminatory voting practices and to counter States' efforts at obstruction. (*See* ECF 33-7, at 2.) As Congress considered the legislation that would become the Civil Rights Act of 1960, Representative Emanuel Celler urged that inspection mechanisms were needed to prevent discriminatory application of voter qualification rules. 86 Cong. Rec. 5440-5517, at 5450 (Mar. 14, 1960) ("It is ancillary to the right to vote, to inspect the records and have the records preserved. They complement each other like the reverse and obverse side of a coin.")

It was against this backdrop that, in 1960, Congress required States to preserve all voter registration records and make them available to the Attorney General for inspection. The Commission on Civil Rights and the Department of Justice thereafter used those provisions precisely the way Congress intended: gathering evidence to investigate complaints of racially discriminatory practices, evaluating whether there were patterns or practices disenfranchising Black voters, and seeking legal remedies in the federal courts where negotiations with voting officials were ineffective. *See generally Report of United States Commission on Civil Rights* (Sept. 30, 1963), https://tinyurl.com/58v3a84u.

Here, by contrast, the Department does not claim any civil rights-related purpose for its demands for voter registration records. Instead, it has claimed that it is entitled to inspect registration records to determine compliance with the NVRA and HAVA—statutes that did not exist when Congress enacted the Civil Rights Act's record retention provisions.

## CONCLUSION

The motions to dismiss should be granted.

January 6, 2026,

Respectfully submitted,

__/s/ Keith Ellison____________
KEITH ELLISON
Attorney General of Minnesota

102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

____/s/ Anthony G. Brown______
ANTHONY G. BROWN
Attorney General of Maryland

____/s/ Daniel Kobrin_________
Daniel Kobrin*
Assistant Attorney General
* Admitted pro hac vice

200 Saint Paul Place, 20th Floor
Baltimore, MD 210202

__/s/ Kathleen Jennings________
KATHLEEN JENNINGS
Attorney General of Delaware

Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

____/s/Raul Torrez____________
RAÚL TORREZ
Attorney General of New Mexico

NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501

___/s/ Nicholas W. Brown______
NICHOLAS W. BROWN
Attorney General of Washington

1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100

___/s/ Peter F. Neronha_______
PETER F. NERONHA
Attorney General of Rhode Island

150 South Main Street
Providence, RI 02903

/s/ Rob Bonta
ROB BONTA
Attorney General of California

1300 I Street, Suite 125
Sacramento, CA 95814

/s/ Philip J. Weiser
PHILIP J. WEISER
Attorney General of Colorado

Office of the Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

/s/ Kristin K. Mayes
KRISTIN K. MAYES
Attorney General of Arizona

2005 N. Central Ave.
Phoenix, AZ 85004

/s/ Dana Nessel
DANA NESSEL
Attorney General of Michigan

P.O. Box 30212
Lansing, Michigan 48909

/s/ Anne E. Lopez
ANNE E. LOPEZ
Attorney General of Hawai'i

Department of the Attorney General
425 Queen Street
Honolulu, Hawai'i 96813

/s/ Aaron M. Frey
AARON M. FREY
Attorney General of Maine

6 State House Station
Augusta, ME 04333

/s/ Matthew J. Platkin
MATTHEW J. PLATKIN
Attorney General of New Jersey

Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

/s/ Kwame Raoul
KWAME RAOUL
Attorney General of Illinois

115 S. LaSalle St.
Chicago, IL 60603

___/s/ Dan Rayfield____________
DAN RAYFIELD
Attorney General of Oregon

1162 Court Street NE
Salem, OR 97301

___/s/ Charity R. Clark_________
CHARITY R. CLARK
Attorney General of Vermont

109 State Street
Montpelier, VT 05609

___/s/ Aaron D. Ford____________
AARON D. FORD
Attorney General of Nevada

100 North Carson Street
Carson City, NV 89701

## CERTIFICATE OF COMPLIANCE

This brief complies with page limits and formatting requirements of Local Rules 7.2(d) and 10.1(a).

Dated: January 6, 2026,

Respectfully submitted,

/s/ Daniel Kobrin______________
Daniel Kobrin*
Assistant Attorney General
* Admitted pro hac vice