HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

GREGORY DOLIN
Counsel
Civil Rights Division

JAMES T. TUCKER
Trial Attorney, Voting Section
Civil Rights Division

*Attorneys for the United States*

JOHN A. SARCONE III
Acting United States Attorney
Northern District of New York

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK
## SYRACUSE DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF ELECTIONS OF THE STATE OF NEW YORK; KRISTEN ZEBROWSKI STAVISKY, in her official capacity as Co-Executive Director of the Board of Elections of the State of New York; RAYMOND RILEY, III, in his official capacity as Co-Executive Director of the Board of Elections of the State of New York; PETER KOSINSKI, in his official capacity as Commissioner of the Board of Elections of the State of New York; HENRY BERGER, in his official capacity as Commissioner of the Board of Elections of the State of New York; ANTHONY CASALE, in his official capacity as Commissioner of the Board of Elections of the State of New York; ESSMA BAGNUOLA, in her official capacity as Commissioner of the Board of Elections of the State of New York; and the STATE OF NEW YORK,<br><br>Defendants. | No. 1:25-CV-1338 (MAD/PJE)<br><br><br>**MEMORANDUM OF THE UNITED STATES IN SUPPORT OF THE UNITED STATES' CROSS-MOTION TO COMPEL PRODUCTION OF FEDERAL ELECTION RECORDS PURSUANT TO 52 U.S.C. § 20701, et seq. AND IN OPPOSITION TO MOTIONS TO DISMISS (DOCS. 73-74, 76-77)** |

## **MEMORANDUM OF LAW**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ....................................................................................................... 3

THE UNITED STATES IS ENTITLED TO PRODUCTION OF THE FEDERALELECTION
RECORDS IT HAS DEMANDED UNDER TITLE III OF THE CRA........................................ 7

   A.   The Federal Rules of Civil Procedure, including the motion to dismiss standard, are
inapplicable to orders to compel under Section 305 of the CRA. .............................. 8

   B.   Title III of the CRA does not require allegations that the federal election records
demanded are needed to investigate race-based denial of voting rights. ................... 10

   C.   New York's SVRL falls within Section 301's broad definition of "all records and papers"
relating to registration to vote in federal elections..................................................... 13

   D.   Movants cannot challenge the Attorney General's basis and purpose to investigate New
York's HAVA and NVRA compliance. ...................................................................... 16

   E.   The United States is entitled to unredacted "reproduction" and "copying" of New York's
federal election records, including its SVRL............................................................. 18

THE UNITED STATES IS COMPLYING WITH APPLICABLE FEDERAL PRIVACY LAWS
............................................................................................................................. 22

   A.   The United States is complying with the Privacy Act. ............................................ 22

   B.   The First Amendment does not prohibit access to data the United States needs for its
HAVA and NVRA claims. ........................................................................................ 25

   C.   The E-Government Act does not prevent the United States from obtaining data
supporting its HAVA and NVRA claims. .................................................................. 25

   D.   The Driver's Privacy Protection Act does not allow Defendants to deny the United
States list maintenance data. ..................................................................................... 27

VI.   NEW YORK IS A PROPER PARTY TO THIS ACTION ................................................ 31

VII.   CONCLUSION...................................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960) ...................................... passim

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013).................................................... 4

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020)............................................................... 13

*Brunner v. Ohio Republican Party*, 555 U.S. 5 (2008)........................................................... 29

*Carolina Tobacco Co. v. Bureau of Customs & Border Prot.*, 402 F.3d 1345 (Fed. Cir. 2005) ... 23

*Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025) ........................................................................................................................................ 21

*Coleman v. Campbell*, 208 F. Supp. 199 (S.D. Miss. 1962) ................................................ 12, 17

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963)....................................................... 9, 12, 17, 21

*Ebert v. Poston*, 266 U.S. 548 (1925)......................................................................................... 12

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity*, 266 F. Supp. 3d 297 (D.D.C. 2017) ...................................................................................................................... 26, 27

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017) .................................................................................................................................. 27

*Ex Parte Siebold*, 100 U.S. 371 (1879)......................................................................................... 4

*Foster v. Love*, 522 U.S. 67 (1997) ............................................................................................ 4

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)..................................................................... passim

*Reno v. Condon*, 528 U.S. 141 (2000) ....................................................................................... 27

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) .......................................................... 4

*United States v. Armstrong*, 517 U.S. 456 (1996)....................................................................... 23

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846 (W.D. La. 1960)...... 9, 10, 30

*United States v. Bisceglia*, 420 U.S. 141 (1975)........................................................................... 9

*United States v. Great N. Ry. Co.*, 343 U.S. 562 (1952)............................................................. 13

*United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269 (1929)............................................................. 12

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ............................................................... 9

*United States v. Owen*, 500 F.3d 83 (2d Cir. 2007)..................................................................... 12

*United States v. Powell*, 379 U.S. 48 (1964) ............................................................................... 9

**Statutes**

18 U.S.C. § 2721 ......................................................................................................................... 27

18 U.S.C. § 2725 ......................................................................................................................... 27

44 U.S.C. § 3101 ......................................................................................................................... 23

5 U.S.C. § 552a ........................................................................................................................... 24

52 U.S.C. § 20502 ....................................................................................................................... 31

52 U.S.C. § 20503 ....................................................................................................................... 31

52 U.S.C. § 20507 ............................................................................................................... 4, 20, 30

52 U.S.C. § 20510 ............................................................................................................ 4
52 U.S.C. § 20701 ...................................................................................................... passim
52 U.S.C. § 20703 ...................................................................................................... passim
52 U.S.C. § 20704 .......................................................................................................... 19
52 U.S.C. § 20705 .................................................................................................... 2, 4, 16
52 U.S.C. § 20706 ............................................................................................................ 7
52 U.S.C. § 21083 ........................................................................................................ 4, 20
52 U.S.C. § 21111 ........................................................................................................ 4, 29
52 U.S.C. § 21141 .......................................................................................................... 31
CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960) ..............................................10, 11
The E-Government Act of 2002, Pub. L. No. 107–347, § 208 ................................ 25, 26
The Privacy Act of 1974, Pub. L. No. 93–579, 88 Stat. 1896 (1974) .......................... 24

## Other Authorities

64 Fed. Reg. 73585-02 (Dec. 30, 1999) ........................................................................ 24
66 Fed. Reg. 8425-02 (Jan. 31, 2001) ........................................................................... 24
68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003) ............................................................... 23
70 Fed. Reg. 43904-01 (July 29, 2005) ......................................................................... 23
74 Fed. Reg. 57194 (Nov. 4, 2009) ............................................................................... 23
82 Fed. Reg. 24147-01 (May 25, 2017) ................................................................... 23, 24
82 Fed. Reg. 24151 (May 25, 2017) .............................................................................. 23

## Regulations

28 C.F.R. § 0.50 ............................................................................................................. 23
28 C.F.R. § 0.51 ............................................................................................................. 23

## Constitutional Provisions

U.S. Const. art. I, § 4, cl. 1 .............................................................................................. 3

## Legislative Materials

106 Cong. Rec. 7767 ......................................................................................................11
148 Cong. Rec. S10512 (daily ed. Oct. 16, 2002) ........................................................ 29
H.R. Rep. 107-329, pt. 1 (2001) ....................................................................................11

Plaintiff United States of America respectfully submits this Memorandum of Law in support of its Cross-Motion to Compel Production of Federal Election Records pursuant to 52 U.S.C. § 20701, *et seq.* and in Opposition to: (1) the Motion to Dismiss by Defendant State of New York ("New York") (Doc. 74); (2) the Motion to Dismiss by Defendants Zebrowski Stavisky, Berger, and Bagnuola ("Dem. BOE Defs.")[1] (Doc. 76); the Motion to Dismiss by Proposed Intervenor-Defendant League of Women Voters of New York State ("LWV Intervenors") (Doc. 73); and the Motion to Dismiss by Proposed Intervenors National Association for the Advancement of Colored People and the NAACP New York State Conference ("NAACP Intervenors") (Doc. 77). Collectively, the moving Defendants and Proposed Intervenors are referred to as "Movants." The United States submits this consolidated Memorandum in support of its Cross-Motion and in opposition to all motions to dismiss to facilitate the Court's review of the duplicative and overlapping arguments made by the Movants. *See* L.R. 7.1(c).

## I.    INTRODUCTION

The Attorney General of the United States brought this case as part of her investigation of New York's list maintenance practices under the Help America Vote Act ("HAVA"), and the National Voter Registration Act ("NVRA"). The United States engaged in repeated correspondence with Defendants, requesting their cooperation in providing federal election records necessary to its assessment in a manner consistent with federal privacy law. Those efforts were met by delay, obfuscation, and Defendants' refusal to produce records as mandated by federal law and necessary

---

[1] Defendants Zebrowski Stavisky, Berger, and Bagnuola are the Democratic appointees to Defendant Board of Elections of the State of New York. *See* N.Y. Bd. of Elections, Board Leadership and Mission, *available at* https://elections.ny.gov/board-leadership-mission (last visited Jan. 6, 2026). The remaining three members of the Board of Elections, Defendants Riley, Kosinski, and Casale, have filed an Answer to the Complaint (Doc. 75).

to evaluate their compliance with federal election laws. This action followed. *See* Compl., Doc. 1.

Title III of the Civil Rights Act ("CRA") provides the principal statutory authority for the United States to immediately obtain federal election records including New York's statewide Voter Registration List ("SVRL"). Those provisions broadly authorize the Attorney General to compel production of "all records and papers" that "come into … possession" of the defendants relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. § 20701; *see also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the production of federal election records demanded under Section 303 of the CRA). In that manner, Title III is unique because it is purely an investigative tool. As such, it enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[2] The United States will focus most of its response on its CRA claim to compel production of federal election records it requires to complete its investigation of Defendants' list maintenance practices under HAVA and the NVRA.[3]

The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or

---

[2] Caselaw addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, courts have not had occasion to revisit the issue. The United States is unaware of any courts disagreeing with the Fifth Circuit's approach to the CRA.

[3] The United States will briefly address its HAVA and NVRA claims, which likewise authorize the Attorney General to obtain federal election records. The record production requirements of those statutes are subject to litigation procedures inapplicable to Title III of the CRA.

refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703. As discussed below in detail, the record before the Court demonstrates that the United States has established each of these requirements. In contrast, Movants have wholly failed to establish that there remains any "matter[] open for determination" which would provide a basis for their respective motions to dismiss. *Lynd*, 306 F.2d at 226. Therefore, the United States is entitled to an order compelling production of New York's SVRL and other responsive federal election records, and the motions to dismiss should be denied.

## II.    BACKGROUND

While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices.[4] The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections

> Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States.

---

[4] Defendant New York argues otherwise but fails to cite any controlling authority recognizing the primacy of state law over federal in the conduct of federal elections. *See* New York Mot., Doc. 74-1 at 1.

*Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the three statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1). Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510(a), 20507(b), 20507(a)(4).

4

Acting pursuant to its authority to enforce these federal election statutes, on June 30, 2025, the United States sent a letter to Co-Executive Directors Zebrowski Stavisky, and Riley, seeking information regarding New York's compliance with HAVA's list maintenance requirements ("June 30 Letter"). Ex. 1 to Decl. of Eric Neff ("Neff Decl."). The June 30 Letter specifically requested an electronic copy of New York's current SVRL used for federal elections, including both active and inactive voters. On July 24, 2025, New York sent a letter in acknowledgment, stating it anticipated responding by the end of August. *See* Ex. 2 to Neff Decl.

On August 14, 2025, the United States sent a follow up letter, clarifying the scope of the requested federal election records ("August 14 Letter"). *See* Ex. 3 to Neff Decl. It explained that the SVRL to be produced "should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number" ("SSN4") as required by HAVA. *Id.* at 1 (emphasis in original). The August 14 Letter further elaborated on the statutory authority requiring production of the federal election records. It stated, "[w]e have requested New York's [SVRL] to assess your state's compliance with the statewide VRL maintenance provisions" of the NVRA, as provided by the Attorney General's enforcement authority under Section 11 of the NVRA. *Id.* It also identified Section 401 of HAVA, which makes the Attorney General solely responsible for enforcing HAVA. *Id.* at 2. The August 14 Letter included a written demand for federal election records under Section 303 of the CRA:

> Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of New York's complete and current [SVRL]. The purpose of the request is to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA.

*Id.* The letter described the applicable privacy protections that would be followed, including Section 304 of the CRA and the Privacy Act. *Id.* at 2-3. The letter concluded with information about how New York could send the requested federal election records securely. *Id.* at 3.

On August 29, 2025, New York replied to the combined requests from the United States ("August 29 Letter"). *See* Ex. 4 to Neff Decl. The August 29 Letter contained a partisan split on the request for the nonpublic federal election records including the SVRL. *Id.* at 4. The Democratic counsel maintained that only the public list, which did not include the HAVA identifying numbers (the driver's license or SSN4) should be shared. *See* Ex. 5 to Neff Decl. The Republican counsel maintained that the entire list should be shared with the United States. *See* Ex. 6 to Neff Decl. Because of the split, New York only offered to share the public version of the SVRL with the United States.

On September 25, 2025, the United States filed the instant action seeking to compel production of the federal election records that it demanded, including New York's SVRL with the HAVA identifying numbers. *See* Compl., Doc. 1. The Complaint included three counts requiring production under the CRA, NVRA, and HAVA, respectively. *Id.* at 14-17. As discussed below, the United States believes it is unnecessary for the Court to address its claims under the NVRA and HAVA, which mandate production through the normal litigation process. Rather, the United States' CRA claim is dispositive of all the relief that it seeks through Title III's "severely limited inquiry" in a "summary proceeding."[5] *Lynd*, 306 F.2d at 226.

---

[5] As provided by Local Rule 7.1(c), the United States has filed a cross-motion to compel production of the federal election records under the CRA. The issues in the cross-motion are the same as those in Movants' respective motions, making it more efficient for the Court to review them together.

### III.    THE UNITED STATES IS ENTITLED TO PRODUCTION OF THE FEDERAL ELECTION RECORDS IT HAS DEMANDED UNDER TITLE III OF THE CRA.

The elements of a demand for production of federal election records under the CRA are few and well-defined. First, the Attorney General must have made a written demand for federal election records stating the basis and purpose. 52 U.S.C. § 20703. Second, the demand must have been made to an officer of election, as that term is defined in Section 306 of the Act.[6] 52 U.S.C. §§ 20703, 20706. Third, the officer of election must have failed or refused to make the demanded federal election records "available for inspection, reproduction, and copying." *Lynd*, 306 F.2d at 225-26; *see* 52 U.S.C. § 20703. Fourth, the Attorney General must have provided "a simple statement" to the Court where a production order is sought showing that these elements were satisfied. *Lynd*, 306 F.2d at 225-26. As discussed in Part II, the record demonstrates that the United States has met these requirements and is entitled to an order of production under Section 305 of the CRA.

In response, Movants make several overlapping and duplicative arguments, all of which lack merit. They misapprehend the nature of a CRA claim by erroneously suggesting the Court

---

[6] Section 306 provides:

> As used in this chapter, the term ''officer of election'' means any person who, under color of any Federal, State, Commonwealth, or local law, statute, ordinance, regulation, authority, custom, or usage, performs or is authorized to perform any function, duty, or task in connection with any application, registration, payment of poll tax, or other act requisite to voting in any general, special, or primary election at which votes are cast for candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico.

52 U.S.C. § 20706.

should apply the motion to dismiss standard to it. They incorrectly maintain that Title III of the CRA applies to investigation of only a narrow category of federal election laws. They ask the Court to ignore caselaw under the CRA and allow an impermissible challenge to the basis and purpose of the Attorney General's written demand. Likewise, they assert that the Court should undermine the Attorney General's enforcement authority by rewriting the congressional mandate in the CRA. In place of producing all election records requisite to voting in federal elections, Movants invite the Court to narrow the mandate to encompass only publicly available records.[7] For the reasons discussed below, Movants' respective motions should be denied and the United States' demand for production of New York's federal election records, including its SVRL, should be granted.

### A.    The Federal Rules of Civil Procedure, including the motion to dismiss standard, are inapplicable to orders to compel under Section 305 of the CRA.

Each of the Movants contend that the Court should apply the motion to dismiss standard to the United States' CRA claim seeking an order to compel production of federal election records. *See* New York's Mot., Doc. 74-1 at 8-9; Dem. BOE Defs.' Mot., Doc. 76-6 at 3; LWV Intervenors' Mot., Doc. 73-2 at 11; NAACP Intervenors' Mot., Doc. 77 at 7-8. Illustrative of their approach, the LWV Intervenors argue that the Court must apply the *Iqbal* and *Twombly* standards and find that to secure relief under the CRA, the United States must allege in its Complaint a claim— presumably, a substantive violation of HAVA or the NVRA—and all known facts that support it. *See* LWV Intervenors' Mot., 73-2 at 11. They are mistaken. Movants repeat what the Fifth Circuit has described as "a basic misconception… concerning a Title III proceeding." *Lynd*, 306 F.2d at

---

[7] A "publicly available" record would never need to be "produced." The Attorney General would simply be able to access it in the same manner as any other member of the public. If that were the rule, CRA's provisions mandating production would essentially be rendered meaningless.

225. The United States will correct their misconception.

The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is… purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what the Movants argue, no factual allegations of a substantive violation of federal law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for the effective fulfillment of that obligation" through Title III of the CRA.[8] *Id.* at 230. That approach makes sense. The United States cannot be expected to effectively enforce federal election laws such as HAVA and the NVRA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her. *See id.* at 227 (the Attorney General's "right to records does not require that [she] show [she] could win without them").

---

[8] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34… is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including the motions to dismiss presently before the Court, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

**B.    Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.**

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election …." 52 U.S.C. § 20701. Section 303 authorizes

the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative." 52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Movants argue that the Court must go outside the text of the statute to the sparse legislative history and find that Title III is limited to those records "necessary to investigate any denial of voting rights in New York." New York Mot., 74-1 at 2; *see also id.* at 14 (arguing that the Attorney General's request must pertain to "any pending or anticipated investigation to voting rights violations in New York"). Other Movants make similar arguments. LWV Intervenors acknowledge that "the statute does not provide a definition of basis," but nevertheless argue that the only permissible basis for a Title III request is "the Attorney General's belief that federal civil rights law has been violated …." LWV Intervenors' Mot., Doc. 73-2 at 12. Defendants Zebrowski Stavisky, Berger, and Bagnuola similarly contend that the CRA is limited to "racial discrimination," despite the absence of any language in Title III supporting their position. *See* Dem. BOE Defs.' Mot., Doc. 76-6 at 9-12. NAACP Intervenors' Motion suffers from a similar infirmity. *See* NAACP Intervenors' Mot., Doc. 77 at 18.

As LWV Intervenors acknowledge, no such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706. Moreover, in a decision cited by the Defendant Movants, New York's Mot., ECF 74-1 at 12 and Dem. BOE Defs.' Mot., Doc. 76-6 at 8, the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 848 (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible

violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated"). The United States clearly has satisfied that requirement by informing the officers of election that "the purpose of the request is to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA."[9] Ex. 3 to Neff Decl. at 2.

Requiring more than that by engrafting a requirement of racial discrimination that does not exist in the statute would violate the clear congressional mandate. Where, like here, the language of an enactment is clear, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Owen*, 500 F.3d 83, 89 (2d Cir. 2007) (quoting *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929)). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In

---

[9] Congress has explained why list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote. For example, passage of HAVA was intended to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found." H.R. Rep. 107-329, pt. 1, at 36 (2001).

that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

As a result, the United States respectfully submits that the Court must decline Movants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id.*

## C.    New York's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.

The scope of federal election records covered by Title III of the CRA is broadly established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added). This language is unequivocal in its breadth.

Nevertheless, two Movants argue that New York's SVRL is not encompassed by Section 301 of the CRA. Defendants Zebrowski Stavisky, Berger, and Bagnuola maintain that "[a]n electronic, statewide voter registration list is not the type of 'record' that can be maintained for a 22-month period" and therefore is not covered by Title III of the CRA. Dem. BOE Defs.' Mot., Doc. 76-6 at 9. The NAACP Intervenors go even further. They ask the Court to ignore the unambiguous language of the Act and twist it to read that the Attorney General is entitled only to the records that the officers of election have received "from someone else," but not to those that

the officers created themselves. NAACP Intervenors' Mot., Doc. 77-1 at 15. Neither of the two

Movants can point to any statutory carveout supporting their novel reading. Nor do they cite any

federal court decision that has adopted their misplaced contention about the CRA.

Indeed, the federal courts that have applied Section 301 have concluded that Congress

meant what it said in the statute. It does not exclude electronic records or records created by the

officer of election. One court explained in detail why a similar effort to impede the Attorney

General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation
> and production of all records and papers which are in the possession of an
> election official … if those records and papers relate to the acts requisite to
> voting…. Regardless of when these records came into the possession of the
> election official, under Section 301 they must be retained and preserved for
> a period of twenty-two months 'from the date of any general, special, or
> primary election…' if they relate to acts requisite to voting in such election.

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). In *Lynd*, the Fifth Circuit likewise

recognized that "the papers and records" covered by Section 301 "have been specifically identified

by Congress." 306 F.2d at 226. This requirement "is sweeping." *Id.* It applies to "all records and

papers," as the statute provides, *id.*, and cannot be circumvented in the manner that the NAACP

Movants suggest. In a similar vein, and contrary to the argument by Defendants Zebrowski

Stavisky, Berger, and Bagnuola, "there is no question for judicial determination as to how far back

the records go. This, too, is fixed by the statute." *Id.* "[T]he Attorney General's right of inspection

and copying extend as far back as the earliest date of any such record or paper which bears on the

eligibility of any currently listed voter to vote" in a federal election. *Id.* at 227. To put it even more

succinctly: Section 301 means what it says in requiring production of "all records and papers"

relating to registration to vote in a federal election, including New York's SVRL. 52 U.S.C. §

20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Therefore, the argument by

14

Defendants Zebrowski Stavisky, Berger, and Bagnuola and the NAACP Intervenors fails as a matter of law.

Finally, NAACP's construction would create absurd results. Title III was enacted to, *inter alia*, counteract discriminatory practices in allowing citizens to vote. *Lynd*, 306 F.2d at 228. (This is not to say that this is Title III's sole purpose. It is not.) The United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[10] To ascertain whether a jurisdiction engages in practices that violate federal law (whether the Voting Rights Act or the NVRA or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the SVRL, so as to assure herself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. Thus, the Attorney General needs to examine both the records created by third parties that then "come into possession" of election officials and the records created by election officials themselves. Limiting the Attorney General's ability solely to the first type of records would make it nearly impossible for her to carry out the duties assigned to her by Congress. Because NAACP's suggested statutory construction would lead to absurd results that no rational legislator could have possibly intended, the Court should reject it.

---

[10] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), doc. 1. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia, supra*, at Doc. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited Jan. 6, 2026). For the Court's convenience, the three documents are provided as Exhibits 7-9 to the Declaration of Eric Neff.

**D.      Movants cannot challenge the Attorney General's basis and purpose to investigate New York's HAVA and NVRA compliance.**

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records. As explained in the preceding discussion, it covers "all records and papers" which come into possession of an officer of election that relate to any prerequisite to voting in a federal election, including voter registration applications and records. 52 U.S.C. § 20701. Pursuant to Section 303 of the Act, to obtain those federal election records, the Attorney General need only make to an officer of election with custody, possession, or control of those records a "demand in writing" for "inspection, reproduction, and copying," accompanied by "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. After that written demand has been made, and the officer of election has rejected it, the Attorney General may seek an order from the federal court "to compel the production of such record or paper." 52 U.S.C. § 20705.

In the August 14 Letter, the Attorney General made a written demand under Section 303 of the CRA for New York's federal election records, including its SVRL. The letter specifically cited Section 303 of the CRA, stating that "[p]ursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of New York's complete and current [SVRL]. The purpose of the request is to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA." Ex. 3 to Neff Decl. at 2.

Nevertheless, the Movants argue that the United States failed to provide a sufficient statement of the basis and purpose of its request for federal election records. New York criticizes the Attorney General's stated basis and purpose for making what it describes as a "conclusory assertion" of the need for the records in order to assess the state's compliance with the NVRA and HAVA. New York's Mot., 74-1 at 14. The state argues that the letter was required to explain a

belief "that New York had failed to comply with any provisions" of the two statutes and to "explain how the sensitive voter registration information" was germane to that assessment. *Id.* The other Movants make related arguments. *See* Dem. BOE Defs.' Mot., Doc. 76-6 at 9-10 (arguing that a factual basis for the demand must be included); LWV Intervenors' Mot., Doc. 73-2 at 12 (contending that the factual basis "must explain how the requested record would help determine if a violation occurred"); NAACP Intervenors' Mot., Doc. 77 at 18 (maintaining that the demand must identify how New York has "violated federal law"). To the extent that Movants assert the demand needs to include facts showing an *extant* violation of federal law, that argument fails as a matter of law. *See supra* Part III(A) (describing why the investigative nature of a demand under Title III forecloses any requirement that a specific allegation of a violation of federal law be included in that demand).

Federal courts have rejected contentions that parallel those made by Movants. Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must] identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868 (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed "to see if any federal laws were violated"). The United States plainly satisfied that requirement by stating, "[t]he purpose of the request is to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA." Ex. 3 to Neff Decl. at 2.

Contrary to what Movants argue, they are prohibited from using "any procedural device or maneuver," including their motions to dismiss, to challenge or "ascertain the factual support for,

or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…" *Id.* "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228. Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226. Movants' motions to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fail under the plain language of the statute, as applied by federal courts. Therefore, their motions should be denied.

> **E.    The United States is entitled to unredacted "reproduction" and "copying" of New York's federal election records, including its SVRL.**

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers… relating to any… act requisite to voting'…." *Id.*

Nevertheless, the Movants ask the Court to legislate limitations conspicuously absent from Title III. First, New York argues that no electronic records need to be produced to the United States. Instead, the state contends, "[t]he statute only mandates that covered records 'be made available… at the principal office of such custodian.'" New York's Mot., Doc. 74-1 at 15 (citing 52 U.S.C. § 20703). However, the statutory language the state omits with ellipses is telling. The complete relevant text of Section 303 provides, "[a]ny record or paper required by [Section 301] to be retained and preserved shall, upon demand in writing by the Attorney General… be made available for inspection, *reproduction, and copying* at the principal office of such custodian by the Attorney General or [her] representative." 52 U.S.C. § 20703 (emphasis adding the language omitted by New York in its brief). Federal courts have concluded that Section 303 requires reproduction and copying. For example, in *Lynd*, the court rejected a "mechanical objection" in which copying federal election records "would, at one time, have been a formidable thing." *Lynd*, 306 F.2d at 231. There, the court observed that "[m]odern photostating equipment will make short order of most of these demands…." *Id.* New York's SVRL is required by HAVA to be in electronic form. It is axiomatic that providing the United States with an electronic copy of its SVRL will be much less burdensome than physical copying of every individual registration record—which the state describes as records of "*millions* of New York voters"—if, indeed, complete physical records even exist outside of their electronic form.[11] New York's Mot., 74-1 at 1 (emphasis in original).

---

[11] According to the data that New York reported to the U.S. Election Assistance Commission, it is doubtful that millions of federal voter registration records exist in any medium other than electronic form. A large percentage of voter registration transactions were reported as being through e-mail, online, and in-person, and through computer entries at designated voter registration locations. *See* U.S. Election Administration and Voting Survey 2024 Comprehensive Report at 158, 162 (June 2025), *available at* https://www.eac.gov/research-and-data/studies-and-reports (last visited Jan. 6, 2026).

19

The other Movants make similar arguments and contend that unredacted information does not have to be provided under the CRA. *See* Dem. BOE Defs.' Mot., Doc. 76-6 at 16-17; LWV Intervenors' Mot., Doc. 73-2 at 12-15; NAACP Intervenors' Mot., Doc. 77 at 19-21. Consistent with that approach, New York cites state statutes governing privacy of voter registration records. *See* New York's Mot., Doc. 74-1 at 4. New York ignores that Congress has overridden any state laws that conflict with the CRA. *See supra* Part II. Moreover, all the Movants ignore the plain language of Section 304 of the CRA, which prohibits the United States from "disclos[ing] any record or paper produced" pursuant to Title III, including "any reproduction or copy," except for narrow purposes including "the presentation of any case or proceeding before any court or grand jury." 52 U.S.C. § 20704. The United States specifically referenced this restriction in its August 14 Letter, along with other federal protections including the Privacy Act that limit use, dissemination, and disclosure of records produced to the Attorney General. *See* Ex. 3 to Neff Decl. It goes without saying that the United States will strictly abide by these statutory limitations. The unredacted SVRL and other responsive federal election records can certainly be produced to the United States consistent with these federal privacy protections through a protective order stating those protections.[12] *Lynd*, 306 F.2d at 230.

Finally, if the Movants' position were to be adopted, it would eviscerate Title III. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA and the NVRA by having access to the voter identification numbers required by

---

[12] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States has offered all states a memorandum of understanding, or MOU, memorializing these requirements. *See* Neff Decl. ¶ 18. As of January 6, five states have provided their SVRLs without any MOU. Two states – Texas and Alaska – have agreed to provide their SVRL under the terms of the MOU. Seven other states have indicated their intention to provide the SVRLs in the near future. *Id.* ¶ 19.

federal law. For each voter, that includes their driver's license number, their SSN4, or other HAVA identifying number. *See* 52 U.S.C. § 21083(a)(5)(A). That information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.[13] There is no question that enforcement of the list maintenance requirements of HAVA and the NVRA are for "the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868.

The data the United States has requested under the CRA is the same that twenty-five states (not including New York) and the District of Columbia routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-maintenance requirements.[14] Similarly, private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal docketed*, No. 25-1585 (1st Cir. June 17, 2025).

---

[13] *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083(a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters….").

[14] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Jan. 6, 2026).

Consequently, the United States is entitled to reproduction and copying of New York's unredacted SVRL under the unambiguous language of Section 303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying"); *Lynd*, 306 F.2d at 231 (same).

## IV.    THE UNITED STATES IS COMPLYING WITH APPLICABLE FEDERAL PRIVACY LAWS

Defendant Movants make a variety of arguments that privacy laws require dismissal of the United States' efforts to compel production of New York's federal election records. *See* New York's Mot., Doc. 74-1 at 9-12; Dem. BOE Defs.' Mot., Doc. 76-6 at 21-25. They are mistaken. The United States does not dispute that the requirements of the Privacy Act and Section 304 of the CRA apply here, and it is complying with those requirements. The First Amendment does not prohibit the collection of voter information by the United States to assess compliance with HAVA and the NVRA. The requirement for a Privacy Impact Assessment under E-Government Act does not apply to the investigation of New York's list maintenance practices being conducted by the United States under HAVA and the NVRA. Similarly, the Driver's Privacy Protection Act does not limit the United States' ability to conduct list maintenance activities. Each of these arguments will be addressed briefly in turn.

### A.    The United States is complying with the Privacy Act.

Defendant Movants argue that the United States must comply with the Privacy Act, and the United States is doing that. But Defendant Movants go even further, contending that the Complaint must be dismissed because the United States "fails to allege that it has complied" with the Act. New York's Mot., Doc. 74-1 at 9; *see also* Dem. BOE Defs.' Mot., Doc. 76-6 at 21 (same). Not surprisingly, however, there is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain

22

records that contain personally identifiable information.[15] Rather, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.

The voter information that the Department is collecting is maintained according to the Privacy Act protections explained in the Civil Rights Division's Privacy Policy, which it has published online.[16] The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148-24,151.[17]

The statutes cited for routine use include the NVRA, HAVA, and the Civil Rights Act of 1960. *See* Privacy Policy, *supra* n.16. The United States made its requests pursuant to those statutes. *See* Exs. 1, 3 to Neff Decl. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

---

[15] Indeed, governmental compliance with relevant laws is, absent a showing to the contrary, presumed. *See, e.g.*, *Carolina Tobacco Co. v. Bureau of Customs & Border Prot.*, 402 F.3d 1345, 1350 (Fed. Cir. 2005) ("Government officials are presumed to do their duty, and one who contends they have not done so must establish that defect by 'clear evidence.'") (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).

[16] *See* U.S. Dep't of Just., Civ. Rts. Div., Privacy Policy ("Privacy Policy"), *available at* https://civilrights.justice.gov/privacy-policy (last visited Jan. 6, 2026).

[17] Additional SORNs issued by the Civil Rights Division to supplement the Department-wide privacy practices are titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); and 70 Fed. Reg. 43904-01 (July 29, 2005). Movant New York fails to recognize any of the Department-wide SORNs that permit the Department's collection of its SVRL, as was done previously in the Georgia and Texas examples discussed *supra* note 10.

Also, contrary to what some of the Movants contend through third-party hearsay, the records the United States is seeking to compel under the CRA are not "to build a nationwide voter registration list…." NAACP Intervenors' Mot., Doc. 77 at 1; *see also id.* at 4-7 (same). Rather, the records being sought from New York are necessary to perform an individualized assessment of the State's efforts to comply with HAVA and the NVRA. The extent of the litigation necessary to obtain those records, in this case and in others, reflects a coordinated effort to impede federal enforcement of those statutes that is unprecedented in its scale.

Similarly, to the extent that Defendant Movants are concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.[18]

Moreover, the Privacy Act does not bar the disclosure of New York's SVRL to the United States, as New York contends. New York's Mot., Doc. 74-1 at 9-10. The Privacy Act regulates federal agencies' collection, maintenance, and disclosure of information within their own systems of records—it does not restrict the ability of state actors to share information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. § 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government." State and local entities fall outside that definition. The Privacy Act "erects certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93–579,

---

[18] *See* JUSTICE/DOJ-014, Department of Justice Employee Directory Systems, last published in full at 74 Fed. Reg. 57194 (Nov. 4, 2009), and modified at 82 Fed. Reg. 24151, 24153 (May 25, 2017); JUSTICE/DOJ-002, Department of Justice Computer Systems Activity and Access Records, last published in full at 64 Fed. Reg. 73585-02 (Dec. 30, 1999), and modified at 66 Fed. Reg. 8425-02 (Jan. 31, 2001) and 82 Fed. Reg. 24147-01 (May 25, 2017).

24

§ 2(b), 88 Stat. 1896 (1974), only within the scope of federal agency record systems. There is no basis for Defendants to fail to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States is complying with the provisions of the Privacy Act.

> **B.    The First Amendment does not prohibit access to data the United States needs for its HAVA and NVRA claims.**

The United States is not violating 5 U.S.C. § 552a(e)(7) of the Privacy Act by requesting New York's SVRL. Defendants Zebrowski Stavisky, Berger, and Bagnuola contend that "the voter registration data DOJ seeks fall within the Privacy Act's prohibition on collecting or maintaining records related to First Amendment activity." Dem. BOE Defs.' Mot., Doc. 76-6 at 21; *see also* New York's Mot., Doc. 74-1 at 10. But they miss the mark. The decisions they cite merely stand for the propositions noted; namely, that voting and registration implicate speech and actions protected under the First Amendment. *See* Dem. BOE Defs.' Mot., Doc. 76-6 at 22. They do not foreclose the United States from enforcing federal election laws like HAVA and the NVRA. Indeed, application of the Defendant Movants' argument would effectively prevent the Voting Section of the Civil Rights Division from engaging in any investigations or enforcement actions at all. That plainly is not what Congress intended.

> **C.    The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA claims.**

Defendant Movants next argue that the demand for production of New York's SVRL and other federal election records violates the E-Government Act. According to Defendant Movants, the Voting Section is required to conduct a "privacy impact assessment," or "PIA," before initiating investigations of each state's compliance with HAVA and the NVRA. *See* New York's Mot., Doc. 74-1 at 11-12; Dem. BOE Defs.' Mot., 76-6 at 24-25. Again, neither the E-Government

25

Act nor interpretative caselaw support the Defendant Movants' assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107–347, § 208(b)(1)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The request is made to Defendants to provide a voter registration list they already maintain pursuant to federal law to analyze their federally required list maintenance.[19]

Applying the E-Government Act to enforcement of voting statutes would lead to an absurd result in which thousands of Privacy Impact Assessments would have to be done whenever the Voting Section gathers any voter data to enforce the Voting Rights Act, NVRA, HAVA, or the Uniform and Overseas Citizens Voting Act (UOCAVA). Nothing in the E-Government Act or the purpose of the privacy provision in the Act suggests it was meant to encompass the enforcement provisions of all voting laws where voter data is examined. *See* Pub. L. No. 107–347, § 208 (a).

Even if the Court found the E-Government Act applied here—and it should not— Defendants Movants' have misplaced their reliance on *Elec. Priv. Info. Ctr. v. Presidential Advisory*

---

[19] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited Jan. 6, 2026).

*Comm'n on Elec. Integrity*, 266 F. Supp. 3d 297 (D.D.C. 2017) ("*EPIC I*"). *See* New York's Mot., Doc. 74-1 at 11-12; Dem. BOE Defs.' Mot., Doc. 76-6 at 24. *EPIC I* does not support dismissal of a complaint based on an alleged failure to conduct a PIA. In that case, the plaintiff sought to enjoin a federal commission's collection of state voter information, claiming the commission had failed to prepare a PIA under § 208 of the E-Government Act. The D.C. Circuit affirmed dismissal of the claim on standing grounds. *See Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017) ("*EPIC II*"). In doing so, the *EPIC II* court explained that the Act "is intended to protect *individuals*—in the present context, voters—by requiring an agency to fully consider their privacy before collecting their personal information. EPIC is not a voter and is therefore not the type of plaintiff the Congress had in mind." *Id*. at 378 (emphasis in original).

### D.    The Driver's Privacy Protection Act does not allow Defendants to deny the United States list maintenance data.

Defendant Movants' contention that dismissal is warranted because they allege that the United States has "failed to sufficiently allege its compliance with the Driver's Privacy Protection Act ('DPPA')," likewise fails. New York's Mot., Doc. 74-1 at 12; *see also* Dem. BOE Defs.' Mot., 76-6 at 25. The DPPA generally prohibits the disclosure of "personal information" obtained by a state Department of Motor Vehicles in connection with a motor vehicle record. *See* 18 U.S.C. §§ 2721(a), 2725(1), (3), (4). Nonetheless, the statute explicitly contains exceptions that permit certain governmental uses. Under 18 U.S.C. § 2721(b)(1), disclosure is allowed "for use by any government agency … in carrying out its functions," including law enforcement or other regulatory enforcement purposes. This statutory language demonstrates that the DPPA was not intended to block all government access to DMV records.

Defendant Movants both cite *Reno v. Condon*, 528 U.S. 141 (2000), in their motions. New York's Mot., Doc. 74-1 at 12; Dem. BOE Defs.' Mot., 76-6 at 25. But in *Reno*, the Supreme Court

confirmed that the DPAA is inapplicable to requests like the one made by the United States. In that case, the Court upheld the DPPA against a Tenth Amendment challenge, emphasizing that the statute regulates the use of DMV information rather than the state itself. The Court explicitly recognized that the DPPA does not restrict a state agency's use of personal information for its own functions, including enforcement and other official governmental activities. Rather, "[t]he DPPA *permits* DMVs to disclose personal information from motor vehicle records for a number of purposes." *Id*. at 145 (emphasis added).

The DPPA's prohibition is clearly not implicated in the present case. The Department of Justice is a government agency performing a statutorily mandated function—verifying voter registration records and associated list maintenance activities by state and local entities. Under the governmental-function exemption in § 2721(b)(1), the United States' use of DMV-provided information is permissible, even though the information originates from a motor vehicle record. Transfers of DMV data to government agencies for official functions, including voter registration administration, are therefore consistent with the DPPA and fall squarely within the statute's exceptions.

## V.    THE UNITED STATES HAS VALID CLAIMS UNDER HAVA AND THE NVRA

Movants argue that the Court should dismiss the HAVA and NVRA claims brought by the United States to obtain federal election records, including New York's SVRL, necessary to investigate and assess New York's compliance with those statutes. *See* New York's Mot., Doc. 74-1 at 15-19; Dem. BOE Defs.' Mot., Doc. 76-6 at 12-19; LWV Intervenors' Mot., Doc. 73-2 at 16-25; NAACP Intervenors' Mot., Doc. 77 at 8-13. As explained in the United States' introduction and its discussion of its CRA action, the claim under the CRA is dispositive of the relief being sought. The summary nature of an action to compel federal election records under Section 305 of

the CRA, and the sweeping scope of that provision, obviate the need for additional relief under HAVA and the NVRA. If the Court agrees, the United States stipulates that it is appropriate to dismiss without prejudice its records requests under HAVA and the NVRA, which would be mooted by a CRA order of production. Nevertheless, the United States will briefly address its other two records claims.

Turning first to HAVA, Defendants Zebrowski Stavisky, Berger, and Bagnuola point out that the text of the Act "contains no inspection or disclosure procedure." Dem. BOE Defs.' Mot., Doc. 76-6 at 17. That is true, and it explains why the United States is entitled to the federal election records it has demanded through its HAVA claim. The only enforcement provision in HAVA authorizing a cause of action in federal court is found at Section 401, which provides that enforcement of the Act is vested solely in the Attorney General. *See* 52 U.S.C. § 21111. Senator Dodd of Connecticut, a HAVA conferee and sponsor, recognized that the Act did not have a private right of action. *See* 148 Cong. Rec. S10512 (daily ed. Oct. 16, 2002). As a result, the Supreme Court has held that private parties may not enforce Section 303, including requests for records under that provision. *See Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (per curiam) ("Respondents, however, are not sufficiently likely to prevail on the question whether Congress has authorized the District Court to enforce § 303 in an action brought by a private litigant to justify the issuance of a TRO."). Congress unsurprisingly did not include a public disclosure requirement, such as the one included in Section 8(i) of the NVRA, because unlike the NVRA, private parties cannot enforce HAVA.

However, that does not leave the United States without recourse to seek list maintenance records under HAVA. Rather, it may do so through the ordinary discovery process necessary to prosecute its Section 303 claim. Here, the CRA cases are instructive. Under the CRA, election

officials are required to preserve and produce federal election records "to facilitate the investigation … before suit is filed." *Citizens Councils*, 187 F. Supp. at 847. By comparison, the demand for records that the United States has made under HAVA falls into the conventional realm of discovery: "The chief purpose of [Federal] Rule [of Civil Procedure] 34 … is to give a party litigant the right to have records produced after suit has been filed." *Id.* That is all the United States is doing in this case. It seeks records necessary to establish a claim under HAVA, following its investigation into whether Defendants are violating the list maintenance requirements in Section 303(a)(4) of the Act. Again, the expedited and comprehensive nature of relief under the CRA renders the HAVA claim unnecessary if the Court enters an order compelling production of the federal election records.

For similar reasons, Defendants' motion to dismiss the NVRA claim must be denied. The plain text of Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…" 52 U.S.C. § 20507(i)(1). That includes the voter registration list, which necessarily must be used to ensure the accuracy of the official list of eligible voters, and is the some of the best evidence of a state's voter list maintenance efforts. The United States has properly alleged in its Complaint that based upon the information currently available to it—that is, without the benefit of the federal election records that Movants seek to deny—Defendants are impeding efforts to ensure that New York's list maintenance efforts comply with federal law.

It is unnecessary to address in any detail the recitation of authorities that Movants offer alleging that Defendants can deny the United States access to everything but the publicly available federal election records. *See* New York's Mot., Doc. 74-1 at 17-18; Dem. BOE Defs.' Mot., Doc.

76-6 at 15; LWV Intervenors' Mot., Doc. 73-2 at 17-18; NAACP Intervenors' Mot., Doc. 77 at 9-11. All the decisions that Movants summarize, as well as the selected excerpt from an amicus brief filed by the United States in a different case, involved efforts by *private organizations* to obtain that data and accordingly are readily distinguishable from this action. Here, the United States is seeking certain federal election data in the SVRL in its efforts to enforce the NVRA in New York. In contrast to records produced to a private entity or individual, records produced to the United States will be subject to federal privacy protections in place at the Department of Justice. *See supra* Part IV. Consequently, the United States has adequately pled claims for federal election records under HAVA and the NVRA.

## VI.    NEW YORK IS A PROPER PARTY TO THIS ACTION

At the end of its brief, New York argues that it cannot provide the requested relief and therefore is not a proper party to the action. New York Mot., Doc. 74-1 at 19-20. However, as the Fifth Circuit explained, relief under the CRA "is not confined to named individual voter officials but extends as far as the sovereign State itself." *Lynd*, 306 F.2d at 228. Furthermore, the list maintenance requirements of HAVA and the NVRA expressly apply to New York. *See* 52 U.S.C. §§ 20502(4), 20503, 21141. Consequently, to the extent New York argues it should be dismissed as an improper party, its motion should be denied.

## VII.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant its motion to compel production of federal election records under Section 305 of the CRA, and to deny the Motions to Dismiss by Movant Defendants New York (Doc. 74) and Defendants Zebrowski Stavisky, Berger, and Bagnuola (Doc. 76), and by Proposed Intervenor-Defendants LWV Intervenors (Doc. 73) and NAACP Intervenors (Doc. 77).

Dated: January 6, 2026                    Respectfully submitted,


JOHN A. SARCONE III                       HARMEET K. DHILLON
Acting United States Attorney             Assistant Attorney General
Northern District of New York             Civil Rights Division


                                          */s/ Eric V. Neff*
                                          _____

                                          ERIC V. NEFF
                                          Acting Chief, Voting Section
                                          Civil Rights Division

                                          GREGORY DOLIN
                                          Counsel
                                          Civil Rights Division

                                          JAMES T. TUCKER
                                          Trial Attorney, Voting Section
                                          U.S. Department of Justice
                                          4 Constitution Square
                                          150 M Street NE, Room 8.923
                                          Washington, D.C. 20002
                                          Telephone: (202) 598-9232
                                          Email: james.t.tucker@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 6, 2026 a true and correct copy of the foregoing

document was served via the Court's ECF system to all counsel of record.


*<u>/s/ Eric V. Neff</u>*

Eric V. Neff
Acting Chief, Voting Section
Civil Rights Division

33