UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

*Plaintiff,*                    Case No.: 1:25-cv- 1338 (MAD/PJE)

v.

BOARD OF ELECTIONS OF THE STATE OF
NEW YORK, KRISTEN ZEBROWSKI STAVISKY,
in her official capacity as Co-Executive Director of the
Board of Elections of the State of New York,
RAYMOND RILEY, III, in his official capacity as
Co-Executive Director of the Board of Elections of the
State of New York, PETER KOSINSKI, in his official
Capacity as Commissioner of the Board of Elections
of the State of New York, HENRY BERGER, in his
official capacity as Commissioner of the Board of
Elections of the State of New York, ANTHONY
CASALE, in his official capacity as Commissioner of the
Board of Elections of the State of New York, ESSMA
BAGNUOLA, in her official capacity as Commissioner
of the Board of Elections of the State of New York, and
the STATE OF NEW YORK,

*Defendants.*

---

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF
MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)
AND IN OPPOSITION TO THE CROSS-MOTION TO COMPEL THE PRODUCTION OF
FEDERAL ELECTION RECORDS PURSUANT TO 52 U.S.C. § 20701**

HARRIS BEACH MURTHA CULLINA PLLC
677 Broadway, Suite 1101
Albany, NY 12207

*Attorneys for Defendants Kristen Zebrowski
Stavisky, Henry Berger, and Essma Bagnuola*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION .............................................................................................................. 1

I.    DISMISSAL IS WARRANTED DUE TO DOJ'S FAILURE TO ALLEGE A
VIABLE CLAIM FOR RELIEF UNDER TITLE III OF THE 1960 CRA, THE
NVRA OR HAVA. ..................................................................................................... 2

    A.  DOJ has failed to state a viable right to disclosure under the NVRA or HAVA,
which claims it has all but abandoned. ......................................................... 2

    B.  DOJ's argument that the Court may not use the *Iqbal/ Twombly* standard to assess
whether DOJ stated a cognizable claim for document inspection lacks merit. ............ 3

    C.  New York's statewide voter registration list is not a record that falls within the
purview of Title III of the 1960 CRA, nor has DOJ articulated any statement of
basis or viable statement of purpose as the statute requires......................................... 4

    D  DOJ's conclusory preemption argument fails to state a cognizable claim that
Congress has overridden New York privacy laws precluding acquisition of
"all fields" of New York's statewide voter registration list........................................ 10

II.    DISMISSAL IS WARRANTED DUE TO DOJ's FAILURE TO PLAUSIBLY
ALLEGE COMPLIANCE WITH FEDERAL PRIVACY LAWS................................. 13

    A.  DOJ's demand violates the Privacy Act ..................................................... 13

    B.  DOJ's demand violates the E-Government Act........................................... 15

    C.  DOJ's demand violates the Driver's Privacy Protection Act...................... 16

III.    DOJ's "Cross-Motion to Compel" Is a Premature and Procedurally Improper
Summary Judgment Motion.................................................................................... 17

    A.  The CRA does not authorize or compel a special statutory proceeding
exempt from the Federal Rules of Civil Procedure ..................................... 18

    B.  DOJ's cross-motion for summary judgment is procedurally improper ...................... 19

    C.  If the motions to dismiss are not granted, Defendants should be allowed to answer
and conduct discovery................................................................................... 21

CONCLUSION.................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States,*
573 U.S. 169 (2014)................................................................................6

*Alabama ex rel. Gallion v. Rogers,*
187 F. Supp 848 (M.D. Ala. 1960), *aff'd on opinion below sub nom. Dinkens v. Att'y Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961), *cert. denied sub nom Dinkens v. Rogers*, 366 U.S. 913 (1961)..............................................................7

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)..............................................................................20

*Arizona v. Inter Tribal Council of Arizona, Inc.,*
570 U.S. 1 (2013)..................................................................................10

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)................................................................................4

*Becker v. United States,*
451 U.S. 1306 (1981)............................................................................18

*Bell Atlantic Corp. v Twombly,*
550 U.S. 544 (2007)................................................................................4

*Bellitto v. Snipes,*
935 F.3d 1192 (11th Cir. 2019) ............................................................12

*Bond v. United States,*
564 U.S. 211 (2011)..............................................................................16

*Bostock v. Clayton Cnty., Ga.,*
590 U.S. 644 (2020)............................................................................6, 8

*California v. Trump,*
786 F. Supp. 3d 359 (D. Mass. 2025) ..................................................22

*Coalition for Open Democracy v. Scanlan,*
No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025), *appeal docketed*, No. 25-1585 (1st Cir. June 17, 2025) ......................................11

*Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Schs.,*
854 F.3d 683 (D.C. Cir. 2017) ........................................................18, 24

*Crystalline H2O, Inc. v. Orminski,*
    105 F. Supp. 2d 3 (N.D.N.Y. 2000)................................................................20

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
    591 U.S. 1 (2020).............................................................................................21

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
    266 F. Supp. 3d 297 (D.D.C. 2017)...............................................................15

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
    878 F.3d 371 (D.C. Cir. 2017)........................................................................16

*Elliott v. Cartagena,*
    84 F.4th 481 (2d Cir. 2023) ............................................................................20

*Evans v. USA Bobsled & Skeleton Fed'n,*
    No. 8:23-CV-1429, 2024 WL 4120716 (N.D.N.Y. Sept. 9, 2024)........................19

*Foster v. Love,*
    522 U.S. 67 (1997)...........................................................................................10

*Greater Birmingham Ministries v. Sec'y of State for Alabama,*
    105 F. 4th 1324 (11th Cir 2024) .......................................................................3

*Husted v. A. Philip Randolph Inst.,*
    584 U.S. 756 (2018).........................................................................................12

*In re Admin. Subpoena No. 25-1431-019,*
    800 F. Supp. 3d 229 (D. Mass. 2025) .............................................................18

*In re Coleman,*
    208 F. Supp. 199 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313
    F.2d 867 (5th Cir 1963), *cert. denied*, 373 U.S. 950 (1963).....................5

*In re: Dep't of Just. Admin. Subpoena No. 25-1431-030,*
    No. 25-MC-00063-SKC-CYC, 2026 WL 33398 (D. Colo. Jan. 5, 2026) ..............18

*Kennedy v. Lynd,*
    306 F.2d 222 (5th Cir 1962) .....................................................................4, 5, 7, 8

*League of United Latin Am. Citizens v. Exec. Off. of President,*
    No. CV 25-0946 (CKK), 2025 WL 3042704 (D.D.C. Oct. 31, 2025)....................22

*Levine v. B & R Acquisition Partners, LLC,*
    No. 1:24-CV-939 (MAD), 2024 WL 3829567 (N.D.N.Y. Aug. 15, 2024) ..............19

*Loc. Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. A & M*
  *Heating, Air Conditioning, Ventilation & Sheet Metal, Inc.,*
    314 F. Supp. 2d 332 (S.D.N.Y. 2004) ...................................................................19

*Lunts v. Rochester City Sch. Dist.,*
    515 F. App'x 11 (2d Cir. 2013) ...........................................................................20

*Project Vote, Inc. v. Kemp,*
    208 F. Supp. 3d 1320 (N.D. Ga. 2016) ..................................................................3

*Pub. Int. Legal Found., Inc. v. Bellows,*
    92 F.4th 36 ...........................................................................................................2

*Pub. Int. Legal Found., Inc. v. North Carolina State Bd. of Elections,*
    996 F.3d 257 (4th Cir. 2021) ...............................................................................2

*South Carolina v Katzenbach,*
    383 U.S. 301 (1966) ..............................................................................................6

*United States v. Chase Manhattan Bank,*
    598 F.2d 321 (2d Cir. 1979) .........................................................................18, 21

*United States v. Powell,*
    379 U.S. 48 (1964) ...............................................................................17, 18, 21

*United States v. Pritchard,*
    438 F.2d 969 (5th Cir. 1971) .............................................................................18

*United States v. Shirley Weber,*
    Case No. 2:25-cv-09149-DOC-ADS (C.D. Cal.) ................................................1

*West Virginia v. Environmental Protection Agency,*
    597 U.S. 697 (2022) ..............................................................................................6

**Statutes**

5 U.S.C. § 552a(a)(3) ...............................................................................................15

5 U.S.C. § 552a(a)(5) ...............................................................................................15

5 U.S.C. § 552a(e) ....................................................................................................15

5 U.S.C. § 552a(e)(4) ...............................................................................................15

5 U.S.C. § 552a(e)(7) ...............................................................................................15

5 U.S.C. § 552a(f) .....................................................................................................15

18 U.S.C. § 2721(a) ..................................................................................................17

18 U.S.C. § 2725(1) .......................................................................................................17

18 U.S.C. § 2725(3) .......................................................................................................17

18 U.S.C. § 2725(4) .......................................................................................................17

52 U.S.C. § 20507(a)(4) ................................................................................................12

52 U.S.C. § 20701 ...........................................................................................................1

52 U.S.C. § 20703 ....................................................................................................8, 22

52 U.S.C. § 20704 .........................................................................................................11

52 U.S.C. § 20705 .........................................................................................................18

52 U.S.C. § 21083(a)(4)(A)(i) ......................................................................................12

52 U.S.C. § 21083(a)(5) ..........................................................................................17, 23

Fed. R. Civ. P. 1 ............................................................................................................18

Fed. R. Civ. P. 12(b)(6) .............................................................................................1, 25

Fed. R. Civ. P. 26 ..........................................................................................................25

Individual Rules and Practices of Hon. Mae A. D'Agostino, Rule 2(A)(i) .................20

L.R. 56.1(a) ...................................................................................................................20

Pub. L. No. 93-579, § 2(A)(5)(B), 88 Stat. 1896 (1974) .............................................15

Pub. L. No. 107-347, § 208(b)(1)(A)(ii), 116 .............................................................24

**Other Authorities**

68 Fed. Reg. 47610-01, 47611 .....................................................................................14

Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) .....................................23

Office of Mgmt. & Budget, Office of the President, OMB Memorandum M-03-
    33, Guidance for Implementing the Privacy Provisions of the E-Government
    Act of 2002, Att. A. §II(B) (2003) ............................................................................16

Defendants Kristen Zebrowski Stavisky, Henry Berger, and Essma Bagnuola (hereinafter, the "Commissioners"), by their counsel Harris Beach Murtha Cullina, PLLC, submit this Memorandum of Law in further support of their motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) and in opposition to the Cross-Motion to Compel the Production of Federal Election Records Pursuant to 52 U.S.C. § 20701 filed by Plaintiff United States of America (hereinafter "Plaintiff" or "DOJ").

## INTRODUCTION

DOJ's opposition chillingly contends that, under the Civil Rights Act of 1960 (CRA), so long as DOJ makes a "written demand for federal election records stating the basis and purpose," it is entitled to receive whatever records it seeks, reducing the Court's role to a rubber stamp. Thankfully, this is not the law. DOJ's superficial statutory analysis ignores the context and purpose of the CRA, which, when appropriately considered, makes clear that DOJ's demand for the unredacted voter data for New York's more than 13 million voters is unauthorized by that law, enacted to detect voting-related racial discrimination once pervasive.

The Court should follow the lead of the District Court in *United States v. Shirley Weber*, Case No. 2:25-cv-09149-DOC-ADS (C.D. Cal.),[1] the first court to substantively address DOJ's nationwide quest to obtain unredacted statewide voter lists. That court resoundingly rejected each argument DOJ has presented here, concluding that (1) DOJ's claim pursuant to the Civil Rights Act of 1960 (CRA) fails due to DOJ's inadequate and "contrived" statements of basis and purpose (Cal. Decision at 13-19), (2) DOJ's National Voter Registration Act (NVRA) and Help America Vote Act (HAVA) claims provide no authority for DOJ to obtain States' unredacted voting lists

---

[1] The decision (hereinafter the "Cal. Decision"), issued on January 15, 2026, is attached as **Exhibit 7** to the accompanying Declaration of Elliot A. Hallak ("Hallak 56(d) Decl.").  A news article indicating that a District Court in Oregon is poised to issue a similar ruling dismissing DOJ's complaint seeking Oregon's unredacted voter registration list is attached as Exhibit 8 to that Declaration. Hallak Decl. ¶22.

(*id.* at 19-27), and (3) DOJ's claims are independently barred by each of the three federal privacy laws raised in the Commissioners' motion to dismiss (*id.* at 27-31). The California court correctly saw through DOJ's request for what it is, concluding that "DOJ seeks to use civil rights legislation which was enacted for an entirely different purpose to amass and retain an unprecedented amount of confidential data." *Id.* at 32. As that court appreciated, such "centralization" of election information by the federal government would have "a chilling effect on voter registration" *id.,* and is incompatible with the constitutional design under which States possess comprehensive authority to administer elections subject to regulation by Congress, which preempts state law only to the extent federal legislation creates a direct, textual conflict which has not been shown here.

DOJ's "cross-motion to compel" is a procedural gambit that finds no support in the statutes relied upon or governing precedent. DOJ's cross-motion fails for the same reasons the motion to dismiss should be granted. However, if DOJ's complaint survives the motion to dismiss, the weighty issues that would be presented will require substantially more process than DOJ contends.

## I. DISMISSAL IS WARRANTED DUE TO DOJ'S FAILURE TO ALLEGE A VIABLE CLAIM FOR RELIEF UNDER TITLE III OF THE 1960 CRA, THE NVRA OR HAVA.

### A. DOJ has failed to state a viable right to disclosure under the NVRA or HAVA, which claims it has all but abandoned.

In opposition, DOJ has significantly narrowed its focus, primarily asserting a right to disclosure under the inspection provision in Title III of the CRA, indicating that "it is unnecessary for the Court to address its claims under the NVRA and HAVA." Opp. at 6. And with good reason. As explained in the Commissioners' initial brief (IB) (ECF No. 76-6), the NVRA's public inspection provision affords no right to electronic disclosure of an unredacted, electronic statewide voter registration list[2] and HAVA contains no inspection provision of any kind. IB at 12-19. DOJ

---

[2] DOJ has no answer to the precedent holding that redaction of personal information is entirely consistent with the NVRA. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 55-56 (1st Cir. 2024; *see Pub. Int. Legal Found., Inc. v. North Carolina State Bd. of Elections*, 996 F.3d 257,

makes little effort to specifically rebut the Commissioners' arguments.

As to HAVA, DOJ attempts to recast the complaint as asserting something other than an investigative demand, contending that its "demand for records . . . made under HAVA falls into the conventional realm of discovery" under Federal Rule 34, and that it "seeks records necessary to establish a claim under HAVA, *following* its investigation into whether Defendants are violating [HAVA] list maintenance requirements." Opp. at 30 (emphasis added). But DOJ must first state a cognizable claim, overcoming a motion to dismiss, before it is entitled to Rule 34 discovery and DOJ's attempt to put the cart before the horse is revealing. DOJ has all but admitted that it has no legitimate factual basis to suppose New York has violated either the NVRA or HAVA and is clearly attempting to use baseless, conclusory claims as a vehicle to troll through New Yorker's sensitive personal information in pursuit of objectives unrelated to its narrow enforcement role related to list maintenance procedures. The NVRA and HAVA claims are merely fig leaves. For the reasons asserted in the Commissioners' initial brief and further explained here, DOJ has failed to state a viable claim under Title III nor, in any event, could it obtain New York's unredacted statewide voter registration list under any of the statutes on which it relies.

### B. DOJ's argument that the Court may not use the *Iqbal/ Twombly* standard to assess whether DOJ stated a cognizable claim for document inspection lacks merit.

Although DOJ misrepresents their argument, the Commissioners contend – consistent with contemporary precedent governing the enforceability of civil investigative demands – that the threshold inquiry on the motion to dismiss a claim seeking enforcement of an investigative demand is whether the agency seeking records complied with the requirements of the governing statutes purportedly authorizing that request. *See* IB at 5-6. Given that DOJ largely relies on a single statute

---

264 (4th Cir. 2021); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016). Likewise, the NVRA does not grant a right to electronic disclosure. *Greater Birmingham Ministries v. Sec'y of State for Alabama*, 105 F. 4th 1324, 1332 (11th Cir 2024).

as the foundation of its request, at this point that argument largely distills to whether DOJ properly stated a claim under Title III of the CRA. DOJ seems to acknowledge that it must meet "the elements of a demand for production of federal election records under the CRA," Opp. at 7, but fails to explain how this is any different than showing that a claim has been stated under the *Iqbal/Twombly* standard, which inquires whether the complaint alleges facts that, if true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atlantic Corp. v Twombly*, 550 U.S. 544, 570 (2007)).

With respect to standards of review and applicable procedure, *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ("*Lynd*"), on which DOJ primarily relies, has not withstood the test of time and is inconsistent with more contemporary precedent setting forth the standards governing enforcement of investigative demands cited in the Commissioners' initial brief (IB, at 5-6), which DOJ entirely fails to address. As detailed in Point III.A., the Fifth Circuit's conclusion in *Lynd* that the Federal Rules of Civil Procedure do not apply to a Title III enforcement claim is contradicted by the Federal Rules themselves and more recent well-settled precedent.

### C. New York's statewide voter registration list is not a record that falls within the purview of Title III of the 1960 CRA, nor has DOJ articulated any statement of basis or viable statement of purpose as the statute requires.

As explained in the initial brief, DOJ failed to state a claim because, among other reasons: (1) a statewide electronic voter registration list including "all fields" is not among the "records and papers" covered by Title III; (2) DOJ failed to articulate any statement of basis, as required by the plain language of Title III; and (3) DOJ's purported statement of purpose does not align with the Civil Rights Acts, of which Title III is a part. Neither *Lynd* nor *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963), *cert. denied*, 373 U.S. 950 (1963), on which DOJ significantly relies, involved these issues and, in many respects those cases – involving enforcement of Title III demands based on allegations of invidious racial discrimination – support the Commissioners' position. For one

thing, a statement of basis – a factual allegation that the Attorney General had reason to believe the constitutional rights sought to be enforced by the Civil Rights Acts were being infringed – was provided in those cases, which is entirely lacking here.

Likewise, the basis and purpose statements in those cases were consistent with the purpose of the CRA to combat invidious discrimination in violation of the U.S. Constitution:

> This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction. The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violation of Federal law in regard to registration and voting have occurred.

*Lynd*, 306 F.2d at 229 n. 6; *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir 1963), *cert. denied*, 373 U.S. 950 (1963). The records at issue, by their nature and scope, clearly fell within the purview of Title III as the Attorney General sought "voter record information within the time-reach of the statute relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights." *Lynd*, 306 F.2d at 228.[3] The demand neither involved a state's entire, unredacted voter registration list nor "confidential" information. *Id*. at 231. This, of course, was long before Congress enacted HAVA mandating the use of social security and driver's license numbers for voter registration.

DOJ distorts well-settled cannons of statutory interpretation when it asserts that this Court must interpret the language in Title III in isolation without viewing the inspection statute in the context of the broader statutory scheme. Indeed, such an approach is inconsistent with the analysis

---

[3] It is in this context that *Lynd* uses the word "sweeping" to describe the scope of disclosure. In the very next sentence, *Lynd* refers to the specific statutory language describing the covered records subject to disclosure, referencing the 22-month retention provision and the descriptive language clarifying they are records "which come into [the local election officer's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting." *Id.*, at 226. In lieu of a rigorous textual analysis, DOJ repeats the word "sweeping," in an apparent effort to distract the Court from analyzing the statutory language describing the documents.

in *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 645-55 (2020), on which DOJ relies. Opp at 11. DOJ quotes *Bostock* for the proposition that "only the words on the page constitute the law adopted by Congress and approved by the President," Opp. at 11, but, by plucking that sentiment out of its context, DOJ distorts its meaning. Although DOJ suggests otherwise, it is clear from *Bostock* that words in a statute should not be viewed in isolation and interpreted without consideration of the text of the broader statutory scheme, nor should statutory language be given a contemporary meaning divorced from its historical context, as is evident when the snippet cited by DOJ is read in context.[4] "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. Environmental Protection Agency*, 597 U.S. 697, 721 (2022) (citation and quotation marks omitted). When interpreting statutory language, courts "must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history and purpose." *Abramski v. United States*, 573 U.S. 169, 179 (2014).

Title III was not adopted in a vacuum, and it must be interpreted and applied consistently with the surrounding statutory scheme. Title III was one of the "perfecting amendments" enacted to strengthen the Civil Rights Act of 1957 by, among other things, "[giving] the Attorney General access to local voting records." *See South Carolina v Katzenbach,* 383 U.S. 301, 313 (1966). Despite DOJ's nonsensical suggestion that Title III (part of the "Civil Rights Act of 1960") is not an antidiscrimination statute, the inspection provision was enacted under the same authority as the 1957 CRA to facilitate "preliminary investigations of registration practices . . . in order to

---

[4] *Bostock* actually states: "Court normally interprets a statute in accord with the ordinary public terms at the time of its enactment. After all, only the words on the page constitute the law adopted by Congress and approved by the President. If Judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imagination, we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations." *Id*. at 654-655.

determine whether or not such practices conform to constitutional principles[,] *as . . . an essential step in the process of enforcing and protecting the right to vote regardless of color, race, religion or national origin.*" *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp 848, 853-54 (M.D. Ala. 1960), *aff'd on opinion below sub nom. Dinkens v. Att'y Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961), *cert. denied sub nom Dinkens v. Rogers*, 366 U.S. 913 (1961) (emphasis added). Title III is one of a suite of statutes intended to combat invidious racial discrimination to give effect to equal protection and voting rights enshrined in the Fourteenth and Fifteenth Amendments.

No one disputes that Title III is an "investigative tool." Opp. at 2. But DOJ is wrong when it suggests the inspection provision is a standalone tool that can be used to investigate anything the Attorney General might be interested in examining, regardless of the factual basis or true objective of its demand. Title III is an enforcement tool adopted to strengthen other enforcement mechanisms in a pre-existing statutory scheme, specifically to facilitate investigation of race-based discrimination in relation to voter registration. A component of the Civil Rights Act of 1960, Title III must be read in the context of the preceding Civil Rights Acts to which it relates. This is evident from *Lynd*, 306 F.2d at 225 (emphasis added), the case on which DOJ selectively relies, which states: "Title III provides an effective means whereby preliminary investigations of registration practices can be made in order to determine whether or not such practices *conform to constitutional principles.*" *Gallion*, 187 F. Supp at 853. That context is critical to properly determining the nature of the records covered by Title III and what constitute proper statements of basis and purpose supporting the request.

While DOJ accuses the Commissioners of trying to "rewrite the CRA," Opp. at 13, it is DOJ that is attempting to "remodel" or "update" Title III's language to cover a type of disclosure never contemplated by Congress by omitting qualifying language describing and limiting the scope of the records to which it relates, while at the same time attempting to transform the "inspection" procedure into a right to demand electronic disclosure of records that did not exist when Title III

was enacted. Indeed, while lecturing on the need for textual purity, DOJ largely ignores the statutory text, making no effort to grapple with its plain language. Likewise, DOJ refuses to view the language in a manner consistent with the time of its enactment, despite the directive in *Bostock* and other cases that, "we orient ourselves to the time of the statute's adoption [when] examining the key statutory terms." *Bostock*, 590 U.S. at 655.

Properly interpreted in statutory and historical context, the documents covered under Title III are "all records and papers" that "come into . . . possession" of the registrar during the voter registration application process, and which could be retained for 22 months, relating to individuals "to whom there is a question concerning infringement or denial of . . . constitutional voting rights," *Lynd*, 306 F.2d at 226-28. In other words, documents relevant to determining whether the constitutional rights of the prospective voter were infringed – not a dynamic electronic statewide voter registration list created by election officials *after* the registration process is concluded, reflecting only the registration of applicants that successfully navigated that process. Moreover, although DOJ suggests otherwise, *Lynd* itself makes clear that, in the event of a dispute concerning "whether or not any specified particular paper or record comes within this broad statutory classification," the Court is empowered to resolve the issue. *Id*. at 226. This case presents such a dispute and DOJ fails to meaningfully answer the Commissioners' textual argument that the information DOJ requests is not a paper or record covered by Title III.

Moreover, although DOJ acknowledges that a proper Title III demand must be in writing "stating the basis and purpose" for the request, DOJ thereafter simply ignores the "statement of basis" requirement. *See* 52 U.S.C. § 20703. DOJ neither claims that it was required only to provide a statement of purpose nor disputes that a statement of basis refers to factual allegations underlying the request, as reflected in the basis statements in *Lynd* and *Coleman* quoted above. *Lynd* indicates that the Attorney General does not have to prove the facts articulated in the statement of basis but, even assuming *Lynd* was correct on that point, the Fifth Circuit never suggested the Attorney

General could dispense with the statement altogether.  Such a conclusion would be inconsistent with the plain language of 52 U.S.C. § 20703.  The absence of a statement of basis – an omission DOJ does not even attempt to explain – is fatal to DOJ's document request.  Indeed, it appears that this demand is entirely without factual basis because DOJ has no reason to question New York's compliance with the CRA or, for that matter, HAVA or the NVRA.

As to purpose, DOJ essentially argues that it need not connect a Title III demand with an effort to combat civil rights violations even though it cannot reasonably be disputed that Title III is a civil rights law enforcement provision.  The DOJ's unstated premise is that it can use any statute granting authority to request documents without regard to whether its investigation is related to the laws that statute was enacted to enforce, an approach that divorces the enforcement mechanism from its statutory context, broadening its reach beyond that authorized by Congress. If DOJ were correct (and it is not), it could, for example, use a Title III document request to obtain a voter's registration information in furtherance of an investigation entirely unrelated to civil rights violations, such as to investigate tax fraud (a voter registration application might supply relevant information relating, for example, to a resident's claimed address on a particular date).  But that would be an abuse of Title III. The evident purpose of Congress requiring that a Title III investigative demand include a statement of basis and purpose was to ensure that the inquiry had factual support and was properly initiated to secure rights protected by the Civil Rights Acts.  If its purpose involves enforcement of some other law (such as combating tax fraud), the government must rely on the investigation and enforcement provisions Congress deemed appropriate to facilitate enforcement of that law.

The well-settled requirement that the government must have statutory authority to demand documents would provide little protection if the government were not required to use the demand in the manner and for the purpose authorized by Congress.  The Court should therefore reject DOJ's efforts to separate Title III from its regulatory framework, putting the Court's imprimatur

on a fishing expedition unmoored from the objectives animating its enactment. DOJ's proffered purpose of ascertaining "compliance with the list maintenance requirements of the NVRA and HAVA," Hallak Dec., Exh C., at 2, fails to align with Title III's civil rights enforcement mandate and is therefore facially insufficient.

> **D. DOJ's conclusory preemption argument fails to state a cognizable claim that Congress has overridden New York privacy laws precluding acquisition of "all fields" of New York's statewide voter registration list.**

Citing Part II of its Opposition papers, DOJ contends that "New York ignores that Congress has overridden any state laws that conflict with the CRA." Opp. at 20. Part II, entitled "Background," is largely a fact section in which DOJ asserts that Congress has "enacted broad regulations over the conduct of federal elections," identifying in general fashion: (1) HAVA's requirement that states create statewide computerized voter registration lists, regularly update those lists and ensure that eligible voters are not removed in error; (2) the NVRA's public inspection requirement involving records concerning "programs and activities" relating to list maintenance; and (3) the NVRA's requirement, as DOJ characterizes it, that states maintain "accurate and current voter rolls" for federal elections and remove ineligible voters. Opp. at 4. This is the sum total of DOJ's response to the Commissioners' detailed argument that there is no federal statute preempting New York privacy laws precluding disclosure of the sensitive personal information DOJ seeks, including social security and driver's license numbers.

As explained in the Commissioners' initial brief, IB at 19-21, even the cases cited by DOJ demonstrate that, in the Elections Clause context, Congressional statutes preempt state laws only to the extent they are directly "inconsistent therewith." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 9 (2013). "[T]he scope of Congress's pre-emptive intent" is determined by the "statutory text" of its enactments. *Id*. at 14; *see Foster v. Love*, 522 U.S. 67, 69 (1997). DOJ has not pointed to any statutory text – and there is none – that conflicts with New York laws protecting

the sensitive, personally-identifying information of 13 million New York voters.

Failing to engage with the proper Elections Clause preemption analysis, DOJ contends instead that the presence of 52 U.S.C. § 20704 – itself a nondisclosure provision – somehow negates New York privacy laws. That provision precludes the Attorney General from "disclos[ing] any record or paper produced [under Title III] . . . except to Congress and any committee thereof, governmental agencies, and in the presentation of any case before any court or grand jury." 52 U.S.C. § 20704.[5] The fact that information that comes into DOJ's possession is subject to certain disclosure limitations in no way alters the nature or scope of the information DOJ is entitled to acquire, which is the question at issue here. And, as further explained in point III.C., DOJ's contention that "the United States" will abide by federal restrictions and privacy laws is little comfort given that, to date, DOJ has not complied with the federal Privacy Act or other applicable privacy laws and there are numerous credible reports of the planned, widespread sharing and use of voters' private information by various federal agencies to serve objectives far removed from, and in fact patently inconsistent with, the anti-discrimination laws Title III was enacted to enforce.

DOJ's claim that interpreting Title III in a manner consistent with its plain language and statutory context will prevent meaningful enforcement of list maintenance requirements under HAVA and the NVRA is not convincing. DOJ has been enforcing those provisions for decades without either invoking Title III or securing access to statewide voter registration lists, much less voters' social security or driver's license numbers. In fact, DOJ does not dispute that no court has ever compelled disclosure of a statewide voter registration list to a federal agency pursuant to an investigative demand.[6] The NVRA obligates "each State" to "conduct a general program that

---

[5] Although DOJ contends it offered "all states a memorandum of understanding, or MOU, memorializing the confidentiality requirement of section 20704 and the federal Privacy Act," Opp. at 20 n. 12, no such offer was made to New York.

[6] DOJ's reference to *Coalition for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025), *appeal docketed*, No. 25-1585 (1st Cir. June 17, 2025) is

makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" based on death or change of address of a registrant, 52 U.S.C. § 20507(a)(4), and HAVA requires each state to maintain "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" as required by the NVRA. *See* 52 U.S.C. § 21083(a)(4)(A)(i).[7] While no one disputes DOJ's right to review states' list maintenance programs and procedures, DOJ is not itself tasked with examining the "accuracy" of a state's list. Perfect accuracy is not required by federal law and would, in any event, be impossible to achieve because there is necessarily a lag in reporting of deaths and changes of address, among other events that impact voter eligibility. In fact, the NVRA imposes a lengthy notice-and-failure-to-vote procedure preventing hasty removal, *see Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761-65 (2018), meaning some voters that have moved will remain on registration lists while that process plays out. There is unlikely to be any moment when a list perfectly reflects the eligible voter pool and, if disclosed, a list would reveal only a snapshot in time and would soon be stale. A static copy of the list could not reasonably be used in the manner suggested by DOJ, even if Congress had granted DOJ that type of examination authority, which it did not.

Congress directed the *states* to maintain statewide voter registration lists and to conduct a "general program that makes a reasonable effort" to remove voters that are ineligible to vote due to death or change of address." 52 U.S.C. § 21083(a)(4)(A)(i). DOJ's enforcement authority

---

misleading. There, a District Court ordered disclosure of New Hampshire's statewide voter registration list via discovery in ongoing litigation, determining the list to be relevant. Even assuming such a ruling was proper, disclosure was not pursuant to Title III or an investigative demand, nor was the recipient a federal agency. DOJ's reference to two instances when states consented to provide their statewide registration lists is likewise inapposite. *See* Opp. at 15 n. 10.

[7] The NVRA and HAVA require states to conduct a general program that makes a reasonable effort to remove voters that are ineligible due to death or change of address; these laws permit but do not compel *states* to engage in list maintenance efforts that remove registrants on other grounds. *Bellitto v. Snipes*, 935 F.3d 1192, 1202-03 (11th Cir. 2019). Neither law permits the *federal government* to remove a registrant from a state's voter registration list on any basis.

extends to determining whether a state has created a statewide voter registration list and whether it has developed a reasonable list maintenance program as required by law. Here, there is no allegation that New York has been deficient in either respect and none of the statutes on which DOJ relies permit it to conduct what appears to be a fishing expedition through New York's unredacted voter registration list to question the *bona fides* of New York voters.

## II. DISMISSAL IS WARRANTED DUE TO DOJ'S FAILURE TO PLAUSIBLY ALLEGE COMPLIANCE WITH FEDERAL PRIVACY LAWS.

Even if DOJ had stated a viable claim under Title III of the CRA, its noncompliance with federal law independently requires dismissal of the complaint.

### A. DOJ's demand violates the Privacy Act

DOJ first contends that it was not required to plead compliance with the Privacy Act to state a valid claim. DOJ is wrong, which is evident from its own demand and complaint, both of which tacitly acknowledge the potential barrier to disclosure that the Privacy Act poses. *See* Hallak Decl., Ex. 3; Compl. ¶¶ 47, 52. The presumption of regularity applicable to prosecutorial decisions in criminal matters, even if applicable, does not provide any refuge for DOJ here as the motion record is clear that it has taken no new action under the Privacy Act despite its aggressive efforts to obtain unredacted statewide voter lists from New York and most other states. In other words, there is no evidentiary gap for a presumption to fill. Further, although the Commissioners dispute DOJ's assertion that it was not required to plead compliance with the Privacy Act to state a valid claim, the Privacy Act unquestionably may—and should —be considered by the Court in opposition to DOJ's cross-motion to compel.

The CRT 001 SORN cited in DOJ's complaint simply is not expansive enough to cover a statewide—much less nationwide—voter registration database. DOJ's opposition does not even address the language contained in the CRT 001 SORN used for its investigation and enforcement case files, which is tantamount to an admission that the DOJ's current efforts do not fit within its

considerably narrow scope. The CRT 001 SORN only covers "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." *See* 68 Fed. Reg. 47610-01, 47611. DOJ offers no explanation as to how this language could be interpreted to cover statewide voter lists. Certainly, the CRT 001 SORN provides citizens with no notice that their private information included on voting registration materials would be collected, which was the reason the Privacy Act was enacted. *See* Pub. L. No. 93-579, § 2(A)(5)(B), 88 Stat. 1896 (1974). DOJ cannot satisfy its obligations under the Privacy Act merely by listing NVRA, HAVA, and CRA on its website as statutes pursuant to which the Civil Rights Division is "authorized" to collect information—it must follow the detailed process set forth in the statute for each new "system of records." *See* 5 U.S.C. §§ 552a(e), (f).

DOJ's argument that the Privacy Act "does not restrict the ability of state actors to share information with federal agencies" is a strawman. *See* Opp. at 24. The Commissioners are not arguing that the Privacy Act restricts the states in any way. The Privacy Act imposes conditions precedent upon federal agencies—not states—before private identifying information may be gathered from any source. 5 U.S.C. §§ 552a(a)(3), (5), (e)(4), (f). Thus, a federal agency must comply with the Privacy Act's requirements before requesting or demanding private information or documentation from a "state actor." The fact that DOJ does not allege to have done so before making its unprecedented demand for New York's—and each other state's—unredacted voter list conclusively demonstrates that it is out of compliance with the Privacy Act's requirements.

DOJ's response regarding the Privacy Act's restriction upon collecting records related to an individual's First Amendment activity amounts to hand waving. DOJ does not contend that its activity falls within any of the narrow exceptions for the collection of First Amendment information, which includes uses "expressly authorized by statute" or "pertinent to and within the scope of an authorized law enforcement activity." *See* 5 U.S.C. § 552a(e)(7). As stated above and in the Commissioners' initial brief, none of the statutes upon which DOJ relies authorize, much

less necessitate, DOJ to access or review New York's statewide unredacted voter registration list. Therefore, the Court should not accept DOJ's argument that enforcing this subsection would "effectively prevent [DOJ] from engaging in any investigations or enforcement actions at all." Opp. at 25. DOJ can undertake investigations and enforcement actions authorized by statute but its limited role under the NVRA and HAVA cannot justify its unprecedented request for New York's unredacted statewide voter list.

### B. DOJ's demand violates the E-Government Act

DOJ's response regarding the E-Government Act is similarly unavailing. DOJ states that the E-Government Act applies only to "a new process whereby [the United States] is contacting individuals for information (Opp. at 26);" however, the statute's reach is not so limited. According to the federal government's own implementing memorandum prepared by the Office of Management and Budget—the agency tasked with implementing the E-Government Act, the statute's privacy provisions are even implicated where "a system change creates new privacy risks,"[8] such as when previously held databases are merged or when new interagency functions involve new uses of identifiable information. It is impossible to square DOJ's litigation position with the official government position stated in the OMB memorandum. Tellingly, DOJ fails to address or even acknowledge the memorandum. In any event, the statute, as clarified by OMB, unquestionably covers DOJ's current initiative to gather each state's entire unredacted voter list, which have not been historically possessed by the federal government.

DOJ's attempt to distinguish *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 311 (D.D.C. 2017) was unsuccessful, particularly since the Commissioners only cited the case to describe the required agency process under the E-Government Act, which DOJ does not appear to dispute. However, to the extent DOJ's opposition

---

[8] Office of Mgmt. & Budget, Office of the President, OMB Memorandum M-03-33, Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002, Att. A. §II(B) (2003).

suggests that the Commissioners lack standing to rely upon the E-Government Act, such contention is without merit. It is incumbent upon plaintiffs, not defendants, to establish standing, and "[w]hen [Article III's] conditions are met, Article III does not restrict the opposing party's ability to object to relief being sought at its expense" and "ha[s] no bearing upon [the defendant's] capacity to assert defenses." *Bond v. United States*, 564 U.S. 211, 217 (2011). In *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017), the E-Government Act was invoked by the plaintiffs, but here it is invoked by the defendants. DOJ fails to contend with this dispositive procedural difference.

### C. DOJ's demand violates the Driver's Privacy Protection Act.

DOJ's opposition regarding the Driver's Privacy Protection Act (DPPA) rests entirely on its conclusory assertion that "it is performing a statutorily mandated function—verifying voter registration records and associated list maintenance activities by state and local entities." Opp. at 28. However, not only is DOJ unauthorized to "verify voter registration records"—which is exclusively a state function, *see* 52 U.S.C. § 21083(a)(5)—DOJ's response reveals that the demand's stated purpose is inaccurate or at least incomplete. DOJ's purported purpose was to "ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA". Hallak Decl., Ex. 3. DOJ cannot graft on additional unstated purposes to attempt to shoehorn its proposed use into DPPA's government-use exception.

Regarding DOJ's actual stated purpose, there is no basis in the complaint for the Court to conclude that the government-use exception is applicable here. While DOJ has enforcement authority under NVRA and HAVA, DOJ makes no allegations as to why driver's license numbers are necessary for—or even relevant to—DOJ's assessment of New York's list maintenance practices. DOJ's silence on this issue is telling. Without plausible allegations that would support application of the government-use exception, the Commissioners are prohibited by the DPPA from disclosing driver's license numbers to DOJ. *See* 18 U.S.C. §§ 2721(a), 2725(1), (3)-(4).

### III.    DOJ'S "CROSS-MOTION TO COMPEL" IS A PREMATURE AND PROCEDURALLY IMPROPER SUMMARY JUDGMENT MOTION.

Unhappy with the current procedural posture of the case, DOJ engages in a gambit aimed at limiting this Court's ability to perform meaningful judicial review of its unprecedented request. Although this entire action should be dismissed for the reasons stated in the Commissioners' motion to dismiss, to the extent the Court considers DOJ's purported "Cross-Motion to Compel," it should be denied as unauthorized by statute, procedurally improper, and premature.

### A. The CRA does not authorize or compel a special statutory proceeding exempt from the Federal Rules of Civil Procedure.

The Court should reject DOJ's request to cast aside the Federal Rules of Civil Procedure in favor of a "special statutory proceeding" in which the Court's role would effectively be limited to serving as a rubber stamp of DOJ's demand. DOJ's proposed procedure is not required by the CRA and is contrary to governing precedent involving governmental document requests.

First, the Federal Rules of Civil Procedure themselves contradict DOJ's argument that they are inapplicable to the CRA claim. The Federal Rules "govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 1.  Rule 81 limits the application of the Federal Rules in particular proceedings, such as admiralty cases, but does not exempt or exclude cases under Title III of the CRA. Moreover, there is no statutory language in Title III which might exempt application of the federal rules generally applicable to governmental subpoenas under Federal Rule 81(a)(1).

Second, Title III does not authorize or require a different procedure but directs that a proceeding to compel production of papers or records is subject to "appropriate process," 52 U.S.C. § 20705—language that the Supreme Court has interpreted to require application of the Federal Rules absent a statutorily defined alternate procedure. *See United States v. Powell*, 379 U.S. 48, 57-58 n.18 (1964) (holding that a provision of the tax code governing the enforcement of summonses by "appropriate process" required the application of the Federal Rules of Civil

Procedure "because [the statute] contains no provision specifying the procedure to be followed in invoking the court's jurisdiction'); *see also United States v. Pritchard*, 438 F.2d 969, 971 n.3 (5th Cir. 1971) (in proceeding to enforce a summons, "[t]he Federal Rules of Civil Procedure apply, absent any other statutory direction."). As noted above, DOJ's singular reliance on *Lynd*, a more-than-60-year-old Fifth Circuit decision addressing unique historical circumstances, is misplaced.

Notwithstanding *Lynd*, in *Powell* and other subsequent cases involving government demands for records, Courts have consistently deemed applicable the Federal Rules of Civil Procedure. *See, e.g.*, *Powell*, 379 U.S. at 57-58 n. 18; *Becker v. United States*, 451 U.S. 1306, 1307–08 (1981). Under the process dictated by the Federal Rules, Courts evaluating governmental document requests have engaged in robust judicial review that is demonstrably different from the judicial rubber stamping that DOJ demands from this Court. *See, e.g.*, *Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 690 (D.C. Cir. 2017) (concluding that "perfunctory" statement of purpose made in connection with a CFPB civil investigative demand was inadequate because it failed to "state adequately the unlawful conduct under investigation or the applicable law"); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 237 (D. Mass. 2025) (quashing DOJ subpoena for failure to demonstrate a proper purpose); *In re: Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25-MC-00063-SKC-CYC, 2026 WL 33398, at *5-6 (D. Colo. Jan. 5, 2026) (quashing DOJ subpoena on multiple grounds, including DOJ's "pretextual" purpose). In an appropriate case, such as where indicia of bad faith or abuse of process are present, the proceeding should involve the familiar trappings of a civil action, including discovery. *See United States v. Chase Manhattan Bank*, 598 F.2d 321, 327 (2d Cir. 1979) (where there was "insufficient evidence in this record to decide that the IRS [was] proceeding in 'good faith'" in enforcing a summons pursuant to the tax code, discovery was necessary). Thus, even if *Lynd* stands for the propositions DOJ asserts (which the Commissioners' dispute), it is clear from post-*Lynd* precedent that the required process is far more robust and governed by the Federal Rules.

### B. DOJ's cross-motion for summary judgment is procedurally improper.

Given the applicability of the Federal Rules to this action, DOJ's cross-motion to compel is effectively a motion for summary judgment because it seeks the ultimate relief sought in the complaint. *See Loc. Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. A & M Heating, Air Conditioning, Ventilation & Sheet Metal, Inc.*, 314 F. Supp. 2d 332, 346 (S.D.N.Y. 2004) (motion to compel arbitration was "tantamount to a motion for partial summary judgment" where it requested "the ultimate relief" sought in the action). If the Court reaches the issue—and it should not and need not—the cross-motion is both procedurally improper.

DOJ's cross-motion fails to comply with the relevant provisions of the Local Civil Rules. Rule 56.1(a) of the Local Civil Rules, which provides that all summary judgment motions "shall contain a separate Statement of Material Facts." Failure to satisfy this requirement "shall result in a denial of the motion." L.R. 56.1(a). By incorrectly naming its motion a "motion to compel," DOJ attempts to side-step this requirement. Due to the mandatory language "shall result" used in Rule 56.1(a), DOJ's failure to file a statement of material facts necessitates the denial of its motion. *See Evans v. USA Bobsled & Skeleton Fed'n*, No. 8:23-CV-1429 (MAD/CFH), 2024 WL 4120716, at *5 (N.D.N.Y. Sept. 9, 2024) (denying defendant's summary judgment motion because, *inter alia*, defendant failed to file a statement of material facts).

DOJ also ignored this Court's Individual Rules in filing its cross-motion without first filing a pre-motion letter. Individual Rules and Practices of Hon. Mae A. D'Agostino, Rule 2(A)(i). Although the Court dispensed with the pre-motion letter requirement for Defendants' motions to dismiss at the parties' request (ECF No. 68), the Court did so for a summary judgment motion by DOJ. Indeed, DOJ did not disclose its intention to make such a motion, however denominated, in the parties' joint letter to the Court. *See* ECF No. 66. The Court should deny DOJ's cross-motion for failing to abide by the Court's rules. *See Levine v. B & R Acquisition Partners, LLC*, No. 1:24-CV-939 (MAD), 2024 WL 3829567, at *13 (N.D.N.Y. Aug. 15, 2024) (noting the Court's striking

of a prior motion for failure to file a pre-motion letter as required for "dispositive motions").

### C. If the motions to dismiss are not granted, Defendants should be allowed to answer and conduct discovery.

Among the applicable rules are those set forth in Rule 56 governing motions for summary judgment. Thereunder, "summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Elliott v. Cartagena*, 84 F.4th 481, 493 (2d Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)). "The Second Circuit has denied motions for summary judgment as premature in cases where [the] nonmoving party did not have a fully adequate opportunity for discovery . . . at the time the moving party sought summary judgment." *Crystalline H2O, Inc. v. Orminski*, 105 F. Supp. 2d 3, 8 (N.D.N.Y. 2000) (internal quotations marks and citations omitted).

"[W]hen a party facing an adversary's motion for summary judgment reasonably advises the court that it needs discovery to be able to present facts needed to defend the motion, the court should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion." *Elliott*, 84 F.4th at 493 (citation omitted). Rule 56(d) permits a party to resist summary judgment on the grounds that additional discovery is necessary by showing: "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Elliott*, 84 F.4th at 493 (quoting *Lunts v. Rochester City Sch. Dist.*, 515 F. App'x 11, 13 (2d Cir. 2013) (summary order)). Here, the Commissioners easily satisfy each of Rule 56(d)'s requirements.

Regarding the first prong, the Commissioners would serve requests for production and interrogatories seeking discrete categories of documents and information relating to DOJ's actual purpose in demanding states' unredacted voter lists, including (a) internal planning documents and memoranda and communications (both inter- and intra-agency) concerning the federal

government's intended use of the state voter lists, (b) documentation regarding DOJ's purported plan to evaluate states' compliance with the list maintenance requirements of HAVA and the NVRA, and how social security and driver's license numbers would be used in such assessment, and (c) preparatory measures taken by DOJ in advance of making the demands for unredacted voter lists, including to comply with federal privacy laws. *See* Hallak 56(d) Decl. ¶ 17.

As for the second prong, the discovery the Commissioners intend to seek is reasonably expected to create material issues of fact because it would undercut key elements of DOJ's claims. As noted, Title III of the CRA provides that a demand for records must "contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. DOJ's demand does not contain a statement of any basis and the purported purpose stated is legally insufficient. But even without these defects, Defendants need not accept the purpose stated by DOJ at face value. Defendants are entitled to show that the demand was made for an improper purpose such that its enforcement would amount to an abuse of the Court's process. *See Powell*, 379 U.S. at 58. Discovery has been deemed necessary in this precise context. *See Chase Manhattan Bank*, 598 F.2d at 327 (where there was "insufficient evidence in this record to decide that the IRS [was] proceeding in 'good faith'" in enforcing a summons pursuant to the tax code, discovery was necessary). DOJ's failure to disclose its actual purpose would render the demand unenforceable, since Title III requires DOJ to state "*the* purpose" for its demand, as opposed to any plausible purpose. 52 U.S.C. § 20703 (emphasis added). DOJ itself has advocated for a strict reading of the statutory language. "Justice Holmes famously wrote that '[m]en must turn square corners when they deal with the Government.' But it is also true, particularly when so much is at stake, that 'the Government should turn square corners in dealing with the people.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 24 (2020) (citations omitted). DOJ's apparent failure to disclose its true purpose is fatal to its CRA claim.

There is already substantial factual support for the conclusion that DOJ's purpose in

demanding New York's unredacted voter list—and identical lists from most, if not all, other states—is not to "ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA". Hallak Decl., Ex. 3. Even in the context of the pending lawsuits, DOJ has equivocated as to its purpose. For example, at oral argument in the California action, DOJ identified its purpose as "voter roll maintenance enforcement and compliance." Hallak 56(d) Decl., Ex. 1 at 82:19-21. DOJ's motion papers in this case articulate an even more expansive and clearly illicit purpose—to "verify[] voter registration records" (Opp. at 28), which is clearly a state function, *see* 52 U.S.C. § 21083(a)(5) (describing the requirements for a State's "Verification of voter registration information"). There is further evidence still that DOJ's actual purpose is to create a federal voter registration database and to share data with other agencies, including the Department of Homeland Security (DHS), for reasons unrelated to voting or the CRA's objectives. Indeed, the first sentence of DOJ's complaint invokes Executive Order No. 14248, in which President Trump orders that the DHS review state voting lists. *See* Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025).[9] Furthermore, there is extensive credible reporting that DOJ's true purpose in demanding states' unredacted voter lists is to create a national voter database and to then coordinate with DHS to discover undocumented immigrants it believes are voting.[10]

---

[9] Other portions of Executive Order No. 14248 have been declared unconstitutional. *See League of United Latin Am. Citizens v. Exec. Off. of President*, No. 25-cv-0946 (CKK), 2025 WL 3042704, at *1 (D.D.C. Oct. 31, 2025) (declaring Section 2(a) unconstitutional on separation of powers grounds); *California v. Trump*, 786 F. Supp. 3d 359, 396 (D. Mass. 2025) (enjoining implementation of Sections 2(a), 2(d), 3(d), 7(a), and 7(b)).

[10] For example, the New York Times reports that "The administration plans to compare [the voter data they receive from the States] to a different database maintained by the Department of Homeland Security, to see how many voters on the state lists match up with noncitizens listed by immigration agents. . . ."  Hallak 56(d) Decl., Ex. 2, *Trump Administration Quietly Seeks to Build National Voter Roll*, NEW YORK TIMES (Sept. 9, 2025). The New York Times quotes a former DOJ Civil Rights Division attorney who stated regarding the DOJ's demand for voter data that "Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. The idea was, we want to identify undocumented immigrants that have registered to vote." The attorney was concerned that "the data would be used not for purging voter rolls of people who aren't eligible to vote but for broader immigration enforcement." Hallak 56(d) Decl., Ex. 3, *The Unraveling of the Justice Department*

If DOJ's complaint is not dismissed, Defendants are entitled to seek discovery to show, as the reporting strongly suggests, that the purpose stated in the demand is a pretext. In addition to challenging DOJ's stated purpose, the Commissioners are also entitled to discovery to support the additional issues presented, including (1) those arising from federal privacy laws, including the Privacy Act, E-Government Act, and [DPPA], and (2) defenses of overbreadth, bad faith and abuse of process.[11]

Regarding the Privacy Act, the Commissioners are entitled to test DOJ's allegation that the unredacted voter list would be collected pursuant to the CRT 001 SORN, that assessing compliance with the CRA, NVRA, and HAVA are "routine use[s]" of the CRT 001 SORN, and that DOJ's proposed uses are consistent with the limitations provided in the CRT 001 SORN. *See* Compl. ¶ 52. The Commissioners should also be permitted to seek discovery from DOJ to bolster its argument under the E-Government Act that DOJ failed to conduct a privacy impact assessment, as is required by that law before initiating a new collection of information. Pub. L. No. 107-347, § 208(b)(1)(A)(ii), 116 Stat. 2899 (2002). Finally, the Commissioners are entitled to test DOJ's conclusory assertion regarding the applicability of DPPA's government-use exception by seeking discovery concerning DOJ's intended use of driver's license numbers to evaluate compliance with

---

– *Sixty attorneys describe a year of chaos and suspicion*, NEW YORK TIMES (Nov. 16, 2025). NPR reporting describes DHS's recent public notice regarding its SAVE program, which utilizes a national database that can be queried using a name, date of birth, and the last four numbers of a Social Security number, as stating "that said data could be shared with governmental agencies and 'other entities' with DHS agreements for purposes that include monitoring or auditing voter registration records." Hallak 56(d) Decl., Ex. 4, *Trump's SAVE tool is looking for noncitizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025). This reporting is bolstered by DHS' Privacy Impact Assessment for the SAVE program. Hallak 56(d) Decl., Ex. 5, *Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program*, Department of Homeland Security (Oct. 31, 2025). Additional reporting describes a "collaboration" between DHS and DOJ to "prevent illegal aliens from corrupting our republic's democratic process and further ensure the integrity of our elections nationwide." Hallak 56(d) Decl., Ex. 6, *DOJ is sharing state voter roll lists with Homeland Security*, STATELINE (Dec. 10, 2025).

[11] The defenses identified are not intended to be an exhaustive list. The Commissioners reserve the right to assert all available affirmative defenses, including defenses not listed herein.

NVRA and HAVA. *See* Compl. ¶ 47. In support of their overbreadth, bad faith and abuse of process defenses, the Commissioners intend to seek discovery regarding DOJ's planned use of social security and driver's license information to prove that such information is unnecessary to assess compliance with HAVA and NVRA's requirements. *See Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 691 (D.C. Cir. 2017).

Finally, the Commissioners easily satisfy the third and fourth prongs under Rule 56(d). Defendants have not yet sought discovery at this juncture since this matter is at the pleadings stage. The Rule 16 conference in this matter was adjourned *sine die* due to the Defendants' filing of motions to dismiss. *See* ECF No. 71. If the motions to dismiss are not granted, the Commissioners will promptly seek the discovery outlined herein on any schedule the Court may set.

## CONCLUSION

For these reasons, the complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) or, alternatively, if any claim survives, DOJ's procedurally improper Cross-Motion to Compel should be denied, the Commissioners should be permitted to answer and discovery should proceed pursuant to Fed. R. Civ. P. 26.

DATED: January 20, 2026.                          Respectfully Submitted,

HARRIS BEACH MURTHA CULLINA PLLC

By:  */s/ Elliot A. Hallak*_____
    Elliot A. Hallak
    Brian D. Ginsberg
    Lisa A. LeCours
    Daniel R. LeCours
    677 Broadway, Suite 1101
    Albany, New York 12207
    Telephone (518) 427-9700
    ehallak@harrisbeachmurtha.com
    bginsberg@harrisbeachmurtha.com
    llecours@harrisbeachmurtha.com
    dlecours@harrisbeachmurtha.com
    *Attorneys for Defendants Kristen Zebrowski Stavisky, Henry Berger, and Essma Bagnuola*