# Exhibit A

JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 2:25-cv-09149-DOC-ADS** |
|     **Plaintiff,** | |
| **vs.** | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [37] AND INTERVENORS' MOTIONS TO DISMISS [62-1], [67]** |
| **SHIRLEY WEBER ET AL.,** | |
|     **Defendants.** | |

Before the Court is Defendants Shirley Weber and the State of California's (collectively, "Defendants" or "California") Motion to Dismiss ("California Motion" or "Cal. Mot.") (Dkt. 37). Also before the Court is Intervenors' the NAACP, the NAACP California-Hawaii State Conference, Services Immigrant Rights and Education Network's Motion to Dismiss ("NAACP Motion") (Dkt. 62-1). Finally, before the Court is League of Women Voters of California's Motion to Dismiss ("LWVC Motion") (Dkt. 67). For the reasons below, the Court **GRANTS** the motions to dismiss.

## I.  INTRODUCTION

Even after 250 years, the American experiment in democracy remains fragile. It has always been so. When asked after the Constitutional Convention what form of government he and his colleagues had created, Benjamin Franklin famously replied, "A Republic, if you can keep it." History demonstrates that democracy can be lost in a generation.

The foundation upon which American democracy has been built is the right to vote. Brave Americans have given their lives for more than two hundred years to protect this right. Now it seems the Executive Branch of the United States government wants to abridge the right of many Americans to cast their ballots. This is what this case is grounded in—the right to vote and the government's obligation to protect that right. The United States Department of Justice (DOJ) seeks an unprecedented amount of personal information related to California voters from California's unredacted voting rolls. The requested information includes the names, social security numbers, home addresses, voting history and other sensitive information of nearly 23 million Californians. The people of California resist this effort.

The issue presented to this court is animated by a well-established principle, long recognized by the Supreme Court: the right to vote is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). The government's request is unprecedented and illegal.

Congress' purpose in passing the civil rights laws the DOJ now invokes for its extraordinary request was to protect hard won civil rights victories allowing access to the ballot

box. The franchise was not freely given. Rather, the right to vote was won through generations of sacrifices from marginalized communities the American political system devalued, but who were determined to make the promise of democracy real. The pieces of legislation at issue in this litigation were not passed as an unrestricted means for the Executive to collect highly sensitive information about the American people. It is not for the Executive, or even this Court to authorize the use of civil rights legislation as a tool to forsake the privacy rights of millions of Americans. That power belongs solely to Congress.

Title III of the Civil Rights Act of 1960 was passed during the Jim Crow era, when persistent voter suppression was preventing Black Americans from voting. States were utilizing literacy tests, arbitrary registration tactics, voter ID laws, and poll taxes to keep minorities away from the ballot. Black Americans risked intimidation and violence every time they tried to access the polls. To hide their complicity in voter suppression, state officials destroyed the records of Black Americans who had registered to vote, as well as those denied the opportunity to register. The bipartisan Commission on Civil Rights lamented in 1958 that even when records were not destroyed, states refused to turn them over, thwarting efforts by the federal government to investigate whether there was a pattern and practice of disenfranchising Black Americans.[1] Title III was enacted directly in response to these concerns, requiring states to retain and preserve all records pertaining to voter registration, voting applications, and payments of poll taxes. The Constitution gives states the right to control elections, but Congress was tasked with balancing state power against the Executive branch's role in protecting the voting rights of all Americans. In the present case, the DOJ cites no disenfranchisement concerns for their extraordinary request for the personally identifying information of millions of Californians.

The National Voter Registration Act (NVRA) was similarly enacted by Congress in 1993 to combat the effects of discriminatory and unfair registration laws that cheapened the right to vote. *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012).

---

[1] *Report of the United States Commission on Civil Rights* (Sept. 9, 1959), usccr.gov/files/historical/1959/59-001-U.pdf.

Congress understood that unfair registration laws have a "damaging effect on voter participation" and "disproportionately harm voter participation by various groups, including racial minorities." *Id.* Likewise, the Help America Vote Act (HAVA) was passed in 2002 to help prevent election failures and improve voting accessibility. Pub. L. No. 107-252, 116 Stat. 1666 (codified as amended at 52 U.S.C. §§ 20901-21145). In passing Title III of the Civil Rights Act ("Title III"), the NVRA, and HAVA, Congress' intent was clear—ensuring that all Americans, regardless of race, are able to vote without fear or distress.

The DOJ cannot go beyond the boundaries provided by Congress and use these legislative tools in a manner that wholly disregards the separation of powers provided for in the Constitution. It is Congress' role to determine the purpose and use of legislation. Should Congress want to enable the Executive to centralize the private information of all Americans within the Executive Branch, Congress will have to clearly say so.

There is an inherent level of trust that comes along with Americans voting locally. This is why, since the founding of our nation, the Elections Clause has constitutionally prevented the centralization of election management in the Executive by affording states the power to determine the "times, places and manner of holding elections."[2] U.S. Const., art I, sec. 4, cl. 1. State run elections mean that voters recognize their neighbors who staff polling stations, trust their Secretaries of State—whom they voted for—to keep their personally identifying information safe, and believe that they will not be targeted because of what they look like or who they vote for. The DOJ's request for the sensitive information of Californians stands to have a chilling effect on American citizens like political minority groups and working-class immigrants who may consider not registering to vote or skip casting a ballot because they are worried about how their information will be used. There cannot be unbridled consolidation of all elections power in the Executive without action from Congress and public debate. This is antithetical to the promise of fair and free elections our country promises and the franchise that civil rights leaders fought and died for.

---

[2] The Elections Clause simultaneously gives Congress the power to "make or alter such [r]egulations." U.S. Const., art I, sec. 4, cl. 1; *Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1413–14 (9th Cir. 1995).

## II. BACKGROUND

### A.    Facts

On July 10, 2025 the United States Department of Justice's Civil Rights Division (DOJ) sent a letter to Shirley Weber ("Secretary"), California's Secretary of State. (Dkt. 37, Ex. 1).[3] Within fourteen days the DOJ demanded an electronic, unredacted, copy of California's statewide voter registration list that is maintained under HAVA, steps the Secretary takes to ensure compliance with the NVRA, a list of election officials responsible for maintaining California's voter registration list, and a list of follow-up questions to the information provided by California in its response to the U.S. Election Assistance Commission's 2024 Election Administration and Voting Survey (EAVS).[4] The information requested by the DOJ was a litany of sensitive, personally identifying information such as social security numbers linked to voters' names, voters' addresses, voters' phone numbers, methods of voter registration, voter participation history, political party registration, driver's license numbers, language preference for ballots, ID numbers if no driver's license, emails, and current voter registration status. Dec. 4, 2025 Hearing Transcript ("Hr'g Tr"), (Dkt. 100) at 17-21. All of this information would be neatly packaged in one tranche of data, organized by the name of the voter.

On July 22, 2025 the Secretary responded saying that she was identifying the requested information and sought to provide it as soon as possible, but that it could take up to ninety days (Dkt. 37, Ex. 2). The DOJ responded on July 29, 2025 saying that the additional requested time was "not acceptable" for requests such as the voter registration list and reiterated that that an unredacted statewide voter registration list needed to be provided to the DOJ by August 8, 2025, citing the NVRA. (Dkt. 37, Ex. 3). Additional time until August 29, 2025 was given for a few additional requests. *Id.*

The Secretary replied on August 8, 2025. (Dkt. 4, Ex. 4). The Secretary did not make electronically available California's unredacted statewide voter registration list citing California law as a prohibition. However, the Secretary did make California's voter registration list

---

[3] All docket numbers refer to the instant case unless otherwise stated.

[4] An example of the questions asked by the DOJ was, "A list of all registrations, including date of birth, driver's license number, and last four digits of Social Security Number, that were cancelled due to non-citizenship of the registrant." (Dkt. 37, Ex. 1).

available to the DOJ for inspection at the Secretary's office in Sacramento, California. The Secretary clarified that in accordance with California and federal law, sensitive information like voters' driver's license numbers and social security numbers would be redacted. The Secretary also responded to two of the six questions asked by the DOJ regarding California's responses to the EAVS report.

On August 13, 2025 the DOJ renewed its request for an unredacted electronic copy of California's voter registration list, claiming that inspection of the list in Sacramento was not enough. (Dkt. 37, Ex. 5). The DOJ also invoked HAVA and Title III of the CRA, in addition to the NVRA, in its quest for the sensitive information of California voters. In response to any federal privacy concerns the Secretary had with the requested information, the DOJ cited to Section 304 of the CRA which states:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.[5]

52 U.S.C. § 20704.

The Secretary was additionally asked to provide an electronic voter registration list to the DOJ within seven days (August 21, 2025). The DOJ warned the Secretary that failure to do so might result in legal action. (Dkt. 37, Ex. 5).

On August 21, 2025 the Secretary responded reiterating that the DOJ was welcome to inspect a copy of California's voter registration list at her office in Sacramento with appropriate redactions of private, identifying information. (Dkt. 37, Ex. 6). The Secretary explained that Title III of the CRA and HAVA did not authorize the DOJ's broad sweeping request for an

---

[5] It is important to note, that Section 304 of the CRA does not assuage all privacy concerns because it leaves open the possibility that sensitive information collected from voting rolls could be shared with other federal agencies such as the Department of Homeland Security.

unredacted copy of California's voter registration list. Further, the Secretary stated that the DOJ's nationwide effort for requesting identical information from several other states did not support the DOJ's claim that a good faith investigation of California specifically was needed regarding NVRA compliance. Finally, the Secretary reiterated her concerns that the records requested were subject to the Privacy Act of 1974.

The Secretary sent a list of election officials responsible for implementing California's general program of voter registration list maintenance to the DOJ in response to its earlier request on August 29, 2025. Furthermore, the Secretary reiterated that additional responses would be provided to the DOJ by September 12, 2025. (Dkt. 37, Ex. 7).

As promised, on September 12, 2025 the Secretary sent a letter with comprehensive responses to the remaining questions posed in the DOJ's July 10 letter. However, the Secretary did not provide an unredacted copy of every original and completed voter registration application dating back two years due to the aforementioned concerns regarding privacy and the lack of legal authority for such a wide sweeping request. (Dkt. 37, Ex. 8).

There was no response to the Secretary's August 21, August 29, or September 12 letters by the DOJ. And on September 25, 2025 the DOJ sued the state of California for failure to produce their statewide voter registration lists. The DOJ stated during oral arguments on December 4, 2025 that the purpose behind their requests to California was "voter roll maintenance enforcement and compliance." Dec. 4, 2025 Hr'g Tr, (Dkt. 100) at 82, 19-21. On the same day the DOJ sued California, the DOJ also sued an additional five states—Michigan, Minnesota, New York, New Hampshire, and Pennsylvania—for the states' refusal to turn over sensitive voter data.[6] So far the DOJ has sued a total of 23 states and Washington, D.C in an effort to receive the full voter registration files of millions of voters across the entire country.[7] The DOJ has sent demands for complete copies of statewide voter registration files to at least

---

[6] *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls,* U.S. Dep't of Justice (Sept. 25, 2025), https://www.justice.gov/opa/pr/justice-department-sues-six-states-failure-provide-voter-registration-rolls.

[7] The states by sued by DOJ include Arizona, California, Colorado, Connecticut, Delaware, Georgia, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Hampshire, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Wisconsin, and Washington. Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information,* Brennan Ctr. for Justice (updated Jan. 9, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

43 states and Washington, DC. *Id.* These nationwide efforts point at a larger pattern than the DOJ's stated purpose—one that involves collecting sensitive, personally identifying information of nearly every voter in America on an unprecedented scale and then utilizing that information in a completely different context than what the information was provided for.

## B. Procedural History

The Court finds it necessary to summarize the events of the related *USA v. Robert Page* case in conjunction with the procedural history of the instant case. The Court will discuss the history of the two cases together.

On June 25, 2025, the United State of America filed a lawsuit against Robert Page, the Orange County Registrar of Voters in the case, *United States v. Robert Page* (the "County Case" or "Orange County Case"), Case No. 8:25-cv-01370-DOC-ADS (C.D. Cal.). In that lawsuit, DOJ claimed that it "recently received a complaint from the family member of a non-citizen in Orange County indicating that the non-citizen received an unsolicited mail-in ballot from the Defendant, despite lack of citizenship." Complaint ¶ 18 (Dkt. 1), *County Case.* Based on this allegation DOJ sought the following:

> 1. Records from January 1, 2020, to the present showing the number of voter registration records in Orange County cancelled because the registrant did not satisfy the citizenship requirements for voter registration.
>
> 2. Records from January 1, 2020, to the present related to each cancellation described in Request No. 1, including copies of each registrant's voter registration application, voter registration record, voting history, and related correspondence sent or received by the County of Orange Registrar of Voters in regard to the registration.
>
> *Id.* ¶ 19; *see also id.*, Ex. 1.

Orange County responded to the request, but redacted driver's license and identification card numbers, social security numbers, voter identification numbers, language preference, and voter signatures. Complaint ¶ 20 (Dkt. 1), *County Case.* DOJ then filed suit claiming that

Orange County was violating HAVA, the NVRA, and seeking unredacted copies of the above information. *See generally id.*

On July 23, 2025, Page filed an Answer to the Complaint (Dkt. 9), *County Case*. The Court held a scheduling conference on September 15, 2025 (Dkt. 18), *County Case*, and issued a scheduling order on the same day (Dkt. 19), *County Case*, setting a trial date for March 31, 2026. Then, on September 25, 2025, the instant case was filed (Dkt. 1), *United States v. Shirley Weber et al* ("State Case" or "California Case"), Case No. 2:25-cv-09149-DOC-ADS (C.D. Cal.). A Notice of Related Cases (Dkt. 4), *State Case*, was filed on the same day, relating the *County Case* and *State Case*. After both cases were transferred to the same Court (Dkt. 19), *State Case*, the *County Case* was stayed pending the resolution of the *State Case* pursuant to a stipulation by the parties (Dkt. 49), *County Case*.

Next, in the midst of the government funding shutdown[8], DOJ filed a motion to stay on October 1, 2025 citing to the funding issues as the reasons for its motions (Dkt. 6).[9]  The *State Case* proceeded despite this motion to stay, and DOJ withdrew this motion on November 13, 2025 (Dkt. 50) when restored appropriations rendered it moot (Dkt. 115).

On October 7, 2025, the NAACP, the NAACP California-Hawaii State Conference (collectively, "NAACP"), and Services, Immigrant Rights and Education Network ("SIREN") filed a motion to intervene as defendants (Dkt. 14). On October 20, 2025 the League of Women Voters of California ("LWVC") moved to intervene as a defendant (Dkt. 24). After completion of briefing, the Court granted both motions to intervene on the record on November 19, 2025 (Dkt. 70).

California filed a motion to dismiss on November 7, 2025 (Dkt. 37). DOJ requested on November 14, 2025, to extend its briefing deadline for an opposition to the motion to dismiss in light of the aforementioned government shutdown (Dkt. 57). However, this request was mooted when the DOJ filed its opposition brief on November 18, 2025 ("First Opp.") (Dkt. 64). The Court then issued an order setting the remainder of the briefing schedule on November 21, 2025

---

[8] The shutdown lasted from October 1, 2025 to November 12,2025 for a record 43 days. Diana Stancy, *Trump signs bill ending longest government shutdown in US history*, Fox News (Nov. 12, 2025 10:24 p.m. EST), https://www.foxnews.com/politics/trump-signs-bill-ending-longest-government-shutdown-us-history.
[9] All subsequent docket numbers reference the *State Case*, unless otherwise noted.

(Dkt. 71). California filed its reply brief on November 25, 2025 (Dkt. 78). California also lodged amicus briefs from other cases in past years demonstrating allegedly contrary positions of DOJ from the instant case on December 5, 2025 (Dkt. 96).

NAACP and SIREN filed a motion to dismiss[10] on November 17, 2025 (Dkt. 62-1). LWVC filed a separate motion to dismiss on November 20, 2025 (Dkt. 67). DOJ filed a combined opposition to both of Intervenors' motions to dismiss on November 26, 2025 (Dkt. 81). The NAACP and SIREN then filed its reply on December 1, 2025 (Dkt. 86) and LWVC filed its reply on the same day (Dkt. 85).

The Court also has the benefit of numerous amicus briefs. The first amicus brief was filed on November 13, 2025 by the Democratic National Committee (Dkt. 44). A second amicus brief was filed by sixteen states[11] on November 26, 2025 (Dkt. 83). A third amicus brief was filed by a "bipartisan group of former state secretaries of state"[12] on November 26, 2025 (Dkt. 84). On December 8, 2025, after a stipulation of the parties, further amicus briefs were invited from all viewpoints for a specifically delineated period of 14 days (Dkt. 98). Nevada filed a joinder to the sixteen states' amicus brief on December 22, 2025 (Dkt. 120), and another amicus brief was filed on the same day by "former attorneys who worked on voting enforcement in the Civil Rights Division of the U.S. Department of Justice (DOJ)" (Dkt. 121). The Court accepted these amicus briefs on January 14, 2026 (Dkt. 127). Finally, the Court heard oral argument on the motions to dismiss on December 4, 2025 and took the motions under submission (Dkt. 97). Amicus briefs were due to the Court by December 22, 2025.

The transcript for the oral argument on the motion to dismiss was released on December 8, 2025 (Dkt. 100). The Court has endeavored to make this and other transcripts from these proceedings publicly available without cost. These transcripts and other filings can be accessed without payment here: https://www.cacd.uscourts.gov/newsworthy/cases-of-interest-all?field_case_name_tid=%22USA%20v.%20Shirley%20Weber%20et%20al%22.

---

[10] The Court accepted this motion to dismiss as lodged in its November 21, 2025 scheduling order (Dkt. 71).
[11] These states are: Arizona, Colorado, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington.
[12] The former Secretary of States served in Colorado, Connecticut, Minnesota, Nebraska, Oregon, Pennsylvania, and Washington.

## III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to set forth a set of facts that, if true, would entitle the complainant to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that a claim must be facially plausible in order to survive a motion to dismiss). The pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). On a motion to dismiss, a court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). A court is not required to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

In evaluating a Rule 12(b)(6) motion, review is ordinarily limited to the contents of the complaint and material properly submitted with the complaint. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555, n.19 (9th Cir. 1990). Under the incorporation by reference doctrine, the court may also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1121 (9th Cir. 2002). The court may treat such a document as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

When a motion to dismiss is granted, the court must decide whether to grant leave to amend. The Ninth Circuit has a liberal policy favoring amendments, and thus leave to amend should be freely granted. *See, e.g.*, *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th

Cir. 1992). However, a court need not grant leave to amend when permitting a plaintiff to amend would be an exercise in futility. *See, e.g.*, *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile.").

## IV.  DISCUSSION

First, California argues that this Court lacks jurisdiction to adjudicate the claim for violation of Title III of the Civil Rights Act of 1960 ("CRA") because DOJ's demand was made to the California Secretary of State's Sacramento address and the records sought are located there.[13] Cal Mot. at 6 (citing 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper.")). The Court finds this argument persuasive.

However, at oral argument California provided that "even though we raised that jurisdictional argument, we invite a decision on all of the merits in this case." Dec. 4, 2025 Hr'g Tr. (Dkt. 100) at 123:8-12. As noted above, this case concerns matters of national importance. It is thus critical that a decision is rendered on the merits, so that voters know when they next go to the polls whether their voting records are private, or are subject to prying eyes.

Furthermore, this case was transferred to this Court because it is related to the *County Case*, *United States v. Robert Page*, Case No. 8:25-cv-01370 (Dkt. 19). The *County Case* was filed in June 25, 2025 making it the first-filed case. According to DOJ, "[b]oth the Orange County Action and the California Action arise out of the authority of the Attorney General of the United States to enforce requirements" of elections laws "with respect to the conduct of elections in Orange County, and the State of California." Notice of Related Cases (Dkt. 4) ¶ 5.

Once the State Case was filed, DOJ opined that "without getting into any litigation strategy, we do have a plan to bring substantive dispositive issues to Your Honor in that [State] case very, very quickly, unlike this [County] case." Oct. 23, 2025 Hr'g Tr. (Dkt. 105) at 15:5-8.

---

[13] Sacramento is located within the Eastern District of California.

Later, when the Court asked DOJ how it would like to handle the County and State cases given their overlapping issues, the DOJ offered that "I just think at this point it does make sense to allow…a ruling on the state case and that that would be dispositive for the county case" because "the county case sort of is subservient to the state case and the state case is what's going to get reviewed first." Nov. 19, 2025 Hr'g Tr. (Dkt. 111) at 8:5-9, 9:22-10:7. However, for the *State Case* to control the *County Case*, it must be resolved on the merits. DOJ has agreed that this will likely dispose of the *County Case*. Because the Court wishes to resolve the *County Case* that has been languishing since Summer 2025, a decision on the merits is also necessary.

Accordingly, the Court now proceeds with its merits analysis.[14]

## A. The DOJ's claim fails under the Title III of the CRA.

The Court has the authority to dismiss the DOJ's case in the present motion—Title III of the CRA does not require special procedures. DOJ's Title III claims must be dismissed because the DOJ's proffered statement and purpose, as required under the statute, is both lacking in depth and is contrived.

### 1. This Court can evaluate the DOJ's records requests under the Title III of the CRA without special procedure.

Contrary to the position the DOJ takes, Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause. First Opp. at 11. Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures.[15] The Supreme Court has also affirmed that the federal government's demands for documents are governed by the Federal Rules of Civil Procedure (FRCP). *Becker v. United States*, 451 U.S. 1306, 1307–08 (1981); *see also* Fed. R. Civ. P. 81(a)(5). Therefore, exercising "appropriate process" under the FRCP allows this Court to determine that the DOJ has not met Title III of the CRA's statutory requirements and the Motion to Compel filed by DOJ (Dkt. 87) is **DENIED**.

---

[14] The Court also **GRANTS** California's Request for Judicial Notice (Dkt. 37-3). The documents in this Request are properly subject of judicial notice.

[15] The Supreme Court found that courts should apply standard civil procedures in ensuring statuary prerequisites are satisfied under a similarly worded statute. *See United States v. Powell*, 379 U.S. 48, 57-58 & n.18 (1964).

**2. The DOJ's proffered statement and purpose does not suffice under Title III of the CRA.**

The DOJ is required to offer a written statement of *both* the purpose and basis for its demands to California. Title III imposes document retention requirements on elected officials "to secure more effective protection of the right to vote." *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U. S.*, 285 F.2d 430 (5th Cir. 1961). These document retention requirements for election officials require the retention and preservation of "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . ." for 22 months 52 U.S.C. § 20701; *id*. § 20706. In order to actually gain access to and inspect these documents, the Attorney General of the DOJ must make a "demand in writing" for requested records and that demand must include "a statement of the basis and the purpose therefore." 52 U.S.C. § 20703.

The purpose of Title III is to detect voting-related racial discrimination. In the past, the DOJ has routinely stated both a purpose and basis related to alleged civil rights violations and how their requested records would specifically assist in their investigation. For example, in *Lynd* the DOJ stated that its purpose for requesting records was "to ascertain whether or not violations of Federal law in regard to registration and voting"—referencing the Civil Rights Act of 1957—"have occurred." *Kennedy v. Lynd,* 306 F.2d 222, 231 (5th Cir. 1962). The DOJ's stated basis for this demand in *Lynd* was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction."[16] *Id.*

The DOJ claims that it has offered a statement of the basis and the purpose of its demand. In its August 13, 2025 letter to the Secretary, the DOJ wrote its demand was "to assist

---

[16] Other similar statements of basis and purpose have been made by DOJ in the past. For example, in *Kennedy v. Bruce*, the DOJ sought inspection of records and papers related to federal elections. *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962). The purpose of the request was "to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred" and the stated basis of the request was the DOJ's belief that "distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." *Id.*; *see also*, *In re Coleman*, 208F. Supp. 199, 199-200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

in our determination of whether California's list maintenance program complies with the NVRA." (Dkt. 37, Ex. 5). During oral arguments on December 4, 2025, the DOJ stated that the purpose behind their requests to the state of California was "voter roll maintenance enforcement and compliance." Dec. 4, 2025 Hr'g Tr. (Dkt. 100) at 82:19-21.

Though compliance with the NVRA was cited by the DOJ as the purpose of its request, Title III was not passed as a tool for NVRA compliance. The NVRA could never have been passed for this use case because the passage of Title III in 1960 preceded the NVRA by several decades which was passed in 1993. Uniform, centralized statewide voter registration lists—like the one the DOJ is seeking from California, were not even required until the passage of HAVA in 2002. This too points to the DOJ's stated purpose being outside of the scope of what Congress intended Title III to be used for.

Nonetheless, even if compliance with the NVRA was a valid purpose, the DOJ states no reason why an unredacted version of California's voter list is necessary under the NVRA. Title III was meant to provide the DOJ access to "public records which ought ordinarily to be open to legitimate reasonable inspection." *Kennedy v. Lynd,* 306 F.2d 222, 231 (5th Cir. 1962). Title III was not conceived by Congress to provide access to "confidential, private papers and effects." *Id.* Providing DOJ access to California's unredacted voter roll would provide the federal government access to information like millions of voters' social security numbers, addresses, phone numbers, method of voter registration, voter participation history, political party registration, driver's license numbers, language preference for ballots, ID numbers, emails, and current voter registration status. *See* Dec. 4, 2025 Hr'g Tr. (Dkt. 100) at 17-21.

This sensitive and identifying information is private and not open to inspection by federal officials. Particularly, driver's license numbers and partial social security numbers were not required for voter registration until the passage of HAVA in 2002 so Congress could not have conceived for this highly sensitive information to be at the DOJ's disposal through the passage of Title III four decades prior. *See* 52 U.S.C. § 21083(a)(5)(A)(i). As such, regardless of whether compliance with the NVRA is a valid purpose under Title III, DOJ's access to voters' sensitive information is not automatic.

Under the plain meaning of the word, the DOJ may have stated a purpose for its request to California.[17] However, in no circumstances has the DOJ established the basis for its request.[18] The purpose of a records request is the rationale for the request—in the present case compliance with the NVRA. The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law. Here, the DOJ failed to provide an explanation for why it believed the NVRA was violated in its letter to the Secretary. And there was no explanation for why unredacted voter files for millions of Californians, an unprecedented request, was necessary for the DOJ's investigation. The requirement that the Attorney General state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute. Without these requirements, the DOJ could embark on a fishing expedition of voter records in any state looking for concerns, without identifying a single issue with the state's policies beforehand.

Therefore, the DOJ has not complied with Title III of the CRA and has provided an inadequate statement of basis and purpose. Because the DOJ has not complied with the CRA as a threshold matter, the Court will not be reaching the issue of whether the Secretary complied with the CRA by offering the opportunity to view redacted voting records in-person in Sacramento.

### 3. The Court is not obliged to accept a contrived statement and purpose.

While the DOJ has told this Court that its purpose for demanding the sensitive voter information of Californians is "voter roll maintenance enforcement and compliance," representations made by the DOJ elsewhere paint a starkly different picture that this Court cannot ignore. Dec. 4, 2025 Hr'g Tr. (Dkt. 100) at 82:19-21. It appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database.

---

[17] Merriam-Webster describes the meaning of the word "purpose" as "the reason something is done or used." *Purpose*, Merriam-Webster, https://www.merriam-webster.com/dictionary/purpose.

[18] Merriam-Webster describes the meaning of the word "basis" as "something on which something else is established or based." *Basis*, Merriam-Webster, https://www.merriam-webster.com/dictionary/basis.

A core principle of the United States is the separation of powers between branches to sustain the necessary checks and balances. This Court and the American people deserve to know what exactly the sensitive information of millions of Americans is going to be used for. The Court is not required to accept pretextual, formalistic explanations untethered to the reality of what the government has said outside of the courtroom.[19] The Supreme Court reiterated in *Department of Commerce* that judicial review is not merely an empty ritual where courts accept rationales that seem "to be contrived." *Dep't of Commerce v. New York*, 588 U.S. 752, 756 (2019). Opining further, the Supreme Court said it could not "ignore the disconnect between the decision made and the explanation given," nor was it "required to exhibit a naiveté from which ordinary citizens are free." *Id*; *United States v. Stanchich*, 550 F.2d 1294, 1300 (CA2 1977) (Friendly, J.).

Representations by the DOJ itself show that their requests to states for voter roll data go beyond their purported compliance check with the NVRA and into the territory of comprehensive data collection. Former Deputy Assistant Attorney General of the DOJ's Civil Rights Division Michael Gates said in September 2025 that the goal was for all fifty states to receive similar requests for voter rolls so that the government could get the last four digits of every voter's Social Security number.[20] In a statement, the DOJ said that the state voter roll data provided to the Civil Rights Division is "being screened for ineligible voter entries"[21] and Assistant Attorney General for Civil Rights Harmeet Dhillon further confirmed that the DOJ had "checked 47.5 million voter records."[22]

But behind this screening, there appears to be a different purpose. A lawyer working in the DOJ's Voting Section tasked with obtaining states' voter rolls was concerned that "the data would be used not for purging voter rolls of people who aren't eligible to vote, but for broader

---

[19] In *Department of Commerce v. New York*, the Department of Commerce told the court it added a citizenship status question to the census at the behest of the DOJ for better enforcement of Section 2 of the Voting Rights Act. However, later evidence showed that the DOJ only made that request after they were asked by the Department of Commerce to do so. *See Dep't of Commerce v. New York*, 588 U.S. 752 (2019).

[20] Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[21] Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, Homeland Sec. Newswire (Sept. 13, 2025), https://www.homelandsecuritynewswire.com/dr20250913-doj-is-sharing-state-voter-roll-lists-with-homeland-security.

[22] Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://www.npr.org/2025/12/10/nx-s1-5588384/save-voting-data-us-citizens.

immigration enforcement."[23] DOJ's relationship with DHS further confirms that voting roll data is being used to compile a national database with millions of voters' private information.

In other similar cases involving two other states, the DOJ asked election officials to run their entire voter list through the SAVE database—a database housed in DHS and used as the central federal database for citizenship records.[24] These requests by the DOJ mirror requests by DHS itself to states like North Carolina, and complement an executive order by President Trump directing DHS to review publicly available voter registration lists against federal immigration databases.[25] DHS officials have confirmed that the federal government is "finally doing what it should have all along—sharing information to solve problems."[26]

Reports from other agencies also point to the federal government laying the groundwork to amass the personal information of millions of Americans in a centralized database. Technology company Palantir has been enlisted by the federal government to build a massive repository that can house data collected from multiple federal agencies such as the Internal Revenue Service, the Social Security Administration, and the Department of Health and Human Services.[27] States have also been pressured to turn over sensitive information from programs like the Supplemental Nutritional Assistance Program (SNAP), as well as data from Medicaid.[28] These programs and agencies have access to the most sensitive parts of Americans'

---

[23] The attorney interviewed went on to say, "I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division." Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department: Sixty Attorneys Describe a Year of Chaos and Suspicion*, N.Y. Times Mag. (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

[24] Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[25] Pres. Donald J. Trump**,** *Preserving and Protecting the Integrity of American Elections*, Exec. Order, Mar. 25, 2025, https://www.whitehouse.gov/presidential-actions/2025/03/preserving-and-protecting-the-integrity-of-american-elections/; *Id.*

[26] Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists With Homeland Security*, Stateline (Sept. 12, 2025), https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security. Reports indicate that noncitizen voting is exceedingly rare. For example, after a comprehensive review of voter rolls in April, the state of Michigan found that 0.00028% of the state's total votes were cast by noncitizens. Miles Parks, *Despite Grand Claims, a New Report Shows Noncitizen Voting Hasn't Materialized*, NPR (July 30, 2025), https://www.npr.org/2025/07/30/nx-s1-5462836/noncitizen-voting-trump-ceir-review. The risk of deportation, prison time, fines, and derailing of the naturalization process is a great deterrence to stay away from the polls for those unauthorized to vote. *Noncitizen Voting is Vanishingly Rare*, Brennan Ctr. for Justice (Jan. 25, 2017), updated Sept. 17, 2024, https://www.brennancenter.org/our-work/research-reports/noncitizen-voting-vanishingly-rare.

[27] Priscilla Alvarez, Sunlen Serfaty, Marshall Cohen & Tami Luhby**,** *DOGE Is Building a Master Database for Immigration Enforcement, Sources Say*, CNN (Apr. 25, 2025), https://www.cnn.com/2025/04/25/politics/doge-building-master-database-immigration.

[28] U.S. Dep't of Agriculture**,** *Secretary Rollins Requires States to Provide Records on SNAP Benefits, Ensure Lawful Use of Federal Funds* (May 6, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/05/06/secretary-rollins-requires-

lives. Viewing the DOJ's campaign to collect sensitive voter data in the context of these agreements for other types of personal information paints an alarming picture regarding the centralization of Americans' information within the Executive Branch—without approval from Congress or Americans themselves.

The Court does not take lightly DOJ's obfuscation of its true motives in the present matter. Congress passed the NVRA, Civil Rights Act, and HAVA to protect voting rights. If the DOJ wants to instead use these statutes for more than their stated purpose, circumventing the authority granted to them by Congress, it cannot do so under the guise of a pretextual investigative purpose.

## B.   The DOJ's claim fails under the NVRA

Though the DOJ cites to the NVRA as the foundation for its demand for California's unredacted voter rolls, nothing in the NVRA requires California to fulfill this demand and disregard California privacy law. The NVRA requires states to "make a reasonable effort to remove the names of ineligible voters from official lists" for reasons like the death or change of address of voters. 52 U.S.C. § 20507 (a)(4). The NVRA puts the onus on states to maintain voter rolls. Specifically, states are required to "maintain for at least 2 years and . . . make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). The NVRA does not distinguish between private parties and the government regarding the "public inspection" requirement.

Congress' objectives when creating the NVRA was to "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," "to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;" "to protect the integrity of the electoral process; and ... to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(1)-(4). To make these

---

states-provide-records-snap-benefits-ensure-lawful-use-federal-funds; Kimberly Kindy & Amanda Seitz, *Trump Administration Hands Over Medicaid Recipients' Personal Data, Including Addresses, to ICE*, AP News (July 17, 2025), https://www.apnews.com/article/immigration-medicaid-trump-ice-ab9c2267ce596089410387bfcb40eeb7.

objectives achievable, Congress created Section 8(i)(1) along with a private right of action. 52 U.S.C. §§ 20507, 20510(b). Voting rights advocates have used the private right of action to achieve the statute's purpose of increasing the number of eligible voters through investigating the disfranchisement of marginalized voters, particularly concerning election officials' improper denial or cancellation of voter registrations. *See, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 333 (4th Cir. 2012) (nonprofit investigating the improper rejection of voter registrations submitted by students at a historically Black university).

The DOJ seeks to surpass the scope of the NVRA and wield it to collect information beyond the scope and purpose of what Congress envisioned. However, the NVRA ultimately does not allow for the unjustified, wholesale disclosure of voters' sensitive information.

## 1. California is not required to turn over unredacted voter information to the DOJ under the NVRA.

There is longstanding precedent that states are entitled to redact sensitive voter information, like social security numbers and birthdates, under the NVRA and that this information is not relevant to the removal of ineligible voters from voting rolls. *Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711–12 (E.D. Va. 2010); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 733 (S.D. Miss. 2014).[29] The First Circuit held broadly in *Public Interest Legal Foundation* that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information" for files like voter registration lists. 92 F.4th at 45–49. The First Circuit came to this conclusion understanding that the redaction of personal information in statewide voter registration lists could "assuage potential privacy risks." *Id.*

---

[29] *See Project Vote/Voting for Am., Inc.*, 682 F.3d at 339 (affirming district court order to redact social security numbers before disclosure under NVRA); *N.C. State Bd. of Elections*, 996 F.3d at 268 (recognizing that the NVRA permits redactions to "protect sensitive information"); *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1016 (D. Alaska 2023) (holding the NVRA permits "the exclusion of sensitive personal information" from disclosure); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022) (holding the NVRA permits "proper redaction of highly sensitive information"); *Project Vote, Inc. v. Kemp*, 208 F.Supp. 3d 1320, 1344–45 (N.D. Ga. 2016) (holding the NVRA "does not require the disclosure of sensitive information that implicates special privacy concerns," including telephone numbers, partial social security numbers, partial email addresses, and birthdates); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014) (holding the NVRA "does not require the disclosure of unredacted voter registration documents, including voter registrant birthdates"); *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010) (holding the NVRA permits redacting social security numbers).

The DOJ itself acknowledged these privacy risks itself in its *Public Interest Legal Foundation* amicus brief, conceding that "the NVRA does not prohibit States from redacting 'uniquely sensitive information' like voters' Social Security Numbers before disclosing records." *See Br. for the United States as Amicus Curiae in Support of Plaintiff-Appellee at 27– 30, PILF, 92 F.4th 36 (No. 23-1361), 2023* WL 4882397, at *27 (citing *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012)). The DOJ further conceded that the NVRA does not "prohibit [states from] redacting an even broader set of personal information in certain sensitive circumstances." *Id.* (citing *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021)).

The DOJ argues that it is entitled to the unredacted, sensitive information contained in California's voter rolls because there is a distinction between the government and a private individual using the "public disclosure" mechanism under the NVRA. The Court finds this distinction meaningless given that the statute itself makes no distinctions between the government and private individuals. This lack of distinction is particularly meaningful when taken to the logical conclusion that if the DOJ is entitled to unredacted voter information, private individuals should also be entitled to this information. This conclusion cannot be. Further, nothing in the text of the NVRA prohibits the redaction of personal voter information. Therefore, California was well within the directive of the NVRA when it offered the DOJ the ability to inspect redacted voter records.

The DOJ further argues that access to California voter rolls is necessary because "California's voter registration metrics are among the worst in the nation and are strongly suggestive of its list maintenance violations." (Dkt. 64 at 22). However, the NVRA only permits investigations into states' policies regarding reasonable voter roll maintenance. Nothing in the statute suggests as acceptable the deep level of intrusive digging DOJ is proposing in its request for line-by-line voter roll data. The DOJ makes no persuasive argument for why this large amount of unredacted voter information is necessary to evaluate state policies. Therefore, the DOJ's NVRA claims fail. California is not required to turn over unredacted voter information.

### 2. California privacy laws are not preempted by the NVRA.

As discussed above, the NVRA does not require the disclosure of unredacted California voter rolls. Under the Supremacy Clause, "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Free v. Bland*, 369 U.S. 663, 666, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962). Even if disclosure of records was required, California's privacy laws would not be preempted. California law requires that "the California driver's license number, the California identification card number, the social security number, and any other unique identifier used by the State of California for purposes of voter identification. . . , are confidential and shall not be disclosed to any person." Cal. Elec. Code § 2194(b)(1); Cal. Gov't Code § 7924.000(b)–(c). The Court agrees with Intervenors' analysis of *Public Interest Legal Foundation* that "the First Circuit effectively recognized that the NVRA's public inspection provisions did not preempt or circumvent the Maine legislature's lawfully enacted privacy requirements, which largely parallel California's state law protection for sensitive voter information and prohibit disclosure of the highly sensitive personal information DOJ seeks." NAACP and SIREN's Mot. (Dkt. 62-1) at 8; *see* Cal. Elec. Code § 2194(b)(1).

The NVRA and California's privacy protections can coexist because the latter does not obstruct the former. Nothing in the NVRA prevents redaction of sensitive voter information as California law requires. Furthermore, courts have routinely allowed for the redaction of sensitive voter information under the NVRA. Therefore, the DOJ's claim fails under the NVRA and the Court disavows the government's attempt at going beyond the scope of its previous position, as well as the will of Congress.

### C. The DOJ's claim fails under HAVA.

The Help America Vote Act ("HAVA") was enacted "[i] n the wake of the 2000 presidential election." *Crowley v. Nevada ex rel. Nevada Sec'y of State*, 678 F.3d 730, 734 (9th Cir. 2012). It was signed into law by President George W. Bush on October 29, 2002. Pub. L. No. 107-252, 116 Stat. 1666 (codified as amended at 52 U.S.C. §§ 20901-21145). The purpose of HAVA is:

To establish a program to provide funds to States to replace punch card voting systems, to establish the Election Assistance Commission to assist in the administration of Federal elections and to otherwise provide assistance with the administration of certain Federal election laws and programs, to establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections, and for other purposes.

*Id.*

Congress opted to defer much of the program to the decision of the states: "The specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State." 52 U.S.C. § 21085. HAVA sets minimum requirements for voting systems and voter registration lists. 52 U.S.C. §§ 21081, 21083. It also provides federal funding to states for elections to meet these new standards, replace outdated voting systems, and improve future administration of elections. 52 U.S.C. § 20901.

HAVA shifted the aggregation of managing voter registration databases up one level from local governments to state governments. 52 U.S.C. § 21083(a); *see* Orion de Nevers, *What Happened to Hava? The Help America Vote Act Twenty Years on and Lessons for the Future*, 110 Geo. L.J. Online 168, 174-75 (2022). The law requires that all states create a "computerized statewide voter registration list." Nevers, *supra*, at 175 (quoting 52 U.S.C. § 21083(a)(1)(A)). In doing so, "the law targets both interjurisdictional and intra-jurisdictional problems. It addresses interjurisdictional issues by aggregating data at the state, rather than the local level and by requiring the new systems to be coordinated with other state agency databases," and it "provides an intra-jurisdictional solution by mandating that the database be immediately accessible to 'any local election official.' These measures target the interplay of statewide and site-specific problems that plagued the 2000 election." Nevers, *supra*, at 175 (citing 52 U.S.C. § 21083(a)).

The law also provides for a "fail-safe," by allowing voters to cast provisional ballots. Nevers, *supra*, at 175 (citing 52 U.S.C. § 21082(a)). This provision means that "a voter who

arrives at a polling place only to be told they are not on the site's voter roll is entitled to cast a provisional ballot." Nevers, *supra*, at 175 (citing 52 U.S.C. § 21082(a)). The state must then go on to "verify the voter's eligibility and, if the state determines the voter is in fact 'eligible under State law,' count the vote." Nevers, *supra*, at 175 (quoting 52 U.S.C. § 21082(a)). This measure was meant to "respond[] to the votes that were lost in the 2000 election when poll workers erroneously turned away voters from polling places due to inaccurate voter registration information." Nevers, *supra*, at 175.

Finally, HAVA also established the U.S. Election Assistance Commission (the "EAC"), an independent bipartisan commission established with the goal of strengthening electoral resilience. Hope C. Kashatus, *Ready to Roll: How the U.S. Election Assistance Commission Can Strengthen State Compliance with Federal Voter Roll Maintenance Requirements*, 73 Admin. L. Rev. 901, 904, 910 (2021) (citing Arthur L. Burris & Eric A. Fischer, Cong. Rsch. Serv., RS20898, *The Help America Vote Act and Election Administration: Overview and Selected Issues for the 2016 Election* 4 (2016)). The EAC is manned by four commissioners with election administration experience who are nominated by the President, and confirmed by the Senate. Kashatus, *supra*, at 910-11. "The EAC's duties include dispersing election administration funds to states, serving as a clearinghouse of information on best practices for election administration, maintaining the mail voter registration form, developing voluntary voting system guidelines, and producing the biennial EAVS report." *Id.* at 912. Despite this, the "EAC demonstrates lawmakers' reluctance to grant broad federal authority over elections. HAVA limits the EAC's rulemaking authority and does not enable the EAC to enforce federal requirements." *Id.* at 904 (citing 52 U.S.C. §§ 20929, 20508(a); H.R. Rep. No. 107-30, at 13 (2001)).

### 1. HAVA does not provide for disclosure in its provisions.

California and Intervenors argue that HAVA does not contain any disclosure provisions in its statutory text. The Court agrees.

As LWVC notes, "[u]nlike the NVRA and CRA, HAVA does not have a disclosure provision." LWVC Mot. at 12. The NVRA includes a provision providing for "public

inspection." 52 U.S.C. § 20507(i)(1). So too does the CRA include a provision calling for "inspection, reproduction, and copying" under certain circumstances. 52 U.S.C. § 20703. HAVA includes no like provision. *See* 52 U.S.C. §§ 20901-21145.

Without a statutory provision allowing for disclosure or inspection authority, a government agency—like the DOJ—cannot claim to have that remedy tacked on to the text of the statute. *See Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988) ("[W]e are reluctant to assume the existence of the power to issue third-party subpoenas directed at unidentified targets where Congress has not provided for them specifically, nor provided procedural safeguards."). HAVA simply contains no such provision. This ends the inquiry. And the fact that the NVRA and CRA *do* include such provisions signals that the omission in HAVA was intentional. *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 392 (2015) ("Congress acts intentionally when it omits language included elsewhere.").

DOJ claims that HAVA does not include a disclosure provision because there is no private right of action under HAVA. First Opp. at 20-21. DOJ claims that it thus follows logically that there would no attendant "public disclosure requirement." *Id.* This misses the mark. Congress not only omitted any "public disclosure requirement," it omitted any disclosure provision at all. This omission is intentional, and the Court declines to read in inspection authority that is missing from the statutory text. The fact that DOJ may be entitled to these inspection records through discovery is also irrelevant. As California notes: "That DOJ might receive information through discovery in litigation, does not create an independent violation of HAVA for refusing to turn over information prior to litigation—which is the HAVA violation DOJ alleged." Cal. Reply (Dkt. 78) at 7 (cleaned up) (citing Compl. ¶ 62).

## 2. DOJ fails to allege any violations of HAVA.

Putting aside HAVA's lack of any disclosure provisions, DOJ also simply fails to allege any violations of HAVA. Even the federal government is not permitted to sue first, obtain discovery, and finalize its allegations later. This appears to be a telltale "fishing expedition." District courts do not "condone the use of discovery to engage in 'fishing expeditions'" when the Plaintiff has no basis other than "gross speculation" to support their claims. *Webb v. Trader*

*Joe's Co.*, 999 F.3d 1196, 1204 (9th Cir. 2021) (quoting *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004)).

First, the thrust of DOJ's HAVA claim in its Complaint is that California violated HAVA by failing to turn over the full unredacted voter list as requested. *See* Compl. ¶¶ 58-63. That claim fails for the reasons stated in the previous section: There is no disclosure provision in HAVA, and so California cannot have violated any such provision.

Turning to the substantive provisions of HAVA, DOJ has also failed to alleged any violations. HAVA sets standards for "maintenance" of a state's voter lists. *See* 52 U.S.C. § 21083. But California has standards for list maintenance and provided them to DOJ before the initiation of this litigation. Brudigam Decl. (Dkt. 37-2), Exs. 4. 6, 8. DOJ does not identify any deficiencies in these provided standards, and so the thrust of its list maintenance claim fails.

The basis of DOJ's argument appears to be that it has identified apparent anomalies with California's voter registration list—in terms of duplicate registrations, for example, and so California must not be meeting the minimum maintenance requirements.[30] First Opp. at 18-20. But this misses the mark. The fact that California *reported* duplicate registrations, *reported* removals of deceased registrants, and *reported* a change in inactive voters does not indicate that its list maintenance system is deficient. Indeed, the fact that California reported these numbers indicates that its system is properly serving as a net. A lack of reporting would be more telling than the de minimis numbers DOJ singles out.[31]

Furthermore, a lag in removals is not indicative of any wrongdoing: "[A] maximum effort at purging voter lists could minimize the number of ineligible voters, but those same efforts might also remove eligible voters," while "preventing the states from removing

---

[30] DOJ misconstrues the obligation to remove ineligible voters from voter rolls as arising from HAVA. The obligation actually arises under the NVRA. *See* a *Gonzalez v. Arizona*, 677 F.3d 383, 402 (9th Cir. 2012) ("[T]he NVRA regulates voter registration, whereas HAVA is concerned with updating election technologies and other election-day issues at polling places."); *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019) ("Nothing in HAVA broadens the scope of the NVRA's list-maintenance obligations."). Nevertheless, the Court analyzes this claim here.

[31] The original request for the *County Case* concerned only 17 improper voters. Noah Biesiada, *OC Supervisors Reject Idea to Settle Voting Records Lawsuit with DOJ, Voice of OC* (Aug. 27, 2025), https://voiceofoc.org/2025/08/voter-data-lawsuit-orange-county/. Orange County has a population of 3,186,989 people, which means the 17 improper voters constitute only 0.00053% of the population. *See Orange County, California*, U.S. Census Bureau, https://data.census.gov/profile/Orange_County,_California?g=050XX00US06059. Furthermore, the 17 people in question have all since had their information "purged from voter rolls." *See* Biesiada, *supra*.

registrants altogether would ensure that no eligible voters are removed, but, at the same time, maximize the risks associated with inaccurate voter rolls." *Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019). As such, "Congress crafted a statute that sought to balance these competing interests" and in recognition that there may be some lag between maintenance efforts and effect. *Id.* Put simply, DOJ has not "alleged any specific breakdown in [California's] removal program." *Republican Nat'l Comm. v. Benson*, 754 F. Supp. 3d 773, 792 (W.D. Mich. 2024). The fact that California has attempted to demonstrate how its list maintenance program is compliant with the strictures of HAVA, and DOJ continues to only point at "anomalies" is indicative of the deficiencies in DOJ's HAVA claim. Since DOJ has been unable to identify any actual issues with California's list maintenance standards (which is what HAVA actually governs, *see* 52 U.S.C. § 21083), it continues to point out "anomalies" that are not actually elements of a HAVA claim.

### 3. HAVA does not preempt California law.

Even if California had been alleged to violate HAVA and even if it was required to disclose its voter registration list, there is nothing in HAVA that would require California to produce an unredacted copy of this list. California law mandates that any such voter registration list be properly redacted and indeed prohibits the production of an unredacted voter list. HAVA contains no disclosure provision. 52 U.S.C. §§ 20901-21145. As such HAVA, cannot preempt California law and require California election officials to produce an unredacted voter list "in disregard of the law of their state." *Am. C.R. Union v. Philadelphia City Commissioners*, 872 F.3d 175, 186 (3d Cir. 2017).

### D. DOJ's demands violate federal privacy laws.

The DOJ's request for California's unredacted voter rolls violates a plethora of federal privacy laws including the Privacy Act, E-Government Act, and Driver's Privacy Protection Act, by failing to meet the requirements under each statute.

### 1. The DOJ's data requests violate the Privacy Act.

The Privacy Act serves as a protection for Americans against the disclosure of information collected by the government. *Ritter v. United States*, 177 Fed. Cl. 84, 87 (2025).

The Act was passed in 1974 amidst concerns over the Executive accumulating and centralizing Americans' personal information in the wake of the Watergate and Counterintelligence Program scandals, both seen as threats to American democracy.[32] The Act creates "certain safeguards for an individual against an invasion of personal privacy." Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974). Unless narrow exceptions apply, agencies cannot collect or maintain records regarding Americans' First Amendment activities and agencies are required to follow specific procedures prior to maintaining, collecting, using or disseminating records.[33] 5 U.S.C. §§ 552a(a)(3), (a)(5), (e)(4), (e)(7), (f).

The Privacy Act applies to the voter records request by the DOJ because a "system of records" is defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). The DOJ's request for Californians' voting records includes a litany of personal and sensitive information that is governed by the Privacy Act.

The Privacy Act bars DOJ's request for California's unredacted voter roll because fulfillment of that request would include information regarding previous election participation and party affiliation. And voter registration, participation in elections, as well as party affiliation are all types of political expression protected by the First Amendment. *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999); *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69, 75–76 (1990). The Privacy Act prevents federal agencies from collecting records regarding Americans' First Amendment activities. 5 U.S.C. §§ 552a(a)(3), (a)(5), (e)(4), (e)(7), (f). Further, none of the exceptions that would allow for agencies to collect information falling under the First Amendment apply in the present case.

Even if the DOJ successfully argued that its requests do not fall under the First Amendment bar of the Privacy Act, the DOJ fails to identify relevant System of Records

---

[32] See U.S. Dep't of Just., *Overview of the Privacy Act of 1974: 2020 Edition*, https://www.justice.gov/opcl/overview-privacy-act-1974-2020-edition/introduction#LegHistory.

[33] Exceptions include: express authorization by statute, the agency is given permission by the subject of the record, or retention is pertinent to and within the scope of an authorized law enforcement activity. § 552a(e)(7); *see also* 28 C.F.R. § 16.54(g) (imposing the same as a regulatory standard of conduct for all employees and contractors of the Department of Justice).

Notices (SORNs) as necessitated by the Privacy Act. The Privacy Act requires that a SORN be published in the Federal Register before "establish[ing] or revis[ing]" a "system of records." 5 U.S.C. § 552a(e)(4); *Brusseau v. Dep't of Homeland Sec.*, 2021 WL 3174248, at *5 (E.D. Va. July 27, 2021). If millions of Americans' private information is to be collected by the federal government, they deserve the ability to comment and voice their concerns before this collection occurs. 5 U.S.C. § 552a(e)(4)(D); *see Am. Fed'n of State, Cnty. & Mun. Emps., AFLCIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685, 763 (D. Md. 2025), *appeal docketed*, No. 25-1411 (4th Cir. Apr. 18, 2025). The Privacy Act's public notice and comment structure is an essential component of the Act and an essential piece of American democracy. Americans deserve to know the nature, scope, and routine uses of the records before they are collected by the federal government—especially given the federal government's subterfuge regarding why the data is being collected in the first place.

The DOJ identifies three potential SORNS to fulfill its requirement under the Privacy Act, claiming that the "full list of routine uses for this collection of information" can be found in the SORNS listed. First Opp. at 23-24. One SORN identified by the DOJ reads, "indicat[ing] a violation or potential violation of law," covers "[s]ubjects of investigations, victims, [and] potential witnesses." 68 Fed. Reg. 47,610, 47,611. This SORN does nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on an unprecedented level and used for a plethora of government activity—some identified to this Court and others not. *Ruell v. McDonough*, 2024 WL 4771390, at *8 (E.D. Pa. Nov. 13, 2024). The second SORN identified by the DOJ, updating the first, allows public disclosure of information after "the investigation is closed." 70 Fed. Reg. 43,904, 43,904. This SORN again does not sufficiently alleviate concerns regarding what private and sensitive information will be shared and when. The third SORN is concerning disclosures after data breaches—also lacking relevance and specificity. 82 Fed. Reg. 24,147, 24,151. In conclusion, none of the SORNS identified give sufficient notice to the American public as required under the Privacy Act.

The Court is concerned that the very issues that animated Congress to pass the Privacy Act—threats to American democracy amidst erosion of public trust regarding the Executive's use of sensitive data—will play out again if the DOJ is given license to ignore the guardrails created by Congress in the Privacy Act. Congress passed the Privacy Act to prevent the creation of "formal or de facto national data banks" or "centralized Federal information systems" because of the risks posed to the privacy of individual Americans.[34] Congress wanted to prevent "interagency computer data banks" so it made it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen," and to ensure "proper regard for individual privacy, the confidentiality of data, and the security of the system." *Id.* at 884, 217. Now, the Executive stands at the precipice of making Congress' fears come to life. But the Privacy Act remains a protection for the American people. Because the DOJ has not fulfilled its requirements under the Privacy Act, it cannot collect the sensitive, unredacted voting records of millions of Californians.

### 2. The DOJ's data request violates the E-Government Act.

The E-Government Act requires federal agencies to conduct a "privacy impact assessment" (PIA) prior to "initiating a new collection of information" that "includes any information in an identifiable form permitting the physical or online contacting of a specific individual" if the information encompasses "10 or more persons." *Id.* § 208(b). The PIA and the E-Government Act's procedural requirements must be completed "*before* the agency initiates a new collection of information." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 311 (D.D.C. 2017) (emphasis in original).

The information the DOJ seeks to collect from California—like names and addresses of voters—is personal information protected by the E-Government Act. The Court finds the DOJ's assertion that the E-Government Act is not applicable to the enforcement of HAVA and the NVRA unpersuasive because the plain text of the statute includes the very information the DOJ is trying to collect. First Opp. at 27. Additionally, the request made by the DOJ to California is a new one, thus initiating a new collection of data. DOJ cites to a PIA conducted when it began

---

[34] S. Comm. on Gov't Operations and H.R. Comm. On Gov't Operations, 94th Cong., 2d Sess., *Source Book on Privacy* at 168 (1976), https://www.justice.gov/d9/privacy_source_book.pdf.

1    using ServiceNow, but does not specify how this relates to its present request to California.

2    First Opp. at 27. Since the DOJ does not cite to an applicable PIA, it has failed its requirements

3    under the E-Government Act.

### 3. The DOJ's data request violates the Driver's Privacy Protection Act.

5    The Driver's Privacy Protection Act (DPPA) prevents the disclosure of "personal

6    information" that is obtained by the California Department of Moter Vehicles (DMV) in

7    connection with a "motor vehicle record." 18 U.S.C. §§ 2721(a), 2725(1), (3), & (4); *Reno v.*

8    *Condon*, 528 U.S. 141, 143 (2000). The DPPA is implicated by the DOJ's request for voting

9    records because California's statewide voter registration database receives information directly

10   from the DMV. The Secretary receives information from the DMV regarding whether a person

11   has completed their voter registration, along with their completed voter registration when that

12   person applies for a driver's license. Cal. Elec. Code § 2265(b); *see also* 52 U.S.C. § 20504.

13   California's statewide voter registration system also pulls driver's license numbers from the

14   DMV on a regular and ongoing basis. Cal. Code Regs. tit. 2, § 19074(a).

15   An exception to the DPPA is when information is disclosed "For use by any government

16   agency, including any court or law enforcement agency, in carrying out its functions, or any

17   private person or entity acting on behalf of a Federal, State, or local agency in carrying out its

18   functions." 18 U.S.C.A. § 2721(b)(1). The DOJ claims that it falls under this exception. First

19   Opp. at 10. The DOJ has not identified how the use of millions of Californians' driver's license

20   numbers would help it understand whether California conducts a general program that makes a

21   reasonable effort to remove persons from its voter rolls due to death or change in residence.[35]

22   Therefore, the DOJ's request for this information violates the DPPA.

### E.    District of Connecticut Decision

24   On January 12, 2026, DOJ lodged an order by a sister court in the District of

25   Connecticut, which it claims deals with identical claims and supports its position (Dkt. 124).

26   NAACP and SIREN filed a response (Dkt. 126) on January 13, 2026, which distinguished the

27   Connecticut filing and argued it does not support DOJ's position. The Court has reviewed the

28   ---

[35] *See Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597, 606 (7th Cir. 2012) (en banc) ("When a particular piece of disclosed information is not *used* to effectuate that purpose in any way, the exception provides no protection for the disclosing party.").

District of Connecticut order and agrees that it amounts to nothing more than a scheduling order delineating a briefing schedule. In any case, the District of Connecticut is a sister court from another circuit. This Court has the benefit of fully completed briefing and oral argument, so it need not rely on persuasive authority in making its ruling.

## V.  CONCLUSION

The taking of democracy does not occur in one fell swoop; it is chipped away piece-by-piece until there is nothing left. The case before the Court is one of these cuts that imperils all Americans. The erosion of privacy and rolling back of voting rights is a decision for open and public debate within the Legislative Branch, not the Executive. The Constitution demands such respect, and the Executive may not unilaterally usurp the authority over elections it seeks to do so here.

The Department of Justice seeks to use civil rights legislation which was enacted for an entirely different purpose to amass and retain an unprecedented amount of confidential voter data. This effort goes far beyond what Congress intended when it passed the underlying legislation. The centralization of this information by the federal government would have a chilling effect on voter registration which would inevitably lead to decreasing voter turnout as voters fear that their information is being used for some inappropriate or unlawful purpose. This risk threatens the right to vote which is the cornerstone of American democracy.

Abraham Lincoln once said "the ballot is stronger than the bullet." One hundred years later, Dwight Eisenhower observed, "A people that values its privileges above its principles soon loses both."  Both principles are applicable here. But, more critically, the Constitution requires that any decision which might erode fundamental privacy and voting rights must be subjected to the crucible of public debate through the Legislative Branch of the American government. It cannot be the product of an executive fiat.

For the reasons discussed above, Defendant and Intervenors' motions to dismiss are **GRANTED**. Given that the DOJ's request violates federal privacy laws, leave to amend would be futile. Therefore, the motions are **DISMISSED WITHOUT LEAVE TO AMEND**.

DATED:       January 15, 2026

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE