**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

**Plaintiff,**

vs.

**1:25-CV-1338**
**(MAD/PJE)**

**BOARD OF ELECTIONS OF THE STATE**
**OF NEW YORK,** *et al.*,

**Defendants.**

---

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **U.S. DEPARTMENT OF JUSTICE**<br>**CIVIL RIGHTS DIVISION**<br>150 M St. NE - Ste 8-139<br>Washington, District of Columbia 20002<br>Attorney for Plaintiff | **ERIC NEFF, ESQ.** |
| **U.S. DEPARTMENT OF JUSTICE**<br>**CIVIL RIGHTS DIVISION**<br>950 Pennsylvania Avenue, NW<br>Washington, District of Columbia 20530<br>Attorneys for Plaintiff | **GREGORY DOLIN, ESQ.**<br>**JAMES T. TUCKER, ESQ.** |
| **OFFICE OF THE UNITED**<br>**STATES ATTORNEY**<br>James T. Foley U.S. Courthouse<br>445 Broadway<br>Albany, New York 12207<br>Attorney for Plaintiff | **JOHN A. SARCONE, III, First Assistant**<br>**United States Attorney** |
| **HARRIS BEACH MURTHA**<br>**CULLINA PLLC**<br>445 Hamilton Avenue, Suite 1206<br>White Plains, New York 10601<br>Attorney for Defendants Kristen Zebrowski<br>Stavisky, Henry Berger, and Essma Bagnuola | **BRIAN GINSBERG, ESQ.** |
| **HARRIS BEACH MURTHA**<br>**CULLINA PLLC** | **THOMAS J. GARRY, ESQ.** |

1

333 Earle Ovington Blvd, Suite 901
Uniondale, New York 11553
Attorney for Defendants Kristen Zebrowski
Stavisky, Henry Berger, and Essma Bagnuola

**HARRIS BEACH MURTHA**          **DANIEL R. LECOURS, ESQ.**
**CULLINA PLLC**                 **ELLIOT AARON HALLAK, ESQ.**
677 Broadway - Suite 1101        **LISA A. LECOURS, ESQ.**
Albany, New York 12207
Attorneys for Defendants Kristen Zebrowski
Stavisky, Henry Berger, and Essma Bagnuola

**NEW YORK STATE OFFICE OF**     **YUVAL RUBINSTEIN, AAG**
**THE ATTORNEY GENERAL**
28 Liberty Street
New York, New York 10005
Attorney for Defendant State of New York

**EMERY CELLI BRINCKERHOFF**     **ANDREW G. CELLI , JR., ESQ.**
**ABADY WARD & MAAZEL LLP**      **CLAIRE ABBADI, ESQ.**
One Rockefeller Plaza, 8th Floor **DANIEL M. EISENBERG, ESQ.**
New York, New York 10020         **KATHERINE R. ROSENFELD, ESQ.**
Attorneys for Intervenor Defendants National
Association for the Advancement of Colored
People and National Association for the
Advancement of Colored People New York
State Conference

**ELIAS LAW GROUP LLP**          **ARIA BRANCH, ESQ.**
250 Massachusetts Ave NW         **CHRISTOPHER D. DODGE, ESQ.**
Washington, District of Columbia 20001  **TINA MENG MORRISON, ESQ.**
Attorneys for Intervenor Defendants National
Association for the Advancement of Colored
People and National Association for the
Advancement of Colored People New York
State Conference

**BRENNAN CENTER FOR JUSTICE**   **PATRICK BERRY, ESQ.**
**AT NYU SCHOOL OF LAW**
120 Broadway, Suite 1750
New York, New York 10271
Attorney for Intervenor Defendant League
of Women Voters of New York State

2

**CAMPAIGN LEGAL CENTER**
1101 14th St. NW - Suite 400
Washington, District of Columbia 20005
Attorneys for Intervenor Defendant League
of Women Voters of New York State

**ALEXIS D. GRADY, ESQ.**
**DANIEL S. LENZ, ESQ.**
**HEATHER J. SZILAGYI, ESQ.**
**KATE R. HAMILTON, ESQ.**
**RENATA O'DONNELL, ESQ.**
**ROBERT B. FERGUSON, ESQ.**
**SEJAL JHAVERI, ESQ.**

**BRENNAN CENTER FOR JUSTICE**
777 6th St. NW - Suite 1100
Washington, District of Columbia 20001
Attorney for Intervenor Defendant League
of Women Voters of New York State

**MAURA E. O'CONNOR, ESQ.**

**JOHN L. O'KELLY**
339 Richard Avenue
Hicksville, New York 11801-1248
Attorney for Amicus NY Citizens Audit
Civic Fund, Inc. d/b/a RealAmerica.Vote

**JOHN L. O'KELLY, ESQ.**

**DEMOCRATIC NATIONAL COMMITTEE**
430 South Capitol St SE #3
Washington, District of Columbia 20003
Attorney for Amicus Democratic National
Committee

**DANIEL J. FREEMAN, ESQ.**

**OFFICE OF THE ATTORNEY GENERAL**
**STATE OF MARYLAND**
Civil Litigation Division
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Attorney for Amicus Maryland

**DANIEL M. KOBRIN, AAG**

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff United States of America ("Plaintiff" or the "Government") brings this civil action to compel the production of the State of New York's complete and unredacted computerized voter registration list against Defendants the Board of Elections of the State of New

3

York (the "BOE"); Co-Executive Directors of the BOE Kristen Zebrowski Stavisky, Raymond Riley, III, and Peter Kosinski; Commissioners of the BOE Henry Berger, Anthony Casale, and Essma Bagnuola; and the State of New York ("New York" or the "State"). *See* Dkt. No. 1. This case mirrors dozens of similar actions brought by the Government in district court across the country, seeking the production of state voter registration lists.

Presently before the Court are (1) motions to intervene filed by the National Association for the Advancement of Colored People and the National Association for the Advancement of Colored People New York State Conference ("NAACP Intervenors"), and the League of Women Voters of New York State ("LWV Intervenors") (collectively, "Intervenor Defendants"), *see* Dkt. Nos. 7, 20; (2) motions to dismiss filed by (a) the State, (b) Defendants Essma Bagnuola, Henry Berger, Kristen Zebrowski Stavisky,[1] and (c) Intervenor Defendants, *see* Dkt. Nos. 73, 74, 76, 77; (3) amicus briefs filed by amici NY Citizens Audit Civic Fund, Inc. d/b/a RealAmerica.Vote ("NYCA"), the Democratic National Committee, and the states of Arizona, California, Colorado, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Vermont, and Washington, by and through their respective Attorneys General (the "Seventeen Amici States"), *see* Dkt. Nos. 46, 51, 78, 79; (4) Plaintiff's cross-motion to compel, *see* Dkt. No. 81; and (5) numerous notices of supplemental authority and responses thereto, *see* Dkt. Nos. 64, 91, 92, 94, 95, 96, 97, 98.

For the reasons that follow, the motions to intervene and motions to dismiss are granted, and Plaintiff's cross-motion to compel is denied.

---

[1] As explained in Plaintiff's briefing, Defendants Bagnuola, Berger, and Zebrowski Stavisky are the Democratic appointees to the BOE. *See* Dkt. No. 81-1 at 6 n.1. Defendants Anthony Casale, Peter Kosinski, Raymond Riley, III, the remaining defendant members of the BOE, answered the complaint and have not moved to dismiss. *See* Dkt. No. 75. For ease of reference, Defendants New York, Bagnuola, Berger, and Zebrowski Stavisky will be referred to as "Defendants" herein.

## II. BACKGROUND

**A.      Relevant Legal Background**

At the forefront of the discussion of this lawsuit are the Constitutional principles of federalism and the separation of powers.  Pursuant to the Elections Clause of the United States Constitution, the States are empowered, in the first instance, to regulate and administer elections: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ."  U.S. Const. art. I, § 4, cl. 1.  As the Supreme Court has explained,

> times, places and manner . . . [are] comprehensive words [that] embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of elections returns.

*Smiley v. Holm*, 285 U.S. 355, 366 (1932).

It has long been recognized that the Elections Clause entrusts the administration of federal elections to the States.  *See United States v. Gradwell*, 243 U.S. 476, 484 (1917) ("The policy of thus [e]ntrusting the conduct of elections to state laws, administered by state officers, which has prevailed from the foundation of the government to our day, with the exception, as we have seen, of twenty-four years, was proposed by the makers of the Constitution, and was entered upon advisedly by the people who adopted it . . .").  "In practice, the [Elections] Clause functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'"  *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (citation omitted).

Among those statutes enacted by Congress to regulate elections are Title III of the Civil Rights Act of 1960 ("Title III" or the "CRA"), the National Voter Registration Act (the "NVRA"),and the Help America Vote Act ("HAVA")[2]—the statutes the Government now invokes in its pursuit to compel disclosure of New York's unredacted voter registration list.

### 1. Title III

As relevant here, Title III requires state election officials to "retain and preserve, for a period of twenty-two months from the date of [certain elections], all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . ."  52 U.S.C. § 20701.[3]  Section 20703 permits the Attorney General to demand production of § 20701 documents:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative.

52 U.S.C.A. § 20703.  Additionally, § 20703 requires that "[t]his demand shall contain a statement of the basis and the purpose therefor."  *Id.*

### 2. The NVRA

Congress enacted the NVRA in 1993 with "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls."  *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018).  The NVRA states four purposes: (1) "to

---

[2]  *See* 52 U.S.C. § 20701 *et seq.*; 52 U.S.C. § 20501 *et seq.*; 52 U.S.C. § 20901 *et seq.*

[3]  The Court will refer the records and papers subject to § 20701 as "§ 20701 documents" for purposes of this Memorandum-Decision and Order.

establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;" (2) "to enhance[ ] the participation of eligible citizens as voters in elections for Federal office;" (3) "to protect the integrity of the electoral process;" and (4) "to ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b).

"The NVRA 'erect[s] a complex superstructure of federal regulation atop state voter-registration systems.'"  *Husted*, 584 U.S. at 761 (quoting *Arizona*, 570 U.S. at 5).  Among other directives, the NVRA "'requires States to provide simplified systems for registering to vote in federal elections,'" *Arizona*, 570 U.S. at 5 (citation and emphasis omitted), and to "'conduct a general program that makes a reasonable effort to remove the names' of voters who are ineligible 'by reason of' death or change in residence[,]" *Husted*, 584 U.S. at 761 (quoting 52 U.S.C. § 20507(a)(4)).  As relevant here, the NVRA contains a disclosure provision which requires that "[e]ach State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," with certain exceptions.  52 U.S.C. § 20507(i)(1).  The Attorney General, as well as private individuals, may bring civil actions "in an appropriate district court for declaratory or injunctive relief" to enforce the NVRA.  *See id.* § 20510(a)-(b).

### 3.  *HAVA*

HAVA requires states to implement, "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list" containing the names of all registered voters and their pertinent personal information.  52 U.S.C. § 21083(a)(1)(A).  Under HAVA, states must "make[ ] a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters."  *Id.* § 21083(a)(4)(A).  Further,

HAVA requires states "to ensure that voter registration records . . . are accurate and are updated regularly," *id.* § 21083(a)(4), including implementing "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters," *id.* § 21083(a)(4)(B).  "The Attorney General may bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief . . . as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under [§ 21083]."  *Id.* § 21111.

### 4.  New York's voter registration list

New York's "[v]oter registrations are actively maintained through the statewide system known as NYSVoter, the 'official' registration database for all of New York."  *Tenney v. Oswego Cnty. Bd. of Elections*, 142 N.Y.S.3d 288, 294 (N.Y. Sup. Ct. 2021) (citations omitted); *see* N.Y. Elec. Law § 5-614.  The NYSVoter List contains "the name and registration information of every legally registered voter in [New York]," as well as "a unique identifier for each legally registered voter . . . ."  N.Y. Elec. Law § 5-614(3)(b)-(c).  The NYSVoter List is in the "custody" of the BOE, and is "administered and maintained" by the BOE.  *Id.* § 5-614(1).

## B.    Factual Background

On June 30, 2025, the Government sent a letter to Defendants Stavisky and Riley, Co-executive directors of the BOE.  *See* Dkt. No. 1 at ¶¶ 42-43; Dkt. No. 74-3.[4]  In the June 30, 2025

---

[4]  Defendants have submitted copies of the June 30, 2025 letter, a subsequent letter from the United States dated August 14, 2025, as well as letters from the BOE dated July 24 and August 29, 2025.  *See* Dkt. Nos. 74-3, 74-4, 74-5, 74-6, 74-7, 76-2, 76-3, 76-4, 76-5.  This correspondence between the Government and the BOE is expressly referenced and quoted in the complaint.  *See* Dkt. No. 1 at ¶¶ 42-48.  As such, the letters are incorporated in the complaint by reference and the Court will consider them in deciding the present Rule 12(b)(6) motions.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) ("'[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference[,]'" and "[e]ven where a document is not incorporated

letter, the Government requested certain information pertaining to the NYSVoter List and New York's compliance with HAVA. *See* Dkt. No. 1 at ¶¶ 42-43; Dkt. No. 74-3 at 2-3. The BOE acknowledged the June 30, 2025 letter in a letter dated July 24, 2025. *See* Dkt. No. 1 at ¶ 44. On August 14, 2025, the Government sent another letter to "clarify" the scope of the June 30, 2025 letter. *See id.* at ¶¶ 45-47; Dkt. No. 74-4 at 2. The August 14, 2025 letter stated that the requested NYSVoter List disclosure "should contain all fields, which means, [it] must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under [§ 21083(a)(5)(A)(i) of HAVA]." Dkt. No. 74-4 at 2.

The August 14, 2025 letter also asserted that the Government sought to "assess [New York's] compliance with the statewide maintenance provisions" of the NVRA, referenced the Attorney General's authority to bring enforcement actions pursuant to 52 U.S.C. § 20501(a), and stated that "the Attorney General is also empowered by Congress to request records" pursuant to Title III of the Civil Rights Act of 1960" under 52 U.S.C. §§ 20701 and 20703. *Id.* at 2-3. Although the final sentence of § 20703 requires that the Attorney General's "demand shall contain a statement of the basis and the purpose therefor," the August 14, 2025 letter did not explicitly state a "basis" and asserted that the "purpose" of the demand was "to ascertain New York's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 3.

On August 29, 2025, the BOE replied to the Government's letters. *See* Dkt. No. 1 at ¶ 48. The BOE's response reflects a partisan split regarding disclosure of an unredacted version of the NYSVoter List; the Democratic counsel's position was that only the public list without certain

---

by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint") (citations omitted).

9

identifying information such as last four digits of social security numbers and/or driver's licenses should be shared, while "the Republican counsel maintained that the entire list should be shared with the United States." *Id.* "Given the split, the State . . . only shared the public version of the [NYSVoter List] with the Attorney General." *Id.* The Government claims that the public NYSVoter List disclosed does not contain "information that is necessary for the Attorney General to carry out its duties of NVRA and HAVA enforcement" and prevents the Government from determining whether "New York is conducting effective list maintenance to ensure that the [NYSVoter List] is free of errors such as duplicitous registrations, deceased and noncitizen voters, and voters who have moved." *Id.* at ¶ 49.

Through the present action, the Government claims that it is entitled to New York's unredacted NYSVoter List pursuant to Title III, the NVRA, and HAVA. *See id.* at ¶¶ 1-7. Specifically, the complaint asserts claims pursuant to § 20703 of the CRA, § 20507(i) of the NVRA, and § 21083 of HAVA. *See id.* at ¶¶ 53-70. The Government requests a declaratory judgment as well as an order that "Defendants . . . provide to the United States the current electronic copy of [the NYSVoter List], with all fields, including each registrant's full name, date of birth, residential address, their state driver's license number, and the last four digits of their Social Security number[,]" pursuant to 52 U.S.C. § 20703. *See id.* at 17-18.[5] Although the Government also alludes to its pursuit of information regarding New York's compliance with the NVRA and HAVA's "list maintenance requirements," *id.* at 17, the only data that the Government seeks to compel disclosure of through this action is the NYSVoter List, *see id.* at 17-18.

---

[5] This citation is to the pagination generated by CM/ECF, instead of paragraph numbers, as the Court is referring the section of the complaint titled "Prayer for Relief." Unless otherwise noted, citations to documents filed on the docket are to the pagination on the heading such documents, which is generated by CM/ECF, the Court's electronic filing system.

**III. DISCUSSION**

**A.    Motions to Intervene**

The Court will begin by addressing the motions to intervene.  *See* Dkt. Nos. 7, 20.

NAACP Intervenors contend that they are entitled to intervene pursuant to Rule 24(a) of the

Federal Rules of Civil Procedure (or, alternatively, should be permitted to intervene pursuant to

Rule 24(b)) because (1) they have significant interests in, *inter alia*, ensuring that the personal

information of their members is not disclosed; and (2) the existing parties do not adequately

represent those interests.  *See* Dkt. No. 7-1 at 9-11.  LWV Intervenors also move pursuant to

Rules 24(a) and 24(b), arguing that its members are at risk of having their sensitive data disclosed

and the existing Defendants do not adequately represent LWV's interests.  *See* Dkt. No. 20-1 at

11-20.  On December 12, 2025, Plaintiff filed a letter which indicates, *inter alia*, that it "takes no

position on any motions to intervene and submits to the court's discretion."  Dkt. No. 66 at 1.

Defendants have not opposed either motion to intervene.

Rule 24(a) provides that courts must permit a nonparty to intervene who "claims an

interest relating to the property or transaction that is the subject of the action, and is so situated

that disposing of the action may as a practical matter impair or impede the movant's ability to

protect its interest, unless existing parties adequately represent that interest."  Fed. R. Civ. P.

24(a)(2)  And, under Rule 24(b), even if a nonparty is not entitled to intervene as a matter of right,

a court may grant permissive intervention where the movant "has a claim or defense that shares

with the main action a common question of law or fact" and intervention will not "unduly delay or

prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(1)(B), (b)(3).

The Second Circuit has held that an applicant seeking intervention as of right or by

permission, "must (1) timely file an application, (2) show an interest in the action, (3) demonstrate

that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *Floyd v. City of New York*, 770 F.3d 1051, 1057 (2d Cir. 2014) (citation and internal quotation marks omitted).  Courts also consider the following factors in determining whether to grant permissive intervention:

> (1) whether the applicant will benefit by intervention, (2) the nature and extent of the intervenors' interests, (3) whether [the intervenors'] interests are adequately represented by the other parties, and (4) whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.

*Kearns v. Cuomo*, No. 19-CV-00902, 2019 WL 5060623, *4 (W.D.N.Y. Oct. 9, 2019) (quoting *Ass'n of Conn. Lobbyists LLC v. Garfield*, 241 F.R.D. 100, 102 (D. Conn. 2007)).

Although the Court has some doubt about whether intervention as of right is available under Rule 24(a)(2) (particularly with respect to whether Intervenor Defendants' interests are protected adequately by the parties), permissive intervention is nonetheless appropriate.  Indeed, it appears that Intervenor Defendants have "a claim or defense that shares with the main action a common question of law or fact," the motions to intervene were timely filed within thirty days of the commencement of this action, no prejudice would stem from granting these unopposed motions, and Intervenor Defendants have submitted proposed briefing that significantly contributes to the development of the factual and legal issues presented.  Fed. R. Civ. P. 24(b); *see Kearns*, 2019 WL 5060623, at *4.  Accordingly, both motions to intervene are granted and the Court will consider the Intervenor Defendants' filings.[6]

---

[6]  Because the Court grants the motions to intervene, the Court also grants Intervenor Defendants' motions for leave to file motions to dismiss. *See* Dkt. No. 73 at ¶¶ 7-14; Dkt. No. 77 at 1-2; *see also* Wright & Miller, Federal Practice and Procedure § 1920 (3d ed. 2021) ("[T]he intervenor is entitled to litigate fully on the merits once intervention has been granted . . . [and] may move to dismiss the proceeding").  Intervenor Defendants properly filed their respective proposed motions

**B.      Appropriate Legal Standard**

*1. Judicial Review of a Title III Demand*

The parties dispute the applicable standard of review for this case.  According to Plaintiff, it is entitled under Title III to a "special statutory proceeding," under which the Court's review is restricted to a "severely limited" inquiry.  Dkt. No. 81-1 at 11-15.  Defendants and Intervenor Defendants contend that the Court should apply the motion to dismiss standard as contemplated by the Federal Rules of Civil Procedure.  *See* Dkt. No. 74-1 at 13-14; Dkt. No. 76-6 at 11; Dkt. No. 73-2 at 19; Dkt. No. 77-1 at 14-15.

Plaintiff's only support for its position is a series of Fifth Circuit cases from the early 1960s, most notably *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962).  *See* Dkt. No. 81-1 at 14.  In *Lynd*, the Fifth Circuit considered its role in evaluating a Title III demand by the Attorney General for voter records, made to investigate the "infringement or denial of . . . constitutional voting rights."  *Lynd*, 306 F.2d at 228.  The court reasoned that Title III creates a "special statutory proceeding . . . [that] does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure."  *Id.* at 225-26.  The Fifth Circuit concluded that "[t]here is no place for any other procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand."  *Id.* at 226.

Here, the Court joins the many other district courts which have determined that a court's role in evaluating these Title III claims is not so limited.  *See United States v. Fontes*, No. 26-CV-00066, 2026 WL 1177244, *1 (D. Ariz. Apr. 28, 2026) ("Each court which addressed the issue

---

to dismiss in accordance with the parties' so-ordered scheduling request.  *See* Dkt. No. 68.  Thus, the Court accepts NAACP Intervenors' motion to dismiss filed at Dkt. No. 77 and LWV Intervenors' motion to dismiss filed at Dkt. No. 73.

found that the Federal Rules of Civil Procedure apply to the Attorney General's lawsuit") (collecting cases); *see, e.g.*, *United States v. Benson*, 819 F. Supp. 3d 753, 766 (W.D. Mich. 2026) ("Here, the procedural circumstances are somewhat abnormal because the United States brings its CRA records request alongside claims under the NVRA and HAVA, which do not confer administrative subpoena authority.  The United States' complaint thus takes the form of a traditional civil complaint, not a petition for summary enforcement.  Accordingly, the Court will apply the Rule 12(b)(6) standard to evaluate the United States' CRA claim"); *United States v. Weber*, 816 F. Supp. 3d 1168, 1182 (C.D. Cal. 2026) ("Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures") (footnote omitted); *United States v. Amore*, No. 25-CV-00639, 2026 WL 1040637, *4 (D.R.I. Apr. 17, 2026) ("[T]he appropriate standard of review for this case is that common to motions to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6)"); *United States v. Oregon*, No. 6:25-CV-01666, 2026 WL 318402, *8 (D. Or. Feb. 5, 2026) ("[T]he Court applies the Federal Rules of Civil Procedure as in any other case. There is no current or binding authority for the proposition that Title III precludes the Court from evaluating the sufficiency of Plaintiff's allegations regarding Defendants' alleged failure to comply with Title III, including whether—applying Rule 12(b)(6) standards—a valid Title III demand was made in the first place"); *cf. United States v. Wis. Elections Comm'n*, No. 25-CV-1036, 2026 WL 1430354, *2 (W.D. Wis. May 21, 2026) (declining to resolve dispute regarding whether Rule 12(b)(6) or a summary proceeding standard is appropriate because "the court's analysis of the dispositive issue would be the same either way").

Plaintiff cites no binding authority for its position that the Federal Rules of Civil Procedure (including the motion to dismiss standard) are inapplicable.  Indeed, the text of Title III does not expressly provide for the type of proceeding proposed by Plaintiff.  Rather, Title III

provides that district courts have jurisdiction over voting records demands "by appropriate process." 52 U.S.C. § 20705. Although the statute does not define "appropriate process," the Supreme Court's holding in *United States v. Powell*, 379 U.S. 48 (1964) categorically contradicts Plaintiff's reliance on *Lynd*. In *Powell*, the Supreme Court interpreted 26 U.S.C. § 7604(a), a statute similar to 52 U.S.C. § 20705, and explained that "[b]ecause [§] 7604(a) contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply" and the court may "inquire into the underlying reasons for the examination [of records]." *Powell*, 379 U.S. at 58 & n.18.

Moreover, "*Lynd* appears to contemplate an application directly to the court for the records." *Oregon*, 2026 WL 318402, at *8 n.1 (citing *Lynd*, 306 F.2d at 225). Here, Plaintiff commenced the instant action by filing a complaint and proceeding through ordinary litigation. *See* Dkt. No. 1. Perhaps recognizing that other district courts have rejected the characterization of nearly identical actions brought by the United States as "special proceedings," Plaintiff asserts through its cross-motion that "it is unnecessary for the Court to address [the Government's] claims under the NVRA and HAVA, which mandate production through the normal litigation process" and instead, Plaintiff's "CRA claim is dispositive of all the relief that it seeks through Title III's 'severely limited inquiry' in a 'summary proceeding.'" Dkt. No. 81-1 at 11. The Court rejects Plaintiff's belated attempt to recharacterize this matter. *See Weber*, 816 F. Supp. 3d at 1182 ("Contrary to the position the DOJ takes, Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause").

For these reasons, the Court finds that the Federal Rules of Civil Procedure provide "appropriate process" and will apply Rule 12(b)(6) standards in evaluating the sufficiency of Plaintiff's allegations.

### 2. Rule 12(b)(6) Standard

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement of relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a

plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.* at 570.

In deciding a motion to dismiss, the court may consider "documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken[.]" *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citing *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999)) (other citation omitted). "Documents that are integral to plaintiff's claims may also be considered, despite plaintiff's failure to attach them to the complaint." *Id.* (citing *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991)).

## C.    The Motions to Dismiss

Defendants and Intervenor Defendants contend that the Government's complaint must be dismissed for the following reasons: (1) a voter registration list is not a record subject to production under Title III or the NVRA; (2) Plaintiff failed to provide an adequate statement of basis and purpose, as statutorily required under Title III; (3) the NVRA does not require the disclosure of an electronic version the NYSVoter List and, even if it did, the redaction of highly sensitive voter registration information does not violate the NVRA; (4) HAVA provides no statutory basis for Plaintiff's demand because it contains no inspection or disclosure provisions; (5) New York is not a proper party because it does not possess the NYSVoter List; and (6) Plaintiff's demand is barred by state and federal privacy laws and the complaint fails to allege compliance with federal privacy statutes. *See* Dkt. No. 73-2 at 19-33; Dkt. No. 74-1 at 13-25; Dkt. No. 76-6 at 11-34; Dkt. No. 77-1 at 15-29. Defendants' amici echo these arguments. *See*

17

Dkt. No. 78-2 at 6-15; Dkt. No. 79-1 at 11-16.[7]  Amicus curiae NYCA voices its support for the

Government's position.  *See* Dkt. No. 51.[8]

**D.     A Voter Registration List is Not a Record Subject to Production Under Title III**

Some district courts analyzing the Government's invocation of Title III in similar demands

for voter registration lists have focused on the "basis" and "purpose" requirements imposed by 52

U.S.C. § 20703.  *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1182-86; *Oregon*, 2026 WL 318402, at *8-

10.  This Court observes the same deficiencies in Plaintiff's demand to New York; Plaintiff's

demand states no basis and the purported "purpose" of "ascertain[ing] New York's compliance

with the list maintenance requirements of the NVRA and HAVA" lacks any relation to the

purposes for which Title III was enacted.  *See Oregon*, 2026 WL 318402, at *9-10 (concluding

that "Plaintiff's August 14 Letter contains no statement of a factual basis for believing Oregon

---

[7]  The Seventeen Amici States also present arguments regarding to the Government's purported motivations for demanding the NYSVoter List in light of similar demands the Government has made for personal data collected by various states in administering the Supplemental Nutrition Assistance Program and Medicaid.  *See* Dkt. No. 79-1 at 6-9.  Faced with analogous arguments, some district courts have noted their concern regarding the Government's potential ulterior motives for seeking sensitive voter data.  *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1186; *Oregon*, 2026 WL 318402, at *11.  The Court understands these critical privacy considerations, and does not take them lightly.  However, whatever motivations the Government may have is not dispositive of the issues presently before the Court (i.e, whether the allegations in complaint, taken as true, can survive the pending motions to dismiss).  *See United States v. Bellows*, No. 1:25-CV-00468, 2026 WL 1430481, *3 n.6 (D. Me. May 21, 2026) (acknowledging that "Defendants, Defendant-Intervenors, and various *amici curiae* have repeatedly and loudly cast aspersions on the Department of Justice's reasons for seeking so many states' [voter registration lists]," but reiterating that "this matter is before me on motions to dismiss, and under the applicable standard, the only facts that I consider are those contained in the United States' Complaint and its attachments, which I take as true") (citations omitted).

[8]  NYCA provides an impassioned account of the reasons why it believes Plaintiff is "the only party left in the nation with the right to enjoin election administrators in defense of fair elections." Dkt. No. 51 at 17-18.  In terms of substance, however, NYCA does not raise any arguments that alter the Court's decision herein.

violated the NVRA or HAVA" and "Plaintiff's stated purpose [of] investigat[ing] list maintenance procedures . . . lack[s] any reference or relation to the purposes for which Title III was enacted").

However, the Court need not even reach § 20703's basis and purpose requirements because Plaintiff's CRA claim fails at the outset for an even more fundamental reason—the Attorney General is simply not entitled to the NYSVoter List under Title III.  This conclusion is supported by six recent district court decisions which have determined that voter registration lists are not records subject to retention and preservation under § 20701.  *See Benson*, 819 F. Supp. 3d at 770;[9] *United States v. Scanlan*, No. 25-CV-371, 2026 WL 1864054, *6 (D.N.H. June 29, 2026); *United States v. DeMarinis*, No. 25-CV-3934, 2026 WL 1780586, *5 (D. Md. June 18, 2026); *Wis. Elections Comm'n*, 2026 WL 1430354, at *3; *United States v. Bellows*, No. 1:25-CV-00468, 2026 WL 1430481, *6-7 (D. Me. May 21, 2026); *Fontes*, 2026 WL 1177244, at *7. Indeed, although the briefing before the Court is primarily concerned with whether the Government's demand contained an adequate "statement of the basis and the purpose therefor" under § 20703, "this issue is moot if the [NYSVoter List] is not a § 20701 document in the first instance." *Fontes*, 2026 WL 1177244, at *3.

To reiterate the statutory framework which forms the basis of Plaintiff's CRA claim: "under § 20703, the Attorney General may only request documents that are 'required by [§ 20701] to be retained and preserved.'" *Id.* (quoting 52 U.S.C. § 20703).  These § 20701 documents are those "'which come into [a state officer of election's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in' certain federal elections." *Id.*

---

[9]  The Sixth Circuit recently affirmed the district court's decision in *Benson*, agreeing that "Title III's narrow text cannot withstand the weight of the government's broad request." *United States v. Benson*, No. 26-1225, 2026 WL 1815425, *1 (6th Cir. June 24, 2026).

19

(quoting 52 U.S.C. § 20701).  The Attorney General must make a demand for § 20701 documents in writing, containing a statement of "the basis and the purpose therefor."  52 U.S.C. § 20703.

Whether the NYSVoter List is a § 20701 document is a question of statutory interpretation.  *See Wis. Elections Comm'n*, 2026 WL 1430354, at *3.  "As in any statutory construction case, '[courts] start, of course, with the statutory text,' and proceed from the understanding that '[u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.'"  *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (quoting *BP Am. Prod. Co. v. Burton,* 549 U.S. 84, 91 (2006)).  "Statutory language, however, 'cannot be construed in a vacuum.'"  *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (quoting *Davis v. Mich. Dept. of Treasury,* 489 U.S. 803, 809 (1989)).  "'It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"  *Id.* (quoting *Davis*, 489 U.S. at 809).  Another "longstanding canon[] of statutory construction" is that courts "must normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.'"  *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698-99 (2022) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

As first articulated in *Benson* and reiterated in *DeMarinis*, a voter registration list is not a § 20701 document because it is created by state officials and, therefore, "does not 'come into [their] possession.'"  *DeMarinis*, 2026 WL 1780586, at *4; *see Benson*, 819 F. Supp. 3d at 768-69.  "The phrase 'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source."  *Benson*, 819 F. Supp. 3d at 768 (collecting sources) (emphasis in original).  "Congress frequently uses the phrase 'come into possession' to refer to items that a person *obtains* rather than *creates*."  *Id.* (collecting sources) (emphasis in original).

Congress chose to qualify what records were subject to a demand under Title III; "Congress could have referred simply to 'records in the possession of' election officials, or even just 'records' without any qualifier," but it did not. *Id.*  Thus, to give effect to the phrase "come into [their] possession" and prevent it from being surplusage, this Court joins the district courts that interpret "the phrase as referring to only those documents that state election officials receive from prospective voters." *Id.*; *see Bellows*, 2026 WL 1430481, at *6 n.10 ("Coming into possession of something most naturally implies receipt from an external source.  Congress could have required the retention and production of all election-related records and papers 'in the possession of' the state election official but did not.  The 'natural implication' of the failure to adopt this 'obvious alternative' is that Congress did not intend the alternative") (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16  (2014)) (other citation omitted).

In *Benson*, the district court bolstered this interpretation of "come into [their] possession" by looking to the next phrase in the statute: "'relating to any application, registration, payment of poll tax, or other act requisite to voting in such election.'"  *Id.* at 768 (quoting 52 U.S.C. § 20701). "Each of these terms refers to something that the voter submits or does as part of the registration process," and, as such, refers to "records that election officials *receive*, rather than *create*."  *Id.* at 768-69 (emphasis in original).  "Such an interpretation makes sense given that when the CRA was passed, the federal government's attempts to protect the voting rights of Black citizens had been frustrated by state officials' destruction of voter registration applications."  *Id.* at 769 (citation omitted).  "The CRA responded to that problem by requiring states to preserve records that voters submit to them—not records that states create."  *Id.*

Moreover, looking at the statutory scheme, interpreting § 20701 to include the NYSVoter List would not be harmonious with an adjacent provision, 52 U.S.C. § 20702, and would place

Title III in conflict with the NVRA and HAVA.  Section 20702 prohibits, *inter alia*, the alteration of any § 20701 document.  *See* 52 U.S.C. § 20702 ("Any person, whether or not an officer of election or custodian, who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved shall be fined not more than $1,000 or imprisoned not more than one year, or both").  "[A voter registration list], unlike a voter registration application that an applicant submits once, is a dynamic list that is constantly updated and, thus, altered." *DeMarinis*, 2026 WL 1780586, at *5.  "The NVRA was enacted, in part, to 'ensure that accurate and current voter registration rolls are maintained[,]'" and "creates a scheme, under which, states are required to 'protect the integrity of the electoral process by ensuring the maintenance of an accurate and *current* voter registration roll.'" *Fontes*, 2026 WL 1177244, at *4 (quoting 52 U.S.C. § 20501(b)) (emphasis in original).  Similarly, "HAVA requires state[s] to 'perform list maintenance with respect to the computerized list *on a regular basis*.'" *Id.* at *5 (quoting 52 U.S.C. § 21083(a)(2)(B)) (emphasis in original).

Therefore, if the NYSVoter List were deemed a § 20701 document, "then § 20702 would prohibit the [NYSVoter List] from being altered." *Id.*  "This conclusion would directly conflict with both the NVRA and the HAVA, which affirmatively require[] states to modify [their voter registration lists] under certain conditions." *Id.*  Interpreting § 20701 in this manner would produce an absurd result.  Thus, based on the text of § 20701, this Court finds that the NYSVoter List is not a document subject to demand by the Attorney General pursuant to § 20703.

The Government's arguments to the contrary are unpersuasive.  *See* Dkt. No. 81-1 at 18-20.  The Government contends that "the federal courts that have applied [§ 20701] have concluded that . . . [i]t does not exclude electronic records or records created by the officer of election," relying on *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960) and

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *Id.* at 19. However, neither of these cases contain any affirmative findings that bind this Court's interpretation of § 20701. *See Fontes*, 2026 WL 1177244, at *5 (observing that both *Gallion* and *Lynd* "essentially reiterate the plain text of § 20701 and do not make any affirmative findings which would suggest that the [voter registration list] is covered by § 20701"). *Gallion* concerned the constitutionality of the CRA, and the court explained that "[t]here is nothing uncertain about that part of the [CRA] requiring the preservation and production of all records and papers which are in the possession of an election official . . . *if those records and papers relate to the acts requisite to voting*." *Gallion*, 187 F. Supp. at 855 (emphasis added). "Similarly, *Lynd* merely recognized that the documents covered by § 20701 are 'sweeping,' but did not make any additional finding which would suggest that § 20701's 'sweeping' language includes the [voter registration list]." *Fontes*, 2026 WL 1177244, at *5 (quoting *Lynd*, 306 F.2d at 226).

The Government also references its 2006 consent judgment with Georgia, as well as a 2008 Memorandum of Understanding with Texas, wherein those states agreed to provide their voter registration lists. *See* Dkt. No. 81-1 at 20 n.10. However, the Government provides no authority that would support a conclusion that these agreements between the United States and states that are not party to the present action are binding here. *See Taylor v. Sturgell*, 553 U.S. 880, 898 (2008) ("[O]ur decisions emphasize the fundamental nature of the general rule that a litigant is not bound by a judgment to which she was not a party") (collecting cases); *Martin v. Wilks*, 490 U.S. 755, 762 (1989) ("A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings") (footnote omitted). And, of course, the mere fact that other states agreed to provide their voter registration lists two decades ago is entirely irrelevant to a statutory interpretation of § 20701.

23

Additionally, the Government relies on *Coal. for Open Democracy v. Scanlan*, No. 24-CV-312, 2025 WL 1503937, *2 (D.N.H. May 27, 2025) ("*Open Democracy*"), asserting that "private parties have been granted access to even more detailed voter data than what the [the Government] has requested where necessary to bring actions to enforce federal rights." Dkt. No. 81-1 at 26. In *Open Democracy*, the district court ordered disclosure of New Hampshire's voter registration list during discovery in a lawsuit challenging the constitutionality of a bill that made "changes to New Hampshire's voter registration and identification requirements" *Open Democracy*, 2025 WL 1503937, at *1. As Defendants correctly note, *Open Democracy* is inapposite because "disclosure was not pursuant to Title III or an investigative demand, nor was the recipient a federal agency." Dkt. No. 87 at 18 n.6. As such, nothing in *Open Democracy* bears on this Court's analysis of whether the NYSVoter List is a § 20701 document.

Finally, in a supplemental filing, the Government submits an opinion published by the Department of Justice's Office of Legal Counsel ("OLC") on May 12, 2026, which determined that the CRA authorizes the Government to compel production of the NYSVoter List. *See* Dkt. No. 97-1. The Sixth Circuit explicitly rejected the Government's reliance on the OLC opinion in *Benson,* noting that the Government's interpretation is "not contemporaneous with the passage of Title III[,]" does not adhere "to some earlier Executive Branch interpretations of Title III[,]" and "conflicts with the plain language of Title III." *Benson*, 2026 WL 1815425, at *8. Indeed, OLC opinions "are not binding [on the courts]," *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 689 (D.C. Cir. 2023), and "[t]his Court will not interpret the CRA contrary to its text simply because an office of the party advancing that interpretation has adopted it," *DeMarinis*, 2026 WL 1780586, at *5.

For these reasons, this Court joins every district court to have addressed this issue in concluding that a voter registration list is not a record or paper that a state must produce to the Government under Title III. *See Benson*, 819 F. Supp. 3d at 770; *Scanlan*, 2026 WL 1864054, at *6; *DeMarinis*, 2026 WL 1780586, at *5; *Wis. Elections Comm'n*, 2026 WL 1430354, at *5; *Bellows*, 2026 WL 1430481, at *7; *Fontes*, 2026 WL 1177244, at *5. Accordingly, the Government's CRA claim is dismissed and its cross-motion to compel is denied as moot.[10]

**E.    The NVRA**

As for the Government's claim that it is entitled to the NYSVoter List under the NVRA, the Government focuses on the statute's public disclosure provision, arguing that New York violated § 20507(i) by refusing to disclose its full voter registration list. *See* Dkt. No. 81-1 at 35. Defendants contend that the NYSVoter List is not a record subject to a demand under the NVRA and, even if it were, sensitive voter information can be omitted or redacted. *See* Dkt. No. 74-1 at 20-23; Dkt. No. 76-6 at 20-25.

Many courts analyzing § 20507(i) have concluded that the statute does not require states to disclose the sensitive information of voters. *See Benson*, 819 F. Supp. 3d at 760 (collecting cases). In so holding, some courts have reasoned that the NVRA does require the disclosure of

---

[10] On April 9, 2026, NAACP Intervenors filed a notice of supplemental authority regarding *United States v. Galvin*, No. 25-CV-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026). *See* Dkt. No. 92. In *Galvin*, the District of Massachusetts ruled that the Attorney General's written demand letters did not provide an adequate factual basis as required under § 20703. *See Galvin*, 2026 WL 972129 at *6. In response to this notice of supplemental authority, Plaintiff requests that, if the Court were to come to the same conclusion as *Galvin*, Plaintiff be permitted leave to send the Defendants "a curing elaboration letter" (presumably containing some factual basis for its Title III demand). Dkt. No. 94 at 2. However, the Court dismisses the CRA claim on the grounds that the NYSVoter List is not a record or paper subject to demand under Title III, and does not reach the basis of Plaintiff's demand. As such, Plaintiff's request is denied as moot.

voter registration lists, but that states may redact voters' "uniquely or highly sensitive personal information." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024).

However, this Court finds it unnecessary to read a privacy exception into the NVRA that would permit limited disclosure of the NYSVoter List. Indeed, similar to the CRA claim, the Government's NVRA claim fails for a much simpler reason: § 20507(i) does not require the disclosure of voter registration lists at all. *See Benson*, 819 F. Supp. 3d at 762 ("[I]f § 20507(i) does not require disclosure of voter registration lists (or other information regarding individual voters), then there is no need to graft on an atextual privacy exception"). This Court finds itself in agreement with at least two other federal courts which recently determined that a voter registration list does not fall under § 20507(i) because Congress intended the statute to apply only to records pertaining to the NVRA's required list maintenance process (not the lists themselves). *See Pub. Int. Legal Found., Inc. v. Nago*, 174 F.4th 664, 679-83 (9th Cir. 2026); *Benson*, 819 F. Supp. 3d at 762. In reaching this conclusion, the Court utilizes the same tools for statutory interpretation described above.

To begin, § 20507(i) states in its entirety:

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, *all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters*, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.
>
> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507 (emphasis added).

The phrase "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists," *id.*. § 20507(i)(1), is important because it "narrows the scope of materials subject to public disclosure," *Nago*, 174 F.4th at 679. In order to "give effect, if possible, to every clause and word of" the statute, *Williams v. Taylor*, 529 U.S. 362, 404 (2000), the Court must determine whether the NYSVoter List is in fact a record "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists," 52 U.S.C. § 20507(i)(1). "[A] natural reading of that language encompasses only records about the *process* that a state uses to maintain their voter list—not the underlying list itself." *Benson*, 819 F. Supp. 3d at 762 (emphasis added).

To be sure, "several courts have rejected this interpretation of § 20507(i) and adopted a broader reading under which any documents related to the maintenance process—including voter registration lists—must be disclosed." *Id.* (collecting cases). For example, in *Pub. Int. Legal Found., Inc. v. Bellows*, the District of Maine reasoned that a voter registration list is a record "concerning" the activities used to maintain the voter registration list because that list is "the output and end result of such activities." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th at 47. However, this Court agrees with *Benson*'s conclusion that *Pub. Int. Legal Found., Inc. v. Bellows* and other non-binding cases are unpersuasive. *See id.*

Instead, in addition to *Benson*, this Court is persuaded by the Ninth Circuit's recent interpretation of § 20507(i) in *Nago*:

> The phrase "concerning the implementation of" provides an initial limitation. Contemporaneous dictionaries state that "implement" connotes execution or administration—"to give practical effect to." *See Implement*, Webster's Third New International Dictionary (1993); *see also Implement*, Webster's Dictionary of English *680

27

Usage (1989) (stating that "implement" "typically describes the taking of concrete measures to carry out an official policy or program").  The inclusion of that word suggests that covered records are those that describe measures to maintain the accuracy and currency of voter lists, not the lists themselves . . . .  "Concerning" does have a "broadening effect," *see Patel v. Garland*, 596 U.S. 328, 339 (2022), but its sole object here is the word "implementation," not "all records."  The category of "records concerning . . . implementation" therefore encompasses materials documenting each step a state undertakes when actively implementing relevant programs.  Examples of records that would "concern[ ] implementation" might include duplicate-removal reports, procedural manuals about list maintenance tasks, or correspondence with voters, but not the very voter-registration lists that the implemented efforts seek to update and maintain.  *See* 52 U.S.C. § 20507(d)(1)-(2) (requiring states to send confirmation notices before removing voters for changing their residence); *id.* at § 20507(c)(2)(A).

The next clause—"programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters"—further cabins the disclosure requirement.  A "program" is "a proposed project or scheme," *Program*, Webster's Third New International Dictionary, and an "activity" is a "natural or normal function or operation," *Activity*, Webster's Third New International Dictionary.  Both terms relate to active processes or the plan for carrying them out, not the outcome of those processes.

*Nago*, 174 F.4th at 679-80 (internal citation omitted).

Moreover, the Ninth Circuit reasoned that although the phrase "all records" broadens the scope of records subject to disclosure under the statute, courts "construe statutory language in context and 'limit otherwise capacious terms when that context "tug[s] . . . in favor of a narrower reading."'"  *Id.* at 680 (quoting *Arconic, Inc. v. APC Inv. Co.*, 969 F.3d 945, 953 (9th Cir. 2020)).  "Here, Congress drafted a nuanced disclosure provision that includes qualifying language.  If Congress had wanted to require that states make a statewide voter list public, it could have just said so."  *Id.* at 680-81 (citing *Biden v. Texas*, 597 U.S. 785, 798 (2022)).

Some courts also reason that § 20507(i)(2) implies that "that the records required to be disclosed in paragraph (1) encompass information regarding individual voter applicants." *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1339 (N.D. Ga. 2016) (citations omitted).  But this Court reads § 20507(i)(2) differently.  Reading the statute as a whole, the records referenced by § 20507(i)(2) "are administrative records relating to a discrete program for 'ensuring the accuracy and currency' of the voter lists, . . . which suggests that other covered records would also concern the active implementation of such programs." *Nago*, 174 F.4th at 681 (quoting 52 U.S.C. § 20507(i)(1)) (internal citation omitted).

In sum, this Court finds the Ninth Circuit's and Western District of Michigan's thorough analyses and statutory interpretation to be the most persuasive.[11]  The Court agrees that "a natural reading of § 20507(i) suggests that it requires states to disclose information regarding the process by which they maintain their voter registration list but not the list itself. " *Benson*, 819 F. Supp. 3d at 764.  This interpretation "avoids the implausible suggestion that Congress intended for every member of the public to access voters' sensitive information" and also "avoids reading into § 20507(i) a privacy exception that appears nowhere in the text." *Id.*

Accordingly, the Court finds that the Government cannot obtain the NYSVoter List under § 20507(i) and the Government's NVRA claim is dismissed for failure to state a claim.[12]

---

[11]  In *Nago* a private organization, as opposed to the Government, sought Hawaii's voter registration list.  *See Nago*, 174 F.4th at 667.  Plaintiff is correct that cases involving "efforts by private organizations to obtain" voter registration lists are distinguishable from cases where the Government seeks the lists, such as here.  Dkt. No. 81-1 at 36 (emphasis omitted).  Nevertheless, *Benson* is factually analogous to the present matter; there the Government sought Michigan's voter registration list under the NVRA and the district court also concluded that such data was not subject to disclosure under § 20507(i).  *See Benson*, 819 F. Supp. 3d. at 757-65.  The Court finds that, together, *Nago* and *Benson* offer ample support for the conclusions herein.

[12]  The Court's conclusion that the NYSVoter List is not subject to disclosure under Title III or the NVRA obviates the need to reach the parties' arguments related to state and federal privacy laws.

**F.    HAVA**

Finally, the Government claims that it is entitled to the NYSVoter List under HAVA, *see* Dkt. No. 1 at ¶¶ 65-70, but concedes that HAVA lacks any inspection or disclosure provisions, *see* Dkt. No. 81-1 at 34. Indeed, courts have explicitly recognized that HAVA has no disclosure provision. *See Oregon*, 2026 WL 318402, at *6 ("HAVA grants the Attorney General the ability to bring a civil action for enforcement, not disclosure. Congress knows how to include disclosure provisions, as it did so in both the NVRA and Title III. It did not do so here, and the Court will not play the role of Congress by adding one where it does not exist") (citing *Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988)).

The complaint states that Defendants' refusal to disclose the unredacted NYSVoter List "prevents the Attorney General from determining New York's compliance with the list maintenance requirements of HAVA." Dkt. No. 1 at ¶ 69. Of course, the Attorney General has the ability to bring a civil action to enforce HAVA's requirements. *See* 52 U.S.C. § 21111. But the Government does not allege New York actually violated any of HAVA's substantive provisions—it merely wishes to "evaluat[e]" and "ensure" New York has not done so. Dkt. No. 1 at ¶¶ 67-68.

The Government's position is that it may "seek list maintenance records under HAVA . . . through the ordinary discovery process necessary to prosecute its [HAVA] claim." Dkt. No. 81-1 at 34. But this argument inverts civil procedure; the Government cannot use discovery in hopes of finding an unpled HAVA violation. *See Jones v. Cap. Cities/ABC, Inc.*, 168 F.R.D. 477, 480 (S.D.N.Y. 1996) ("'[T]he purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists'") (quoting *Stoner v. Walsh*, 772 F. Supp. 790, 800 (S.D.N.Y. 1991)).

30

"To state a claim, 'a complaint must allege sufficient facts . . . to state a plausible claim for relief.'" *Romanova v. Amilus Inc.*, 138 F.4th 104, 108-09 (2d Cir. 2025) (citation omitted). "There is simply no basis in the Federal Rules of Civil Procedure for the [Government's] suggestion that it can file a HAVA claim, allege no violations of HAVA, and obtain information to support its (as-yet-nonexistent) claim via discovery." *Benson*, 819 F. Supp. 3d at 759 (citations omitted); *see Iqbal*, 556 U.S. at 678-79 ("[O]nly a complaint that states a plausible claim for relief" can "unlock the doors of discovery").

Accordingly, the Government's HAVA claim is dismissed for failure to state a claim.

## IV. CONCLUSION

After carefully considering the parties' submissions, the entire record in this matter, and the applicable law, the Court hereby

**ORDERS** that Intervenor Defendants' motions to intervene (Dkt. Nos. 7, 20) are **GRANTED**; and the Court further

**ORDERS** that Defendants' and Intervenor Defendants' motions to dismiss (Dkt. Nos. 73, 74, 76, 77) are **GRANTED**; and the Court further

**ORDERS** that the Government's complaint (Dkt. No. 1) is **DISMISSED with prejudice**; and the Court further

**ORDERS** that the Government's cross-motion to compel (Dkt. No. 81-1) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court is directed to enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Dated:  July 10, 2026
        Albany, New York

Mae A. D'Agostino
U.S. District Judge

32